# Exhibit 2

## Documents in State Court Action

Electronically Filed - Jackson - Kansas City - May 10, 2018 - 12:10 AM

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
KANSAS CITY

MIKE DAVIS,                          }
                                     }
                                     }        Case No.:_____
                                     }        Docket:_____
'                                    }        Division:_____
               PLAINTIFF,            }
                                     }        **Plaintiff Demands Trial By Jury**
VS.                                  }
                                     }
RENNY PALUMBO,                       }
2431 Forest Avenue                   }
Kansas City, Mo 64108                }
                                     }
        Defendant,                   }
                                     }
                                     }
CardConnect, LLC                     }
A Delaware Limited Liability Co,     }
 along with its successors and assigns|   }
Serve:  Anthony HRZIC                }
1000 Continental Drive, Suite 300    }
King of Prussia, PA 19406            }
                                     }
        Defendant                    }
                                     }
CardConnect, Corp.                   }
Serve: Jeffrey Shanahan, President   }
1000 Continental Drive, Suite 300,   }
King of Prussia, PA 19406.           }
                                     }
        Defendant                    }
                                     }
                                     }
First Data Corporation               }
Serve:  Guy Chiarello, President     }
225 Liberty Street, 29th Fl          }
New York, NY 20281                   }
                                     }
        Defendant                    }
                                     }
Along with their successors & Assigns }
        Defendants.                  }

1

**Petition For Equitable Disgorgement, Unjust Enrichment, Defamation,**
**Statutory Remedies**
**Fraud, Breach of Contract   and Declaratory Judgment**

Comes now Plaintiff and in support of this Petition states:

1.)     Plaintiff is a resident of Lee';s Summit, Jackson County, Missouri.

2.)     Defendant Palumbo is a resident of Kansas City, Jackson County, Missouri.

3.)     Defendant CardConnect, LLC employed Plaintiff in Kansas and Missouri, and
then changed its name to CardConnect, Corp.  CardConnect Corp. was acquired by First Data
Corp.

4.)     The corporate defendants have had substantial contacts with the state of Missouri
including resident sales agents ,sales efforts, contracts, and provision of financial transaction
processing for Missouri businesses, and accordingly have subjected themselves to the jurisdiction
of the courts of Missouri.

5.)     There is no federal statutory cause of action plead here nor is there complete
diversity of citizenship in that Plaintiff and Defendant Palumbo who defamed Plaintiff resides in
Jackson County, Missouri.

6.)     Kansas City, Jackson County, Circuit Court is the exclusive venue for this action
in that it is where Defendant Palumbo resided when he commenced defaming Plaintiff by
publishing statements eventually uttered by CardConnect employees to Plaintiff in Jackson
County, Missouri as first Missouri publication of false statements that Plaintiff had stolen
accounts from CardConnect and gave them to a firm blamed Basys commencing spring 2017.

**Facts Common To All Counts**

7.)     Plaintiff Davis commenced a  sales career with Marathon Solutions ("MSI")
approximately a decade ago in the lucrative field of selling business who accept credit cards,

2

debit cards, or other electronic payments on using MSI as the merchants payment processing provider.

8.) MSI was acquired by CardConnect, LLC, which later became CardConnect Corp. ("CardConnect").

9.) In 2015 First Data Corp. sought to acquire CardConnect but related in the history of the merger in its merger proxy solicitation, that CardConnect must restate its financials to increase the value of CardConnect,.

10.) In a scheme to cheat its employees, its customers, and to defraud investors CardConnect has engaged in a variety of schemes. In <u>Kao v. CardConnect Corp.</u>,Case 2:16-cv-05707-TJS (E.D. PA 11/1/2016) a class action as filed by merchants for unjust enrichment, fraud, declaratory judgment, arising from merchants claiming to have been cheated. In Scarantino v. CardConnect Corp. Case No. Case 2:17-cv-02677-MMB (E.D. PA 6/13/17) defendants have sued for federal securities fraud respecting the acquisition of CardConnect by First Data Corp. These two class actions arose from pre-merger activity by the Defendants to cheat their merchants and investors.

11.) This lawsuit suits relief from defendants having defamed as well as financially unjustly enriched themselves at the expense of Plaintiff.

12.) Once CardConnect commenced its employment of Plaintiff it agreed to pay his a salary plus 25% of the "CCPROFIT" or profit from charging merchants a discount from their sales for handling their credit card and related financial transaction processing.

13.) Mike Davis was CardConnect's star salesman in this area in that the profit from his sales generated the near entirety of CardConnect's profit for 2015.

14.)    In 2015 Davis was to receive a salary of $ 60,000 payable in monthly installments of $5,000 plus 30% of the profit generated from the transactions arising from his portfolio of customers.  He was also to have the warm sales leads from trade associations he persuaded to endorse CardConnect as merchant transaction processing vendor for association members.

15.)    Mike procured over 500 mainly business to business merchant accounts which by the end of 2015 were creating over $80,000 monthly on average in CCPROFIT from which Mike earned approximately $300,000.   This was to be paid in addition to his $60,000 salary.

16.)    By December 2015, CardConnect's investment banking consultants instructed that it must restate its financials to sell the company to First Data for a significant sum in the range of acquisitions First Data would be interested in.

17.)    In order to accomplish the cooking of the books sufficiently CardConnect set about artificially inflating income estimates by imposing significant price increases on the merchant customers, such that the KAO class action arose.   By inflating charges to customers CardConnect could show higher earnings estimates, such as by a nearly $100 "one time annual charge" for which the merchants received nothing.  Other junk fees were imposed.  With these additional sources of  revenue from the same customers for providing little or not more CardConnect could raise its earnings projections.

18.)    In order to show higher earnings CardConnect also chose to cut expenses, which in the case of Mike Davis' right to be paid for his work, CardConnect was not entitled to do.  To inflate its earnings projections CardConnect would attempt to show a conservation in selling expenses.

19.)    At the end of 2015 a CardConnect executive informed Mr. Davis that "we can't have you earning more than $300,000 next year."  Davis was also told in advance of the

4

imposition of the one time junk fee of nearly $100 per customer that CardConnect fully expected to lose a significant number of customers but that didn't matter because the fee would overcome the lost volume income.

20.)    Card Connect reduced Davis compensation plan as to existing accounts procured by him from 30% of profit, to 25%, to 20% to 0% and also deducted his salary from the commission it did pay Davis resulting in CardConnect's unjust enrichment.

21.)    A collection of merchant processing accounts is referred to as a portfolio. CardConnect represented to Davis in May 2014 if he would return after having been wrongfully terminated in February 2014 that he would own his portfolio, and in fact the monthly commission reports thereafter show Mr. Davis as the owner of the accounts.

22.)    An ISO is an independent sales organization or individual who uses CardConnect by which to process that ISO's merchant's business.  CardConnect, prior to First Data's acquisition was essentially an ISO of First Data as to business run through First Data.

23.)    CardConnect paid outside ISO's 90% of the profit (CCPROFIT) from the ISO's portfolio.  The ISO owns the portfolio.

24.)    A large  portfolio of highly productive merchant accounts is a very valuable and marketable investment device in that it yields a monthly profit for years.  Portfolios are bought and sold based  upon the value of the income they produce,  and Plaintiff's portfolio had very low attrition, fraud, or other expenses.  In addition Plaintiff's portfolio had a high net yield of around 54 basis points,   Plaintiff's portfolio was also mainly busines-to-business customers and had sales on single transactions into the $200,000 range, such as equipment purchased paid by credit card.

5

25.)     On May 8, 2017  CardConnect informed Plaintiff his position was eliminated and he was discharged.  Rather than pay past due sums owing in salary and portfolio percentages and to continue the regular payment of the CCPROFIT on those accounts Plaintiff procured CardConnect sent an oppressive proposed severance agreement the terms of which were in violation of both the law of Missouri and Kansas in attempting to extract a release and draconian equitable remedy such as a consent restraining order without bond, attorneys fees and other remedies in exchange for only $25,000.00.

26.)     Plaintiff had been unpaid his commission at 30% since December 2015, and none since mid 2016.    Plaintiff's $5,000 monthly salary had been deducted every month from his commission.

27.)     Promptly after his termination Plaintiff demanded his salary and unpaid portfolio commissions as the regular payment of ongoing commission and this was willfully and wrongfully refused.   CardConnect's position was that if Plaintiff did not accept $25,000 by a certain date that its offer would expire.    Plaintiff has entered into no agreement with Defendants to liquidate his rights.

28.)     CardConnect has repudiated its agreement with Plaintiff denying there is any obligation to him.

29.)     In February 2014 CardConnect wrongfully terminated Plaintiff and discontinued any payment to him.

30.)     By April 2014 a CardConnect executive contacted Plaintiff and told him that his termination was wrongful, that he was "pissed off" when he heard about it, that had he known he would have intervened and begged him to return to "do what you do best - close contracts."

6

31.)　　As inducement to returning Plaintiff was offered the return of "your portfolio" a $60,000 annual salary, and freedom to work his own hours, wherever he wished and a 25% payout of the profits on the portfolio revenues.

32.)　　As CardConnect's merger plans proceeded it determined it needed Davis to work even harder to achieve its dream of being sold for hundreds of millions of dollars.　Merchant Acquirer's are valued in large part on the value of the portfolio they service.　The price is a multiple of profit and figures into the 70s x monthly profit are not unheard of.　The multiple takes into account various factors including:

　　　a.)　　account life expectancy.　Mike's portfolio had accounts nearly 9 years in duration and almost nonexistent attrition of b-2-b customers.

　　　b.)　　the more valuable big ticket low fraud business to business merchants versus the consumer market which is less valuable.　Mike's portfolio was almost entirely highly profitable business to business accounts.

　　　c.)　　the profit yield of the portfolio.　Mike's portfolio generated an estimated 54 basis points profit, a significant profit margin of $5400 per $100,000 in transactions.　Some of his merchant's individual transactions were $100,000 to $200,000 each.

33.)　　CardConnect represented that it would raise the payout on his portfolio profit from 25% to 30% if he met performance goals for 6 months and he did so, and the percentage increased.　There was no qualification as to the duration for which the 30% would be paid, in accordance with the parties course of dealing it would be paid so long as the accounts produced profit.

7

34.)     By  January 2016, and after telling Mike CardConnect cannot pay him more than the $300,000 his portfolio would generate as his share of the profit at 30%  CardConnect reduced the payout to 25% then 20% then 0% overall his accounts.

35.)     By the fall of 2016 CardConnect effectively terminated Mike for sales purposes and discontinued paying any of the portfolio profit.   CardConnect then told Mike he would be paid only $10,000 monthly (rather than the nearly $30,000 he was entitled to) to train new younger noncommissioned sales people how to sell Mike's warm sales leads from his endorsements.  CardConnect would not only not pay Mike the vested commission rate on his accounts, but would have him forfeit his sales opportunities to cheaper replacement sales' people it referred to as "kids" who would likewise not be paid any commission.

36.)     By January 2017  CardConnect informed Mike his $10,000 salary was over and he was to return to sales for $5,000 a month plus a quarterly bonus based upon the 'kids' sales , rather than his 30% portfolio payout.

37.)     On May 8, 2017 CardConnect sent Mike a note stating his position was eliminated with a proposed severance agreement containing grossly unconscionable and some unlawful terms indicating he would be paid only $25,000 and then only if he released CardConnect.

38.)     Mike demanded his past due salaries and portfolio payouts and return of his portfolio which CardConnect refused and willfully refused to pay any back compensation owing.

39.)     CardConnect through its employee general counsel repudiated the agreements to pay the salary and commissions evidenced by the 2015 commission statements.

40.)     Upon closing inspection of the commission statements Mike discovered that in fact he was not paid any salary as a sales person because CardConnect deducted the entirety of

the $5,000 salary from his portfolio commission payments so that CardConnect was first to breach both of his employments to a material and substantial degree.

51.)     CardConnect admitted the 2014 termination was wrongful, in addition CardConnect was "first to breach" its material obligations up to that point.

52.)     CardConnect is barred enforcement of any employment agreement existing before it rehired him in late April or May 2014 for having been first to breach by failure to pay compensation and for wrongful termination.

53.)     CardConnect has admitted it entered into no new written employment agreement with Mike respecting his second employment commencing Spring 2014.  The parties agreement was oral but evident in the payroll records.

<center>COUNT ONE</center>

<center>Equitable Disgorgement In Unjust Enrichment</center>

1.)     Plaintiff was told he would be paid a salary  plus a percentage of the profit of the portfolio he procured.   He was told that as his portfolio grew so too would his monthly income and that soon he would not believe how much money he was making to encourage him to work very hard to sell CardConnect's services.  He was not told that continued employment was necessary to receive the commission respecting accounts he had procured which continued to generate profits to defendants, nor that he could be terminated at any time and so too would his compensation for profitable accounts established to that point, nor that trade association leads he procured for his own sales efforts would be taken and given to noncommissioned sales people to save CardConnect money.

2.)     Plaintiff conferred the benefit of causing the procurement of a portfolio of over 500 very profitable accounts generating over $1 million in profit by the end of 2015.

<center>9</center>

3.)      Plaintiff also conferred the benefit of procuring roughly a dozen significant trade association endorsements resulting in thousands of warmed leads to sales effort due to the association endorsement and approval of CardConnect by Plaintiff's work.

4.)      The leads were very valuable in that they were preconditioned to be receptive to sales efforts from Plaintiff on behalf of CardConnect, so much so that his "closing rate" was approximately 90% of sales proposed.

5.)      Plaintiff's job did not entail more than selling accounts, and if he wished to sell endorsements to increase his sales prospects.    Once an account was sold CardConnect was otherwise responsible for fulfilling all aspects of the sale.

6.)      In addition to creating accounts and endorsements, and thousands of valuable leads, Plaintiff's efforts procured over $1,000,000 in net profit to CardConnect in 2015.

7.)      CardConnect was going to miss it's earnings estimates and Plaintiff's profit contribution represented the near entirety of its reported income in its form 10-K filed with the SEC.

8.)      Defendants appreciated the benefits conferred upon them by Plaintiff and in fact utilized those benefits to pump up the value of their acquisition by First Data who valued CardConnect in part based upon the portfolios it services.   Defendant's also falsely represented in their merger proxy solicitation there were no disputes with employees though they knew as of late 2015 when they informed Plaintiff they would not pay him as agreed that a significant dispute was erupting when they notified him they could not pay him his percentage of the profit which without his procurement they would not have received.

9.)      Defendants dirtied their hands, and acted fraudulently and unjustly in accepting and retaining the benefits conferred by Plaintiff including the account servicing, the

endorsements and leads, and the increase in the value of their entity based upon Plaintiff's contribution to the near entirety of its reported profit.

10.) Without the contribution to income and profit from Plaintiff the history of the merger negotiations reflects that CardConnect would not have been a target for acquisition by First Data because CardConnect would have lost money or nearly broken even in 2015.

11.) Acceptance and retention of the benefits conferred by Plaintiff is unjust and inequitable.

12.) Upon the representations that Plaintiff would own his portfolio, have a right to ongoing income so long as the merchants generated volume, and would receive a salary Plaintiff provided his labors and intellect in growing his portfolio to over 500 profitable accounts generating approximately $1 million in annual transaction profit by December 2015.

13.) CardConnect accepted the labors of Plaintiff knowing that he expected to be paid his salary in addition to the agreed percentage of the portfolio's profit.

14.) Trade association endorsements are very valuable reputation enhancing accomplishments that reduce the difficulty of a vendor attempting to sell the membership of the association for two reasons, (a) the vendor gains instant credibility and cost efficient visibility to the members, and (b) the association is supported financially by the members in using endorsed vendors. Association endorsements open the door to sales activity in that the association's endorsement is persuasive to its members. Endorsements by significant associations also enhanced the credibility of CardConnect as a viable vendor in its marketing to others and for the purposes of its acquisition by First Data.

15.) Mike Davis procured at least 5 of the 10 most profitable associations that CardConnect was endorsed by, and others.

11

Electronically Filed - Jackson - Kansas City - May 10, 2018 - 12:10 AM

16.)     CardConnect did not compensate Mike for procuring trade association endorsements and it is inequitable for CardConnect to capitalize thereon.

17.)     Davis is without adequate alternate remedy at law in that there is no written contract per se upon which a traditional breach of contract action may rest, instead only by the court imposing quasi-contract can equity be served and unjust enrichment and fraud avoided.

18.)     CardConnect's in house employee counsel's repudiation of its agreements with Davis entitles Davis to and authorizes the court to fashion equitable relief in unjust enrichment for equitable disgorgement of all of the benefits conferred.

WHEREFORE, Plaintiff prays the court disgorge all of the portfolio to Mike Davis and to invoke tracing of all proceeds of the benefits of his contributions to CardConnect in whosoever hands they may have come and to disgorge those from all successors and assigns, to trace the utilization of the leads and disgorge all benefits therefrom, to disgorge the benefit of all of the endorsements and endorsement based leads, and to disgorge all of the profit earned on the portfolio Mike conferred, as well as the percentage of the merger consideration attributable to the beneficial value Mike created through the benefits he conferred, to bar Defendants counter-restitution as well as any other equitable relief due to their unclean hands, for his costs, attorneys fees, interest, and for such other and further relief as the court deem appropriate.

COUNT TWO

**DEFAMATION**

1.)     Defendant Renny Palumbo commenced uttering false and defamatory representations respecting Mike Davis in the spring of 2017.

2.)     Palumbo stated that Davis was stealing CardConnect accounts and giving them to a competitor Basys.

12

Electronically Filed - Jackson - Kansas City - May 10, 2018 - 12:10 AM

3.)     An employee of CardConnect called Davis in Jackson County, Missouri and confronted him with the allegation that he was stealing accounts from CardConnect according to Renny Palumbo who was the sales manager in the Kansas office.

4.)     The allegations of theft were false and accused Plaintiff of committing the crimes of theft and misappropriation and are defamatory per se.

5.)     At present the first known publication in Missouri was to Plaintiff vesting jurisdiction and venue exclusively in this court.

6.)     The allegation of theft has been emotionally damaging to Plaintiff and has sullied his reputation and impaired him in the confidence of others for business and social relations.

7.)     The defamatory statement were knowingly made and knowingly false in that Palumbo contacted Basys to inquire about his suspicions and was informed that Davis had brought no business to it and did not work for it.   Despite this Defendants failed to take any action to ameliorate their defamatory statements.

8.)     As a result of the defamatory allegations Plaintiff's reputation and standing in the industry and socially have been damaged and he has suffered anguish in an amount in excess of $25,000.00.

9.)     In all regards Defendant Palumbo and the corporate defendants defamatory remarks were made in the course and scope of their employment with CardConnect and First Data and in the furtherance of their business in attempting to render Plaintiff unemployable in the field of merchant acquisition to eliminate him from competition due to his exceptional abilities.

10.)    The Defendants intentionally tortious statements were made knowing the same to be false or with reckless disregard for the falsity thereof amounting to sufficiently outrageous conduct that is intolerable so as to warrant an award of punitive or exemplary damages.

13

WHEREFORE, Plaintiff prays the defendants be held jointly and severally liable for actual damages in excess of $25,000 and fair and reasonable punitive or exemplary damages, his attorneys fees, costs incurred and such other and further relief as the court deem appropriate.

<div align="center">COUNT III</div>

<div align="center">**MISSOURI SERVICE LETTER STATUTE**</div>

1.)     Plaintiff was employed by CardConnect and terminated twice.

2.)     Plaintiff timely requested a "service letter" asking the information set forth in R.S.Mo. 290.140 in a timely manner and by certified mail, obligating CardConnect to respond within 30 days.

3.)     Defendants did not send a compliant response as required by R.S.Mo. 290.140.

4.)     Plaintiff has been distressed by the Letter Defendants did send which strayed beyond requirements of R.S.Mo. 290.140 and wholly failed to address his first employment with them.

5.)     Plaintiff has been deprived of a proper service letter and been unemployed for a year and thereby damaged in excess of $25,000.00.

6.)     Plaintiff is entitled to actual and punitive damages.

WHEREFORE, Plaintiff prays the court enter an award of actual and punitive damages, his costs, his attorneys fees and for such other and further relief as it deem appropriate.

<div align="center">COUNT  FOUR<br>**KANSAS STATUTORY EMPLOYEE PROTECTION ACT**<br>**K.S.A. CHAPTER 44**</div>

Davis incorporates by reference as though fully restated the other matters set forth in this Petition.

<div align="center">14</div>

1.) CardConnect agreed to pay Plaintiff a salary of $5,000 monthly from

plus initially commissions of 25% on the CCPROFIT from transactions generated by his

portfolio of accounts and endorsement leads, which increased to 30% by 2015. CCPROFIT is

the amount charged merchants for service provided less the interchange fees component thereof.

2.) K.S.A. 44-315 provides in relevant part:

44-315. Separation prior to payday; damages for willful nonpayment.

(a) Whenever an employer discharges an employee or whenever an employee
quits or resigns, the employer shall pay the employee's earned wages not later than
the next regular payday upon which he or she would have been paid if still
employed as provided under K.S.A. 44-314 either through the regular pay
channels or by mail postmarked within the deadlines herein specified if requested
by the employee.

(b) If an employer willfully fails to pay an employee wages as required by K.S.A.
44-314, and amendments thereto, or as required under subsection (a) of this
section, such employer shall be liable to the employee for the wages due and also
shall be liable to the employee for a penalty in the fixed amount of 1% of the
unpaid wages for each day, except Sunday and legal holidays, upon which such
failure continues after the eighth day after the day upon which payment is required
or in an amount equal to 100% of the unpaid wages, whichever is less. For the
purpose of such additional damages, the failure to pay shall not be deemed to
continue after the date of the filing of a petition in bankruptcy with respect to the
employer if he or she is adjudicated bankrupt upon such petition nor shall it be
deemed to continue after an appeal is filed under K.S.A. 44-322a, and
amendments thereto, until the decision on appeal becomes final.

3.) The CardConnect office for whom Plaintiff worked was located in Kansas, and it

provided him office space there at which he provided CardConnect his services in addition to

providing services from Jackson County, Missouri.

4.) CardConnect wrongfully terminated Plaintiff in February 2014, then urged him to

return to sell for it stating it would give him his portfolio if he returned in addition to $5,000

monthly salary, and he recommenced his services in late April or May 2014.

15

(a)     CardConnect willfully refused to pay the salary of $60,000 annually ( payable at the rate of $5,000 salary per month) in addition to the 25% and later 30% CCPROFIT percentage on Davis' portfolio ("commission").

(b)     CardConnect failed to pay any compensation for the period of Davis unemployment in 2014 despite ongoing obligation to pay the commission on the portfolio and also terminated non-contingent salary payment installments.

5.)     CardConnect again terminated Plaintiff wrongfully from his sales position in 2016 and has willfully refused to pay him his portfolio percentages on customers he sold from approximately July 2016 through the present.

6.)     CardConnect's termination of Plaintiff in sales was accompanied by a differently position involving association development at a $10,000 monthly salary plus bonuses. Plaintiff did not release CardConnect from its obligation to continue to pay the CCPROFIT% on his portfolio nor the value of the endorsement leads.

7.)     CardConnect willfully refused to pay the $10,000 monthly salary after 3 months and reduced Plaintiff's salary to $5,000 per month from late 2016 through May 8, 2017 with the promise of quarterly bonuses based upon volumes of others' sales efforts but has since May 2017 willfully refused to pay any salary, willfully refused to pay the 2nd quarterly bonus or any other compensation whatsoever.

8.)     Plaintiff did not release CardConnect of its ongoing obligation to pay 30% portfolio commission on sales to which he had a vested right to receive ongoing CCPROFIT% by reason of having made the sales.

16

9.) CardConnect has also willfully refused to pay any portfolio commission accrued from June 2016 to the present at the agreed 30% of CCPROFIT on Plaintiff's portfolio including his accounts and association endorsement leads.

10.) Plaintiff has been damaged by CardConnect's refusal and willful failure to pay his earned wages and earned portfolio percentages and the conversion of the leads he procured through association endorsement sales, as well as the profits generated therefrom.

11.) As shown by monthly commission reports, CardConnect showed Davis it was paying him 30% CCPROFIT commission on all of the accounts procured by Davis, some of which were nearly of a decade's duration. With respect to the CCPROFIT% commission the right to payment vested upon the customer signing a contract and continues so long as the customer procured by Davis by way of sale generates revenue to CardConnect.

(a) The parties have no agreement providing that by reclassification or termination of Davis that his portfolio % commission as to already procured business would be reduced or eliminated. '

(b) Davis did not procure association endorsements so that CardConnect could assign the leads procured therefrom to non-commission sales people to avoid paying Davis. Association leads are very valuable productive sales leads from which Davis was able to accomplish approximately a 90%+ closing rate.

(c) CardConnect's agreement to pay ongoing commission is evident from its payroll records which indicate that commission was paid to Davis ongoing on his portfolio accounts regardless of when the account was procured.

(d) Davis performance obligation was completed when his customers signed an contract with CardConnect for the provision of services.

17

(e)    Davis was the procuring cause of all of the CardConnect customers in Davis' portfolio, all of the trade association endorsements he garnered, and all of the sales to members of the associations from the endorsement leads Davis procured.

12.)    In its monthly commission reports CardConnect states that Davis owns the accounts he sold.

13.)    CardConnect has willfully refused to transfer the accounts to Plaintiff and continued to reap 100% of the profit therefrom, all of which is due Plaintiff during the periods of termination from February 2014 into May 2014, as well as all CCPROFIT earned from July 2016 to the present.

14.)    Plaintiff is entitled to 100% statutory penalty on all sums owing.

15.)    K.S.A. 44-314 requires wages to be paid within 15 days of termination or not less than on 15 day intervals during employment,

16.)    CardConnect throughout Plaintiff's employments violated K.S.A. 44-314 in that it handled payroll as follows:

a.)    Merchants who utilized CardConnect for financial transaction processing were normally paid their sales volume within a couple of days of the transactions. CardConnect utilized First Data to handle its business as processor,

b.)    At the end of a calendar month CardConnect or First Data would issue a statement of charges for their services to the merchant and by the second of the month the charges would be withdrawn from the merchant's account. The charges were priced as a percentage of the merchant's sales volume plus various fees.

c.)    Within 2 weeks after the merchant charges were paid CardConnect would receive

18

payment of its share of the charges (CCPROFIT) from First Data not later than the middle of the month following that in which the merchant transactions occurred.

By way of example:   XYZ company uses CardConnect to process its credit card transactions.  In January XYZ has $100,000 in credit card sales.   XYZ has agreed to pay CardConnect 5% of all sales for  processing, including all fees.   XYZ is paid within a day or two of each charge without deduction of CardConnect's charges.  Each of these transactions generates fees to CardConnect from which it is obligated to pay Davis his CCPROFIT%.

CardConnect is not paid its fees at the time of the charge, but at the first of the following month. On February 2  CardConnect (via First Data) bills the merchant the $5,000 charge for processing the $100,000 in transactions and withdraws the sum the merchant agreed to pay for the processing from the merchant's bank account.

From the sum collected from the merchant in payment of CardConnect charges, First Data deducts the sums CardConnect has agreed to pay First Data for handling the processing of the transactions, say 2% or $2,000 in this example.

By February 15 First Data remits to CardConnect the  remainder of the $5,000 after deduction of First Data's charges, in this example $3,000.00, which is the CCPROFIT from XYZ for the month.    Davis sold XYZ on using CardConnect and is entitled to 30% of the $3,000 or $900 portfolio profit percentage (commission) on XYZ's transactions from January.

Not until March 15th does CardConnect pay Davis his commission from January.

d.)      CardConnect accrued a receivable from XYZ's sales as they were processed but willfully refused to pay Davis by the 15th of the following month, instead placing Davis to 45 days delay from the close of the January transactions.

19

17.)    CardConnect willfully failed and refused to pay Plaintiff within 15 days of the close of the month in which the  income was generated by him, as well as it refused to pay contemporaneously with its receipt of the funds entailing Plaintiff to  daily 1% damages or penalty on all commissions in fact paid after the 15th day of the month after which the charges were processed until paid, 30% of all commission paid, in addition to all other remedies for its willful refusal to pay commission for 45 days after the close of the month in which the sales transactions were processed.

18.)    It is necessary for Plaintiff to conduct discovery or for an accounting to be ordered due to the complex manner in which CardConnect operated financially, for this reason Plaintiff cannot presently determine the exact amount owing but it is in  well in excess of $25,000.

19,)    K.S.A. 44-316 provides that an employer may not condition payment of wages owing on the employee executing a settlement agreement, and that attempting to  obtain such a concession, or if one is obtained is deemed to be in violation of the statute and such an agreement is void.

20.)    On May 8, 2017  CardConnect sent Plaintiff a Letter telling him his position was eliminated and he was therefore terminated.  Accompanying the Letter was a proposed severance agreement stating that for $25,000 which CardConnect falsely represented as 5 months front pay, Plaintiff must release CardConnect and make various other concessions, including agreement to an injunction, no compete, nondisclosure, attorney fees and costs, ex parte relief and other terms and conditions all of which are unconscionable and in violation of K.S.A. 44-314, et seq. as they would preclude employment in sales elsewhere and would grant CardConnect a right to suit and immediate ex parte injunctive relief.

20

21.)     On July 17, 2017 demand was made for all past due wages and commissions and the mentioned statutes were cited and quoted.  To date CardConnect continues to refuse to pay any sum without a release, and for less than the sums owing.

22.)     K.S.A. 44-319 prohibits withholdings except as permitted by law.  CardConnect each month willfully refused to pay by withholding  withheld the sum of $5,000 by way of a deduction from Plaintiff's portfolio profit compensation characterizing the same as $2,500 base and $2,500 draw.   These deductions from Plaintiff's portfolio profit percentage are unlawful withholding in violation of K.S.A. 44-319 and were committed each and every month by CardConnect in violation of K.S.A. 44-319.

23.)     K.S.A.  44-321  prohibits waivers of employee rights:

44-321. Waivers prohibited. Except as provided in K.S.A. 44-324, no provision of, or any right created under this act may in any way be contravened, set aside or waived.

24.)     CardConnect violated K.S.A. 44-321 on May 8, 2017 in demanding that Plaintiff execute an unconscionable severance agreement obviously written by their attorney, as a condition to receive any payment whatsoever.

25,)     The proposed severance agreement calculated to procure a release of all of Plaintiff's employment rights, as well as a bar of Plaintiff from working for anyone in sales of financial transaction processing and would be an unlawful restraint of trade.

(a)     Though Plaintiff did not sign the severance agreement the threat of legal action raised by its language has precluded Plaintiff from working in the field damaging Plaintiff while he has been unemployed by the value to be derived from his portfolio, the unjust enrichment to CardConnect in continuing to take full financial advantage of the portfolio's benefits, and has

damaged Plaintiff by causing fear CardConnect would sue Plaintiff and anyone for whom he may have otherwise worked, or worked in self employment.

(b)     CardConnect also mailed Plaintiff a letter containing representations calculated to prevent him from being employable in violation of the statute.

26.)     KSA  44-342  Protects commission wages with a daily 1% additional damages on commission remaining unpaid for thirty days, and  10% interest per annum thereon. CardConnect knowingly and willfully refused to pay commissions in the amounts due throughout the employment as well as knowingly failed to pay all accrued sums due within 30 days of termination, and further has knowingly failed to pay the portfolio commission since summer of 2016 entitling Plaintiff to an additional 100% damages on the unpaid commissions whether taken as a deduction or otherwise intentionally not paid.

27.)     Pursuant to K.S.A. 44-342 on the portion of the compensation due for CCPROFIT  CardConnect is subject to a running 1% per day  additional damages in addition to 10% annual interest thereon.

28.)     K.S.A. 16-201. Legal rate of interest provides that  Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due..... for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter.

22

Electronically Filed - Jackson - Kansas City - May 10, 2018 - 12:10 AM

29.) Plaintiff is entitled to 10% interest pursuant to K.S.A. 16-201 on all sums due from the dates payable for salary and CCPROFIT until paid.

30.) K.S.A. 44-324 requires that the termination or resignation of a commission sales person must be paid within 30 days following the month of the termination as to sums then due. CardConnect violated this statute from and since February 2014 with respect to that termination and from and since May 8, 2017 with respect to the final termination.

31.) K.S.A. 44-324(b) imposes 1% damages dairy on the unpaid commissions (except Saturday, Sunday and legal holidays) as additional damages and K.S.A. 324(c) affords interest on the sums unpaid in addition to the 1% daily penalty.

32.) K.S.A. 44-343 provides all undisputed commissions must be paid within 30 days unconditionally leaving to the sales person all remedies the sales person may be entitled to including those provided by the Act.

33.) K.S.A. 44-347 gives the sales person the right to recover all commissions arising from sales occurring before the termination even if they produce income thereafter.

34.) Plaintiff's sales "occurred" as a result of a prospective customer signing a contract for the provision of financial transaction processing and related services. Plaintiff's procurement of the customer's agreement constituted his sale and vested his right to ongoing payment from the CCPROFIT accrued from the customer.

35.) Plaintiff is entitled to ongoing payment of 30% of the each merchant he procured as a customer of CardConnect as CardConnect receives payment of the same for as long as the customer generates transactions for CardConnect, its successors and assigns.

23

36.)     Plaintiff also sold trade associations on the endorsement of CardConnect as an approved and recommended vendor for credit card and related services.

37.)     Sales leads generated from trade associations are valuable in that the membership is warm and receptive to calls from vendors endorsed by their association and proposals to association members were closed at over 90% by Davis.

38.)     Association endorsements gave Davis the right to  market CardConnect to the association membership.   Endorsements Davis procured were for the purpose of generating leads for Davis to sell.   Davis is entitled to his portfolio commission on all customers and profits generated from his procured endorsements regardless of the fact CardConnect converted the leads,

39.)   K.S.A. 44-117. Employer not to prevent discharged employee from obtaining employment, provides:

> Any employer of labor in this state, after having discharged any person from his service, shall not prevent or attempt to prevent by word, sign or writing of any kind whatsoever any such discharged employee from obtaining employment from any other person, company or corporation, except by furnishing in writing, on request, the cause of such discharge.

40.)     CardConnect's threats uttered in the proposed Severance Agreement constitute written violation of K.S.A. 44-117.   In addition, in response to a letter requesting what would be required in a Missouri service letter request CardConnect made comments in violation of K.S.A. 44-117.

41.))   K.S.A. 44-119 entitles Plaintiff to treble damages, and  statutory attorneys fees to be taxed as costs.

24

42.)    K.S.A. 44-118 declares violation of Chapter 44 a misdemeanor subjecting the employer to fine and incarceration.    Plaintiff contends that conduct which has been criminalized is sufficiently intolerable to warrant exemplary or punitive damages in addition to statutory enhanced damages.

44.)    CardConnect's practice throughout its several year relationship with Mr. Davis was to pay ongoing portfolio profit percentage on all of the accounts he procured, some of which were 8 or more years duration.  The payment was based upon the profit each account generated each month on the understanding that so long as the portfolio generated income Mr. Davis would be paid his percentage.  CardConnect has breached its agreement to pay commission on accounts procured which have remained with them.

45.)    Card Connect also stated that Mr. Davis owned his portfolio including the accounts he procured and association endorsement leads.

46.)    Each month CardConnect paid portfolio commissions it deducted  and thereby willfully withheld $5,000 from Mr. Davis portfolio commissions.

47.)     Rather than pay Mr. Davis the agreed  $60,000 annual salary in addition to Mr. Davis commission CardConnect treated the salary as a loan rather than a salary so that in fact CardConnect paid none of the salary as such to Mr. Davis from an economic standpoint putting him in the position economically as being paid only commission. Mr. Davis is entitled to the maximal statutory damage addition of 100% of his unpaid salary from the date of CardConect's acquisition of Marathon Solutions (predecessor).

48.)    Separately, CardConnect's deductions of the $5,000 monthly deprived and willfully refused payment of the portfolio percentage of profits due Mr. Davis monthly.

25

49.)     In February 2014  CardConnect first terminated Plaintiff and failed thereafter to ever pay Mr. Davis all wages due through his termination entitling Mr. Davis to a 100% statutory penalty on those sums in addition to those unpaid wages and portfolio percentage..

50.)     In May 2017 CardConnect again terminated Plaintiff and has failed to pay him any and  wages and portfolio percentages thereafter  entitling him to his remaining annual salary and ongoing portfolio profit percentage of 30%.

51.)     Davis procured  and his portfolio included over 500 merchant account customers for CardConnect as well as approximately a dozen substantial trade association endorsements by the time of his 2017 termination.

52.)     Each failure to pay salary and CCPROFIT % (commission) was a willful refusal to pay sums due and owing.

53.)     The office of CardConnect for which Plaintiff provided services was at all relevant times located in Johnson County, Kansas.

54.)     Despite demand for his wages and portfolio profit percentages CardConnect has willfully refused to pay his compensation for his services for longer than 100 days after each of the 2014 and 2017 terminations and despite demand therefore upon its employee attorneys.

**Wherefore,**  Plaintiff prays the court:

(a)       order an accounting to determine all of the accounts procured by Mike Davis, all of the endorsement and endorsement leads procured by Mike Davis, all of the accounts procured through the leads and endorsements generated by Mike Davis including those credited to others, and enter judgment in favor of Plaintiff and against CardConnect  for:

26

Electronically Filed - Jackson - Kansas City - May 10, 2018 - 12:10 AM

(b)  an award all unpaid monthly salaries of  $5,000 per month from the commencement of CardConnect's employment of Davis along with 100% statutory damage enhancement and 10% per annum interest from the due date of each installment until paid; and

(c)  for an award of his CCPROFIT portfolio percentage of 30% for all unpaid sums along with 100% damage enhancement and 10% interest per annum interest from the due date of each installment; and

(d)  for declaration and award of ongoing CCPROFIT portfolio percentage of 30% from each account procured directly by Davis as well as those procured from the endorsements and leads procured by Davis  regardless of who else may have been or may be credited in part therefore for as long as CardConnect (along with its successors and assigns) may derive revenue therefrom; and

(e)  for an award of statutory trebled damages for CardConnect's attempt through its proposed severance agreement to prevent and restrict Davis from subsequent employment and its non-compliant purported response to Davis request for information responsive to the Missouri service letter statute, and

(f)  for statutory attorneys fees to be taxed as costs, and court costs, and

(g)  prejudgment and post judgment statutory interest at the rate of 10%, and

(h)  for all other enhanced damages, civil penalties, and other remedies available by Kansas law to protect employees; and

(i)  and for such other and further relief as the court deem appropriate.

<div align="center">COUNT FIVE</div>

<div align="center">**Missouri Statutory Action For Underpayment of Wages**</div>

Plaintiff incorporates the factual matters set forth elsewhere in this Petition as though fully restated herein.

1.)     R.S.Mo.  290.527        Action for underpayment of wages, employee may bring--limitation.

> 290.527. Any employer who pays any employee less wages than the wages to which the employee is entitled under or by virtue of sections 290.500 to 290.530 shall be liable to the employee affected for the full amount of the wage rate and an additional equal amount as liquidated damages, less any amount actually paid to the employee by the employer and for costs and such reasonable attorney fees as may be allowed by the court or jury. The employee may bring any legal action necessary to collect the claim. Any agreement between the employee and the employer to work for less than the wage rate shall be no defense to the action. All actions for the collection of any deficiency in wages shall be commenced within two years of the accrual of the cause of action.

2.)     CardConnect employed Plaintiff as a sales person on the basis of $60,000 annual salary payable $5,000 per month plus 25% then 30% commission on the CCPROFIT from accounts procured by Plaintiff.

3.)     Each month CardConnect deducted $5,000 from Plaintiff's CCPROFIT commission treating his salary as a loan and taking repayment from his commission.  To the contrary CardConnect promised Plaintiff a salary of $60,000 annually plus 30% of the CCPROFIT generated from accounts procured by him.

4.)     CardConnect paid fully outside sales channels 90% of the CCPROFIT, in accepting the $60,000 salary Plaintiff gave up the lion's share of the value of the ongoing income by agreeing to take less than 90%.   The certainty of a paycheck in the early years and

<div align="center">28</div>

convenience in not having to manage the portfolio while Davis worked for CardConnect were the tradeoff.

5.) Davis generated approximately $1,000,000 in CCPROFIT in 2015 or $80,000 profit per month, which had he operated his own separate Independent Sales Organization ("ISO") would have yielded him approximately $ 72,000 per month income after CardConnect's charge of 10% of the profit.

6.) CardConnect knew it was at no risk in paying Davis a salary of $5,000 per month in that his portfolio generated 16 times that in profit monthly.

7,) Each month from Davis' portfolio commission of only 30% of the CCPROFIT CardConnect deducted $5,000 to eliminate its payment of salary.

8.) Davis is entitled under this count to $5,000 per month salary, and the $5,000 monthly additional damages provided by R.S.Mo.  290.527.

9.) CardConnect agreed to pay Davis initially 25% and then 30% of  the CCPROFIT procured by Davis from selling contracts.  The percentage was to be paid so long as the accounts were serviced by CardConnect (including its successors and assigns).

10.) The deduction of the salary from the commission or percentage of CCPROFIT can be viewed in two ways, as above the failure to pay salary by converting it from the commission, and in addition thereto the failure to pay the commission as due when due each month by a shortchange of $5,000 whatever CardConnect's irrationale may have been.

11.) Davis is entitled pursuant to R.S.Mo. 290.527 to $10,000 monthly on account of the shortchange of his admittedly due commissions.

12.) Davis is entitled to reasonable attorneys fees under R.S.Mo. 290.527 and his costs as well as interest from the date each payment was due to be paid.

29

13.)     Due to the complex and confusing manner in which CardConnect handled its payroll, the termination of February 2014 and period of non-payment, the recommencement and changes in commission rates an accounting or discovery is necessary to establish the amount of unpaid or underpaid compensation in total.

14.)     By reason of the foregoing CardConnect has underpaid Davis in excess of $25,000 in past due and owing wages and commission.

**WHEREFORE,** Plaintiff requests the court order an accounting or permit sufficient discovery by which to ascertain the exact amounts due for wages, commissions and penalties, and for an award of all past due compensation owing along with the statutory doubled damages, reasonable attorneys fees, interest, his costs, and for such other and further relief as the court deem appropriate.

COUNT SIX

**STATUTORY ACTION PURSUANT TO R.S. Mo. 290.110**

Plaintiff incorporates by reference as though fully restated his factual allegations necessary to this count plead otherwise in this Petition.

1.)     R.S.Mo. 290.110  Payment due discharged employee--exceptions--penalty for delay, provides:

> 290.110. Whenever any person, firm or corporation doing business in this state shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of the servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of the discharge or refusal to longer employ and the servant or employee may request in writing of his foreman or the keeper of his time to have the money due him, or a valid check therefor, sent to any station or office where a regular agent is kept; and if the money or a valid check therefor, does not reach the station or office within seven days from the date it is so requested, then as a

30

penalty for such nonpayment the wages of the servant or employee shall continue from the date of the discharge or refusal to further employ, at the same rate until paid; provided, such wages shall not continue more than sixty days. This section shall not apply in the case of an employee whose remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar activities and where an audit is necessary or customary in order to determine the net amount due.

2.)     CardConnect admittedly wrongfully terminated Plaintiff in February 2014.

3.)     CardConnect failed to pay salary and commission due as required by the statute entitling Plaintiff to judgment for salary and commission for the months of his unemployment and the unpaid accrued commission from merchant transactions between the February 2014 termination and his rehiring in May 2014.

4.)     CardConnect also terminated Plaintiff on May 8, 2017 refusing to pay his 2nd quarter bonus and ongoing accruing CCPROFIT commission at 30% since the summer of 2016.

5.)     Despite demand therefore, after each termination CardConnect failed to pay compensation owing that could be calculated at those times without an accounting entitling Plaintiff to 60 days additional compensation following each termination.

6.)     Plaintiff has been damaged in an amount in excess of $25,000.00.

**WHEREFORE,** Plaintiff prays the relief afforded by R.S.Mo. 290.110 including his past due and owing compensation and the statutory penalty, for his costs, interest from the date of each termination, post judgment interest and attorneys fees, and for such other and further relief as the court deem appropriate.

<div align="center">RESERVATION</div>

<div align="center">31</div>

Plaintiff reserves and does not waive any other claim arising from the facts set forth herein, including but not limited to fraud, breach of contract, quantum meruit or other statutory claims arising under state law as well as any common law claims.

Respectfully Submitted,

LAW OFFICES
STEPHEN BRADLEY SMALL, LLC

/s/   Stephen B. Small   Mo#33097
Box 414678
Kansas City, Mo  64141-4678
SBSESQ@aol.com
(816) 726-1697
Attorney for Plaintiff

32



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | Case Number: 1816-CV12118 |
| Plaintiff/Petitioner:<br>MIKE DAVIS | Plaintiff's/Petitioner's Attorney/Address:<br>STEPHEN BRADLEY SMALL<br>BOX 414678<br>KANSAS CITY, MO 64141-4678 |
| vs. | |
| Defendant/Respondent:<br>RENNY PALUMBO | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Extraordinary Remedy | |
| | (Date File Stamp) |

## Summons for Service by First Class Mail

**The State of Missouri to:** RENNY PALUMBO
**Alias:**

**2431 FOREST AVE**
**KANSAS CITY, MO 64108**



**COURT SEAL OF**

**JACKSON COUNTY**

        You are summoned and, within 30 days after the enclosed acknowledgment is filed, you must file an answer to the enclosed petition with the clerk of this court and also must serve this answer upon Plaintiff's'/Petitioner's attorney at the above address. If you fail to do so, judgment by default will be taken against you for the relief demanded in the petition.

<u>26-OCT-2018</u>
Date Issued

_____
Clerk

Further Information:

## Directions to Clerk

    The clerk should issue one copy of this summons for each Defendant/Respondent to be served by first class mail. Under Section 506.150.4, RSMo, service by first class mail may be made by Plaintiff/Petitioner or any person authorized to serve process under Section 506.140, RSMo.

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.

Circuit Court of Jackson County



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>JALILAH OTTO | Case Number: 1816-CV12118 |
|---|---|
| Plaintiff/Petitioner:<br><br>MIKE DAVIS | Plaintiff's/Petitioner's Attorney/Address:<br>STEPHEN BRADLEY SMALL<br>BOX 414678<br>KANSAS CITY, MO 64141-4678 |
| vs. | |
| Defendant/Respondent:<br><br>RENNY PALUMBO | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Extraordinary Remedy | (Date File Stamp) |

## Summons for Service by First Class Mail

The State of Missouri to: CARDCONNECT LLC
Alias:

ANTHONY HRZIC
1000 CONTINENTAL DR STE 300
KING OF PRUSSIA, PA 19406



**COURT SEAL OF**

**JACKSON COUNTY**

You are summoned and, within 30 days after the enclosed acknowledgment is filed, you must file an answer to the enclosed petition with the clerk of this court and also must serve this answer upon Plaintiff's/Petitioner's attorney at the above address. If you fail to do so, judgment by default will be taken against you for the relief demanded in the petition.

<u>26-OCT-2018</u>
Date Issued

_____
Clerk

Further Information:

## Directions to Clerk

The clerk should issue one copy of this summons for each Defendant/Respondent to be served by first class mail. Under Section 506.150.4, RSMo, service by first class mail may be made by Plaintiff/Petitioner or any person authorized to serve process under Section 506.140, RSMo.

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

Service Information - Attorney



# IN THE 16TH JUDICIAL CIRCUIT **COURT**, JACKSON COUNTY, **MISSOURI**

| Judge or Division:<br>JALILAH OTTO | Case Number: **1816-CV12118** |
|---|---|
| Plaintiff/Petitioner:<br><br>MIKE DAVIS | Plaintiff's/Petitioner's Attorney/Address:<br>STEPHEN BRADLEY SMALL<br>BOX 414678<br>KANSAS CITY, MO 64141-4678 |
| **vs.** | |
| Defendant/Respondent:<br><br>RENNY PALUMBO | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Extraordinary Remedy | |
| | (Date File Stamp) |

## Summons for Service by First Class Mail

The State of Missouri to: CARDCONNECT CORP
 Alias:

JEFFREY SHANAHAN, PRESIDENT
1000 CONTINENTAL DR STE 300
KING OF PRUSSIA, PA 19406



*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned and, within 30 days after the enclosed acknowledgment is filed, you must file an answer to the enclosed petition with the clerk of this court and also must serve this answer upon Plaintiff's/Petitioner's attorney at the above address. If you fail to do so, judgment by default will be taken against you for the relief demanded in the petition.

26-OCT-2018
Date Issued
_____
Clerk

Further Information:

## Directions to Clerk

   The clerk should issue one copy of this summons for each Defendant/Respondent to be served by first class mail. Under Section 506.150.4, RSMo, service by first class mail may be made by Plaintiff/Petitioner or any person authorized to serve process under Section 506.140, RSMo.

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

Service Information - Attorney



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | Case Number: 1816-CV12118 |
| Plaintiff/Petitioner:<br><br>MIKE DAVIS | Plaintiff's/Petitioner's Attorney/Address:<br>STEPHEN BRADLEY SMALL<br>BOX 414678<br>KANSAS CITY, MO 64141-4678 |
| vs. | |
| Defendant/Respondent:<br><br>RENNY PALUMBO | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Extraordinary Remedy | |
| | (Date File Stamp) |

## Summons for Service by First Class Mail

The State of Missouri to: **FIRST DATA CORPORATION**
                          Alias:

**GUY CHIARELLO, PRESIDENT**
**225 LIBERTY ST, 29TH FL**
**NEW YORK, NY 20281**



**COURT SEAL OF**

**JACKSON COUNTY**

        You are summoned and, within 30 days after the enclosed acknowledgment is filed, you must file an answer to the enclosed petition with the clerk of this court and also serve this answer upon Plaintiff's'/Petitioner's attorney at the above address. If you fail to do so, judgment by default will be taken against you for the relief demanded in the petition.

       26-OCT-2018
         Date Issued                                   Clerk

Further Information:

## Directions to Clerk

     The clerk should issue one copy of this summons for each Defendant/Respondent to be served by first class mail. Under Section 506.150.4, RSMo, service by first class mail may be made by Plaintiff/Petitioner or any person authorized to serve process under Section 506.140, RSMo.

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.

Circuit Court of Jackson County

Notice and Acknowledgment for Service by Mail
(Supreme Court Form 4-B)

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
KANSAS CITY

MIKE DAVIS,                          }
                                     }
                                     }        Case No.: 1816-CV12118
                                     }
                                     }        Division: 1 5
            PLAINTIFF,               }
                                     }
     VS.                             }
                                     }
RENNY PALUMBO, ET AL.,               }
                                     }
            DEFENDANTS.              }

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION**

NOTICE TO:        RENNY PALUMBO, Defendant
                  2431 Forest Avenue
                  Kansas City, Mo 64108

IN CARE OF:       Jenna R. Rassif
                  Attorney at Law
                  Jackson Lewis P.C.
                  One Biscayne Tower, Suite 3500
                  Two South Biscayne Boulevard
                  Miami, FL 33131

The enclosed summons and petition are served pursuant to Missouri Supreme Court Rule 54.16.

You may sign and date the acknowledgment part of this form and return one copy of the
completed form to the sender within thirty days of _____/0 - 30 - 1 8_____
(insert date of mailing)

If you are served on behalf of a corporation, unincorporated association, including a partnership,
or other entity, you must indicate under your signature your relationship to that entity. If you are
served on behalf of another person and you are authorized to receive process, you must indicate
under your signature your authority.

If you do not complete and return the form to the sender within thirty days, you or the party on whose behalf you are being served may be required to pay any expenses incurred in serving a summons and petition in any other manner permitted by law.

If you do complete and return this form, you or the party on whose behalf you are being served must answer the petition within thirty days of the date you sign the acknowledgment below. If you fail to do so, judgment by default may be taken against you for the relief demanded in the petition.

I DECLARE, UNDER PENALTY OF PERJURY, THAT THIS NOTICE WAS MAILED ON

10-30-18.
(insert the date)

_____
Signature

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION

I declare, under penalty of filing a false affidavit, that I received a copy of the Summons and of the Petition in the above captioned matter.

_____
Signature

_____
Relationship to Entity/Authority
Receive Service of Process

10-29-2018
_____
Date Signed

Notice and Acknowledgment for Service by Mail
(Supreme Court Form 4-B)

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
KANSAS CITY

MIKE DAVIS,                              }
                                         }
                                         }      Case No.: 1816-CV12118
                                         }
                                         }      Division:  1 5
          PLAINTIFF,                     }
                                         }
     VS.                                 }
                                         }
RENNY PALUMBO, ET AL.,                   }
                                         }
          DEFENDANTS.                    }

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION**

NOTICE TO:          CardConnect, LLC    , DEFENDANT
                    A Delaware Limited Liability Co,
                    along with its successors and assigns
                    Serve:  Anthony HRZIC
                    1000 Continental Drive, Suite 300
                    King of Prussia, PA 19406


IN CARE OF:         Jenna R. Rassif
                    Attorney at Law
                    Jackson Lewis P.C.
                    One Biscayne Tower, Suite 3500
                    Two South Biscayne Boulevard
                    Miami, FL 33131

The enclosed summons and petition are served pursuant to Missouri Supreme Court Rule 54.16.

You may sign and date the acknowledgment part of this form and return one copy of the
completed form to the sender within thirty days of _____ _10- 30-18_ .
(insert date of mailing)

If you are served on behalf of a corporation, unincorporated association, including a partnership, or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within thirty days, you or the party on whose behalf you are being served may be required to pay any expenses incurred in serving a summons and petition in any other manner permitted by law.

If you do complete and return this form, you or the party on whose behalf you are being served must answer the petition within thirty days of the date you sign the acknowledgment below. If you fail to do so, judgment by default may be taken against you for the relief demanded in the petition.

I DECLARE, UNDER PENALTY OF PERJURY, THAT THIS NOTICE WAS MAILED ON

_10-30-18_
(insert the date)

_____
Signature

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION

I declare, under penalty of filing a false affidavit, that I received a copy of the Summons and of the Petition in the above captioned matter.

_____
Signature

_Attorney_
Relationship to Entity/Authority
Receive Service of Process

_11-29-2018_
Date Signed

Notice and Acknowledgment for Service by Mail
(Supreme Court Form 4-B)

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
KANSAS CITY

MIKE DAVIS,                              }
                                         }
                                         }        Case No.: 1816-CV12118
                                         }
                                         }        Division: 1 5
               PLAINTIFF,                }
                                         }
     VS.                                 }
                                         }
RENNY PALUMBO, ET AL.,                   }
                                         }
               DEFENDANTS.               }

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION**

NOTICE TO:          CardConnect, Corp., Defendant
                    Serve: Jeffrey Shanahan or current President
                    1000 Continental Drive, Suite 300
                    King of Prussia, PA 19406

IN CARE OF:         Jenna R. Rassif
                    Attorney at Law
                    Jackson Lewis P.C.
                    One Biscayne Tower, Suite 3500
                    Two South Biscayne Boulevard
                    Miami, FL 33131

The enclosed summons and petition are served pursuant to Missouri Supreme Court Rule 54.16.

You may sign and date the acknowledgment part of this form and return one copy of the
completed form to the sender within thirty days of _____ *10 - 30 - 18*.
(insert date of mailing)

If you are served on behalf of a corporation, unincorporated association, including a partnership,
or other entity, you must indicate under your signature your relationship to that entity. If you are
served on behalf of another person and you are authorized to receive process, you must indicate
under your signature your authority.

If you do not complete and return the form to the sender within thirty days, you or the party on whose behalf you are being served may be required to pay any expenses incurred in serving a summons and petition in any other manner permitted by law.

If you do complete and return this form, you or the party on whose behalf you are being served must answer the petition within thirty days of the date you sign the acknowledgment below. If you fail to do so, judgment by default may be taken against you for the relief demanded in the petition.

I DECLARE, UNDER PENALTY OF PERJURY, THAT THIS NOTICE WAS MAILED ON

_10-30-18_
(insert the date)

_[signature]_
Signature

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION

I declare, under penalty of filing a false affidavit, that I received a copy of the Summons and of the Petition in the above captioned matter.

_[signature]_
Signature

_Attorney_
Relationship to Entity/Authority
Receive Service of Process

_11-29-2018_
Date Signed

Notice and Acknowledgment for Service by Mail
(Supreme Court Form 4-B)

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
KANSAS CITY

| | |
|---|---|
| MIKE DAVIS, | ) |
| | ) |
| | ) Case No.: 1816-CV12118 |
| | ) |
| | ) Division: 15 |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) |
| | ) |
| RENNY PALUMBO, ET AL., | ) |
| | ) |
| DEFENDANTS. | ) |

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION**

NOTICE TO:     First Data Corporation, Defendant
Serve: Guy Chiarello, President
225 Liberty Street, 29th Fl
New York, NY 20281

IN CARE OF:     Jenna R. Rassif
Attorney at Law
Jackson Lewis P.C.
One Biscayne Tower, Suite 3500
Two South Biscayne Boulevard
Miami, FL 33131

The enclosed summons and petition are served pursuant to Missouri Supreme Court Rule 54.16.

You may sign and date the acknowledgment part of this form and return one copy of the completed form to the sender within thirty days of _10-30-1 Y_.
(insert date of mailing)

If you are served on behalf of a corporation, unincorporated association, including a partnership, or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the sender within thirty days, you or the party on whose behalf you are being served may be required to pay any expenses incurred in serving a summons and petition in any other manner permitted by law.

If you do complete and return this form, you or the party on whose behalf you are being served must answer the petition within thirty days of the date you sign the acknowledgment below. If you fail to do so, judgment by default may be taken against you for the relief demanded in the petition.

I DECLARE, UNDER PENALTY OF PERJURY, THAT THIS NOTICE WAS MAILED ON

10·30-18
(insert the date)

_____
Signature

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND PETITION

I declare, under penalty of filing a false affidavit, that I received a copy of the Summons and of the Petition in the above captioned matter.

_____
Signature

_____
Relationship to Entity/Authority
Receive Service of Process

11-29-208
_____
Date Signed

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

MIKE DAVIS,⁣ )
⁣ )
⁣ )
⁣⁣ Plaintiff, )
⁣⁣ v. ) Case No. 1816-CV12118
⁣ ) Division 15
⁣ )
RENNY PALUMBO, ET AL., )
⁣ )
⁣⁣ Defendant. )

## ORDER

☒ Plaintiff's Motion for Continuance of the Case Management Conference is hereby,

☒ GRANTED. The new Case Management date is **December 17, 2018, at 9:30 a.m.**

**IT IS SO ORDERED.**

_____
October 29, 2018
DATE

_____
JALILAH OTTO, JUDGE
DIVISION 15

## Certificate of Service

This is to certify that a copy of the foregoing was sent through the eFiling system to all counsel of record on the 29th day of October, 2018.

STEPHEN BRADLEY SMALL – Attorney for Plaintiff

RENNY PALUMBO, Defendant - NOT YET SERVED
2431 FOREST AVE
KANSAS CITY, MO 64108

CARDCONNECT LLC , Defendant -NOT YET SERVED
ANTHONY HRZIC
1000 CONTINENTAL DR STE 300
KING OF PRUSSIA, PA 19406

CARDCONNECT CORP , Defendant  - NOT YET SERVED
JEFFREY SHANAHAN, PRESIDENT
1000 CONTINENTAL DR STE 300
KING OF PRUSSIA, PA 19406

FIRST DATA CORPORATION , Defendant - NOT YET SERVED
GUY CHIARELLO, PRESIDENT
225 LIBERTY ST, 29TH FL
NEW YORK, NY 20281

_Joshua Haven_
Judicial Administrative Assistant/Law Clerk

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

| | |
|---|---|
| **MIKE DAVIS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )  **Case No.: 1816-CV12118** |
| | )  **Division 15** |
| **RENNY PALUMBO, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER GRANTING PRO HAC VICE ADMISSION

Before the Court is attorney Arielle S. Eisenberg's Motion for Permission to Appear Pro Hac Vice on behalf of Defendants. Having considered the Motion and for good cause shown, the Court finds that said Motion should be sustained and that Arielle S. Eisenberg should be and hereby is admitted to practice in the Circuit Court of Jackson County, Missouri for purposes of this case only pursuant to Missouri Rule of Civil Procedure 9.03.

Dated this ___11th___ day of ___December___, 2018.

_____
Circuit Court Judge Jalilah Otto

Page **1** of **1**

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | | |
|---|---|---|
| MIKE DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1816-CV12118 |
| | ) | Division 15 |
| RENNY PALUMBO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING PRO HAC VICE ADMISSION

Before the Court is attorney Jenna Rinehart Rassif's Motion for Permission to Appear Pro Hac Vice on behalf of Defendants. Having considered the Motion and for good cause shown, the Court finds that said Motion should be sustained and that Jenna Rinehart Rassif should be and hereby is admitted to practice in the Circuit Court of Jackson County, Missouri for purposes of this case only pursuant to Missouri Rule of Civil Procedure 9.03.

Dated this ___11th___ day of ___December___, 2018.

_____
Circuit Court Judge Jalilah Otto

Page **1** of **1**

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | | |
|---|---|---|
| **MIKE DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1816-CV12118** |
| | ) | **Division 15** |
| **RENNY PALUMBO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR CONTINUANCE OF THE CASE MANAGEMENT CONFERENCE

NOW on this <u>12th</u> day of December, 2018, the Court takes up and considers *Defendants' Motion for Continuance of the Case Management Conference*, and the Court being fully advised of the premises orders as follows:

IT IS HEREBY ORDERED that *Defendants' Motion for Continuance of the Case Management Conference* is **GRANTED**. The case management conference currently scheduled in this matter for December 17, 2018 will be continued until <u>February 11,</u> , 20<u>19</u> at <u>9</u> :<u>00</u> a.m.

IT IS SO ORDERED.

Date: <u>December 12, 2018</u>                    _____
                                        Circuit Court Judge Jalilah Otto

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | | |
|---|---|---|
| MIKE DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1816-CV12118 |
| | ) | Division 15 |
| RENNY PALUMBO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR EXTENSION OF TIME TO
ANSWER OR OTHERWISE RESPOND TO PLAINTIFF'S PETITION**

NOW on this ⎽21st⎽ day of December, 2018, the Court takes up and considers *Defendants'*
*Motion for Extension of Time to Answer or Otherwise Respond to Plaintiff's Petition*, filed
December 14, 2018, and the Court being fully advised of the premises orders as follows:

IT IS HEREBY ORDERED that *Defendants' Motion for Extension of Time to Answer or*
*Otherwise Respond to Plaintiff's Petition* is **GRANTED**. Defendants First Data Corporation,
CardConnect Corp., CardConnect LLC, and Renny Palumbo shall have up to and including
January 14, 2019, in which to file their response to Plaintiff's Petition.

IT IS SO ORDERED.

Date: ⎽⎽December 21, 2018⎽⎽

⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽
Circuit Court Judge Jalilah Otto

Page **1** of **1**

Electronically Filed - Jackson - Kansas City - January 14, 2019 - 07:00 PM

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

| | | |
|---|---|---|
| **MIKE DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1816-CV12118** |
| | ) | **Division 15** |
| **RENNY PALUMBO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S PETITION AND TO STRIKE SCANDALOUS ALLEGATIONS

Defendants CardConnect, LLC, CardConnect Corporation, First Data Corporation, and Renny Palumbo (collectively, "Defendants"), by and through their undersigned counsel and pursuant to Missouri Rule of Civil Procedure ("Rule") 55.27(6), move to dismiss Plaintiff's Petition, and to strike scandalous allegations in paragraphs 10 (page 3), 17 (page 4), 19 (page 4), 37 (page 8), 51 (page 9), 9 (page 10), and 42 (page 25) pursuant to Rule 55.27(e).[1]  In support, Defendants state the following:

## PRELIMINARY STATEMENT

On October 30, 2018, Plaintiff Mike Davis served all four Defendants with a thirty-two page, 155-plus paragraph Petition purportedly comprised of a mere six Counts titled as follows: (1) Equitable Disgorgement in Unjust Enrichment; (2) Defamation; (3) Missouri Service Letter Statute; (4) Kansas Statutory Employee Protection Act K.S.A. Chapter 44; (5) Missouri Statutory Action for Underpayment of Wages; and (6) Statutory Action Pursuant to R.S. Mo. 290.110.

---

[1] It is necessary for Defendants to include reference here not only to the paragraph number, but also to the page number because Plaintiff did not consecutively number the paragraphs in his Petition.  Instead, Plaintiff re-started his numbering scheme at the beginning of each Count thereby causing the Petition to have multiple paragraphs numbered 1, 2, and 3, and even multiple paragraphs numbered 30, 40, and 50.  This dismissal-worthy problem with the Petition is addressed *infra* in Section I.B.

Defendants spent many painstaking hours deciphering Plaintiff's Petition, which at one point incorporates alleged violations of no fewer than fifteen (15) distinct statutory provisions into one count, *see* Count IV (pages 14-27). Despite the scattershot nature of Plaintiff's Petition, however, Defendants have made a good faith attempt to interpret Plaintiff's Petition and believe that in addition to the flawed structure of Plaintiff's Petition justifying dismissal of the entire Petition, Plaintiff has failed to state claims upon which relief can be granted in Counts II-VI, also justifying this Court's dismissal of the Petition.

## LEGAL STANDARD

Missouri is a fact-pleading state. In order to state a claim upon which relief can be granted, a petition must contain "a short and plain statement of the facts showing that the pleader is entitled to relief." Mo. R. Civ. P. 55.05(1); *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 379 (Mo. 1993). It is well-settled in Missouri that a plaintiff is required to identify the facts upon which the plaintiff's claim rests and present factual allegations in support of each essential element of the claim. *Solberg v. Graven*, 174 S.W.3d 695, 699 (Mo. Ct. App. 2005). In order to withstand a motion to dismiss, a petition must invoke substantive principles of law entitling a plaintiff to relief and ultimate facts informing the defendant of that which the plaintiff will attempt to establish at trial. *Allen v. City of Greenville*, 336 S.W.3d 508, 511 (Mo. Ct. App. 2011).

Because Missouri is a fact-pleading state, "motions to dismiss for failure to state a claim have substantially more 'bite' than they have under the federal system." *ITT Commercial Fin. Corp.*, 854 S.W.2d at 379. The federal courts now use discovery to identify the triable issues. By contrast, such has always been the role of the pleadings in Missouri. *Id.* at 380. Missouri rules "demand more than mere conclusions that the pleader alleges without supporting facts." *Pulitzer*

2

*Publ'g. v. Transit Cas. Co.*, 43 S.W.3d. 293, 302 (Mo. 2001). Courts are to disregard such conclusions in determining whether a petition states a claim. *Solberg*, 174 S.W.3d at 699.

## LEGAL ARGUMENT

This Court should dismiss Plaintiff's Petition in its entirety because the Petition suffers from multiple pleading deficiencies complicating Defendants' ability to respond to the Petition (i.e., failing to identify which Defendants are subject to which Counts and commingling counts) and should dismiss Counts II-VI because Plaintiff fails to state claims in each of those Counts.

I.   **This Court Should Dismiss Plaintiff's Petition in Its Entirety Because the Petition Suffers from Numerous Pleading Deficiencies.**

Plaintiff repeatedly fails to identify which allegations pertain to which Defendant(s), most notably failing to distinguish those allegations that pertain to the individual defendant as opposed to the entity defendants; re-starts his paragraph numbering at "1" in each count, rendering it impossible to reference specific paragraphs in the Petition with ease; only erratically incorporates facts (or, sometimes, "matters") set forth elsewhere in the Petition, providing Defendants with little to no clarification as to which facts should be incorporated into which Counts; and commingles claims within a single count. While Defendants will not reargue the points raised in Section I when discussing in Section II the substantive shortcomings of Plaintiff's Petition, it is important to note that all of the basic flaws of pleading addressed in this Section I are applicable to all Counts asserted in the Petition.

A.   Plaintiff Does Not Identify Which Defendants are Named In Each Count.

Plaintiff identifies six counts against Defendants in his Petition. Each Count, however, fails to specify which Defendant is allegedly liable for the claims included in such Count. It is imperative for Defendants to know the specific allegations Plaintiff asserts against each of them specifically so that Defendants can properly defend themselves against Plaintiff's Petition. Indeed,

3

Missouri Rule 55.05 requires that "a pleading set[] forth a claim for relief . . .[and] . . . contain a short and plain statement of the facts showing that the pleader is entitled to relief." Mo. R. Civ. P. 55.05. Part of this requirement is fundamentally to notify each defendant in a multi-defendant, multi-claim petition which claims the plaintiff asserts against it/him. "The purpose of fact-pleading is to present, define[,] and isolate the controverted issues so as to advise the trial court **and the parties** of the issues to be tried and to expedite the trial of a cause on the merits." *Sivigliano v. Harrahs N. Kan. City. Corp.*, 188 S.W. 3d 46, 48 (Mo. Ct. App. 2006) (*quoting Luethans v. Wash. Univ.*, 894 S.W.2d 169, 171-72 (Mo. 1995)) (emphasis added). Without specifying which Defendant is subject to the claims in each Count, Plaintiff has not met the requirements of Rule 55.05 or advised the parties of the issues to be tried.

Additionally, it is nonsensical that all Defendants would be subject to all claims in all Counts. Indeed, Counts I and Counts III-VI allege causes of action that lie only against an employer. In this regard, Plaintiff asserts claims under a litany of Missouri and Kansas statutes. Under each of these statutes, only an employer may be liable for a violation of the statutory requirements. *See Ellington v. Napleton's Mid-Rivers Motors*, 560 S.W. 3d 72, n. 1 (Mo. Ct. App. 2018) (explaining that Section 290 of Missouri Statues provides for employer liability); *Craig v. FedEx Ground Package Sys.*, 700 Kan. 788 (Kan. 2014) (explaining that an employer-employee relationship is required for liability under the Kansas Wage Payment Act ("KWPA"), K.S.A. § 44-301 *et al.*). *See also e.g.*, K.S.A. § 44-316 (stating that an "*employer* shall pay . . . all wages") (emphasis added); Mo. Rev. Stat. § 209.527 (stating that "[a]ny *employer*. . . shall be liable") (emphasis added). Plaintiff does not allege that Renny Palumbo, the individual defendant, or First Data Corporation, employed him, (*see ¶¶* 7-8, 12). Specifically in regards to Palumbo, the only allegation Plaintiff includes regarding his relationship to Palumbo is that Palumbo "was the

sales manager in the Kansas office." (Pet. ¶3, Count II). Similarly, Plaintiff does not allege any facts to indicate that First Data was his employer. Plaintiff simply states that "Card Connect, LLC employed Plaintiff in Kansas and Missouri, and then changed its name to CardConnect, Corp.," and pleads that at some point First Data acquired Card Connect Corp. (Pet. ¶ 3, page 2). Simply put, Plaintiff's pleading is insufficient to allege liability against Renny Palumbo or First Data for violations of statutes governing the employer-employee relationship.

**B.**     Plaintiff Does Not Comply with Missouri Rule 55.11.

Rule 55.11 requires each count in a petition to be separate and distinct from the previous count. Specifically, the rule states: "[a]ll averments of a claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances. Each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth." Mo. R. Civ. P. 55.11.

Here, Plaintiff fails to comply with Rule 55.11 because he: (1) incorrectly numbers the paragraphs in the Petition; (2) fails to identify which facts are incorporated into which Counts; and (3) includes multiple allegations in a count. First, Plaintiff did not consecutively number the paragraphs in his Petition. Instead, Plaintiff re-started his numbering scheme at the beginning of each Count causing the Petition to have multiple, identically-numbered paragraphs across different pages.

Second, Plaintiff fails to identify which factual allegations pertain to and are incorporated into which Counts. For example, in Count IV, Plaintiff states in an unnumbered paragraph at the start of the Count: "Davis incorporates by reference as though fully restated the other matters set forth in this Petition." In Count V, Plaintiff states: "Plaintiff incorporates the factual matters set

5

forth elsewhere in this Petition as though fully restated herein." And, in Count VI, Plaintiff states in a wholly different way: "Plaintiff incorporates by reference as though fully restated his factual allegations necessary to this count plead otherwise in this Petition." Oddly, however, in Counts I-III, Plaintiff does not even purport to incorporate facts pled. Regardless, Plaintiff's failure to identify the individual facts pertinent to each Count provides Defendants (and this Court) with little to no clarification as to which facts pertain to which Counts.

Finally, in Count IV, Plaintiff alleges that Defendants violated no less than eleven different statutes, each of which should (presuming it is legally and factually supportable) be its own count. *See State ex rel. E.A. Martin Mach. Co. v. Line One, Inc.*, 111 S.W. 3d 924, 930 (Mo. Ct. App. 2003) (holding that "an averment containing two commingled bases of recovery" is specifically prohibited by Rule 55.11); *Nisbet v. Butcher*, 949 S.W. 2d 111, 114-15 (Mo. Ct. App. 1997) (explaining that where the plaintiffs "attempted to include more than one cause of action in a single count," the plaintiffs should have "advance[d] their theories in separate counts to facilitate the clear presentation of their theories of recovery."). As such, while Plaintiff purports to assert only six individual Counts in his Petition, Plaintiff appears to be asserting, in fact, a minimum of sixteen claims against Defendants. Because Plaintiff has plead his claims with insufficient particularity, it is impossible for Defendants to answer the Petition adequately. Based on Plaintiff's violation of Rule 55.11, Defendants request that the Court dismiss Plaintiff's Petition.

**II.** **This Court Should Dismiss Count II Because Plaintiff Fails to Plead Facts Establishing Publication or the Exact Statement Made, and Therefore, Fails to State a Claim for Defamation.**

In Count II, Plaintiff claims that Defendants defamed him by telling him he was stealing clients from Defendants. (Pet. ¶¶ 2, 3, Count II). To state a claim for defamation under Missouri law, Plaintiff must plead the following: (1) publication; (2) of a defamatory statement; (3) that identifies the plaintiff; (4) that is false; (5) that is published with the requisite degree of fault; and

6

(6) damages the plaintiff's reputation. *Nigro v. St. Joseph Med. Ctr.*, 371 S.W. 3d 808, 818 (Mo. App. 2012) (*citing Overcast v. Billings Mut. Ins. Co.*, 11 S.W. 3d 62, 70 (Mo. 2000)). Here, Plaintiff's claim of defamation cannot withstand scrutiny under Missouri law.

    **A.**    <u>Plaintiff Has Not Plead that the Alleged Defamatory Statement Was Published</u>.

Plaintiff has not pled facts sufficient in Count II to establish "publication," an essential element of a defamation claim. Rather, Plaintiff bases his defamation claim on, at best, an intra-corporate communication and, at worst, a communication to himself.[2] Missouri, however, has long recognized the intra-corporate immunity rule in defamation torts. In this regard, under well-established Missouri law, such a communication does not constitute "publication."

The intra-corporate immunity rule rests on the premise that a corporation can only communicate through its employees, and therefore, communications between employees of the same corporation in the regular course of business (including personnel matters) are not publications to third persons as required to prove a defamation tort. *Hellesen v. Knaus Truck Lines, Inc.*, 370 S.W. 2d 341, 344 (Mo. 1963); *Washington v. Thomas*, 778 S.W. 2d 792, 796 (Mo. App. 1989) (holding that the defendant's letter containing a statement that the plaintiff threatened another person with bodily harm with a loaded weapon was not published by placing it in the personnel file to which multiple non-essential employees had access). The policy rationale behind this rule is simple: businesses have a need to communicate "concerning the performances and conduct of employees in the due and regular course of the corporate business," because a "corporation has an interest to see that business runs efficiently." *Lovelace v. Long John Silver's, Inc.*, 841 S.W. 2d 682, 685 (Mo. App. 1992).

---

[2] Plaintiff alleges that an unnamed employee contacted Plaintiff alleging that he was "stealing accounts from CardConnect, according to Renny Palumbo . . . ." (Pet. ¶ 3, Count II). Plaintiff states that "the first known publication in Missouri was to Plaintiff." (Pet. ¶ 5, Count II).

In *Hellesen*, the court held that a document written and placed in a company file was not "published," although presumably read by secretaries, file clerks, and other corporate personnel. *Hellesen*, 370 S.W. 2d at 344. Expanding on *Hellesen*, in *Lovelace*, the Missouri Court of Appeals held that employee statements made to management concerning the plaintiff fell within the intra-corporate immunity rule and such communications did not meet the publication requirement for defamation. *Lovelace*, 841 S.W. 2d at 684. In *Blake v. May Department Stores Company*, the Missouri Court of Appeals also held that the supervisor's communications to the company's Human Resources Vice President regarding a complaint involving the employee were not "published" because they fell within the scope of the intra-corporate immunity rule for defamation. 882 S.W. 2d 688, 6901 (Mo. App. 1994).

Here, Plaintiff has not pled that the alleged statement(s) were "published" to any third party outside of the corporate structure. Rather, Plaintiff alleges that an employee of CardConnect heard from Renny Palumbo, the sales manager for CardConnect, that Plaintiff was stealing accounts from CardConnect. Following *Blake*, *Lovelace*, and *Hellesen*, it is clear that the alleged statement was not "published" because it falls within the intra-corporate immunity rule and that under no set of facts can such a statement constitute defamation. Accordingly, Plaintiff fails to state a claim for defamation against Defendants and this Court should dismiss Count II with prejudice.

**B.** <u>Plaintiff Has Not Plead The Exact Alleged Defamatory Words</u>.

It is well settled that a plaintiff attempting to assert a claim for defamation must set forth in his initial pleading the actual words considered to be defamatory. *Carey v. Pulitzer Publ'g Co.*, 859 S.W. 2d 851, 854 (Mo. App. 1993) (holding that plaintiff properly faced dismissal of his petition because it "failed to present the allegedly libelous words with particularity which he claims defamed him" where the petition merely summarized statements such as plaintiff "attacked

8

Senator Bond on labor at the political forum"); *Shurn v. Monteleone*, 769 S.W. 2d 188, 191 (Mo. App. 1989) (same). The rationale behind this rule is that the court can determine, up front, whether the words are potentially actionable as to Plaintiff. *See Missouri Church of Scientology v. Adams*, 543 S.W. 2d 776, 777 (Mo. 1976) (holding that allegations of the plaintiff's interpretation of news articles attached as exhibits were insufficient). Summaries or paraphrases of the allegedly defamatory statements are insufficient. *Carey*, 859 S.W. 2d at 854. If a petition does not specifically allege those statements claimed to be defamatory, the court should dismiss the claim for failure to state a claim on which relief may be granted. *Id.*; *State ex rel. Diehl v. Kintz*, 162 S.W. 3d 152, 158 (Mo. App. 2005) (finding dismissal of a defamation claim appropriate because Missouri requires fact-specific pleading and the petition was unclear as to the alleged defamatory statements).

Plaintiff's Petition alleges in general terms that an unnamed employee "confronted" Plaintiff about stealing accounts from CardConnect. (Pet. ¶ 3, Count II). Rather than stating the words actually spoken, however, this allegation paraphrases what was allegedly said. Plaintiff's allegations in this regard are inadequate under Missouri Rule of Civil Procedure 55.05 and Missouri case law.

**III.**     **This Court Should Dismiss Count III Because Plaintiff Did Not Plead Facts Showing Non-Compliance by Defendants.**

In Count III, Plaintiff alleges that Defendants violated Missouri Revised Statutes section 290.140 causing Plaintiff distress. Under § 290.140, within forty-five days of receiving a written request from a former employee (by certified mail and specifically referencing the statute), an employer must provide a discharged employee with a letter "setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof truly stating for what cause, if any, such employee was discharged or voluntarily quit such service." Mo. Rev.

Stat. § 290.140.  Plaintiff alleges that he timely requested a letter from CardConnect pursuant to § 290.140 and, though the statute provides an employer forty-five days to respond, gave CardConnect thirty days to respond.  (Pet. ¶ 2, Count III).

Regardless, as Plaintiff points out, CardConnect did respond.  (Pet. ¶ 4, Count III). Notwithstanding, Plaintiff alleges that CardConnect's response was not "compliant" with the statute.  (Pet. ¶¶ 3, 4, Count III).  Significantly, however, Plaintiff fails to state (1) in what regard CardConnect's response did not comply with the statute or (2) in what manner CardConnect's letter caused Plaintiff distress.  Plaintiff's bare bones assertion that CardConnect's letter was noncompliant and caused Plaintiff distress is not enough to meet the pleading requirements of Rule 55.05.  Mo. R. Civ. P. 55.05 (requiring that "a pleading set[] forth a claim for relief . . .[and] . . . contain a short and plain statement of the facts showing that the pleader is entitled to relief.").  *See also Sofka v. Thal*, 662 S.W.2d 502, 509 (Mo. 1983) (explaining that where a petition contains only conclusions and neither the ultimate facts nor any allegations from which to infer those facts, a court should grant a motion to dismiss).  Therefore, this Court should dismiss Count III.

**IV.     This Court Should Dismiss Count IV Because Plaintiff Fails to State a Claim Upon Which Relief Can Be Granted Under Chapter 44 of the Kansas Statutes.**

Chapter 44 of the Kansas Statutes contains seventeen different Articles, all with multiple subsections.  In Count IV of Plaintiff's Petition, Plaintiff references no fewer than eleven of Chapter 44's distinct statutory provisions claiming that Defendants have violated each of those statutes and that Plaintiff is entitled to various types of damages pursuant to the variety of referenced sections.  At a minimum, each theory of recovery should be its own separate count, *see* Mo. R. Civ. P. 55.05, and the Court should dismiss Count IV on this basis alone.  The Court should additionally dismiss Count IV, however, because Plaintiff fails to allege facts to support the multitude of Chapter 44 violations referenced.

10

**A.** <u>Plaintiff Has Not Pled Essentials Elements of Chapter 44</u>.

Plaintiff has failed to plead properly essential elements of his variety of claims under each of the eleven statutes he cites in Count IV of the Petition. Indeed, some statutes to which Plaintiff cites are wholly inapplicable and do not even provide a private cause of action.

> i. *Section 44-314 does not require payment of wages every fifteen days and is inapplicable to commission payments.*

Kansas Statute Annotated section 44-314 states that wages must be paid at least once a month and no less than 15 days after the close of a wage period. K.S.A. § 44-314. Plaintiff incorrectly asserts in his Petition that this statute provides that wages must be paid in fifteen-day intervals and, because of the way Defendants collect from their customers, Defendants did not pay Plaintiff in fifteen-day intervals. (Pet. 15, 16, Count IV). Plaintiff not only misstates the statute, but also fails to distinguish between wages and commission. First, § 44-314 clearly does not require what Plaintiff alleges. In this regard, the statute does not require employers to pay employees every fifteen days, rather it only requires employers to pay once per month within 15 days of the close of the previous pay period. K.S.A. § 44-314. Second, Plaintiff alleges he is owed commission payments, but § 44-314 does not address commission pay. (See Pet. ¶¶ 15–18 of Count IV, referencing only commission payments). As such, Plaintiff has failed to allege a violation of the § 44-314, and this Court should dismiss Count IV (and specifically Plaintiff's claim for damages under § 44-314).

> ii. *Section 44-315 does not apply to Plaintiff's commission or bonus payments.*

Kansas Statute Annotated § 44-315 states that an employer shall pay a terminated employee earned wages no later than the next regular payday after termination. *See* K.S.A. § 44-315. Plaintiff alleges that Defendants violated § 44-315 by refusing to pay him his "portfolio percentages" from July 2016 through the present and refused to pay any salary or quarterly bonus

since May 2017.[3]  (Pet. ¶ 10, Count IV).  First, Plaintiff's allegation that CardConnect reduced his monthly salary from $10,000 to $5,000 and thus "willfully refused to pay the $10,000 monthly salary," (Pet. ¶ 7, Count IV), is not a violation of § 44-315.  An employer has the right to change an at-will employee's salary at any time for any reason or no reason at all.  Thus, a unilateral change in salary is not a violation of § 44-315.  *See Smith v. Kan. Orthopaedic Ctr., P.A.*, 49 Kan. App. 2d 812, 816 (Kan. Ct. App. 2013) (stating that "an employer can make prospective changes to compensation or commissions.").  Second, Plaintiff alleges that he did not release CardConnect from paying him commission.  (Pet. ¶ 6, Count IV).  Section 44-315 applies to wages only, however, not commissions (which are distinct from wages under Chapter 44).  Thus, § 44-315 is not applicable to Plaintiff's allegations regarding unpaid commission.  Accordingly, this Court should dismiss Plaintiff's claims under § 44-315.

   iii. *The Severance Agreement In Question Is Not A Violation of Section 44-316.*

   Kansas Statutes Annotated § 44-316 provides that when there is a dispute between an employee and an employer regarding the amount of wages due, the employer must pay (without conditions) all wages the employer believes, in good faith, to be due leaving the employee with remedies to collect the disputed balance under different sections of Chapter 44.  Plaintiff alleges that Defendants violated § 44-316 when providing Plaintiff with a severance agreement because, according to Plaintiff, § 44-316 provides that an employer may not condition payment of wages on a severance agreement.  (Pet. ¶ 19, Count IV).  Plaintiff further alleges that the severance agreement was "unconscionable" because it contained such standard provisions as non-compete and non-disclosure clauses, among others, which "would preclude employment in sales

---

[3] Notably, Plaintiff also alleges Defendants violated this particular section by failing to pay him in 2014, but as discussed below in Section B, "[a]n action upon a liability created by a statute other than a penalty or forfeiture" is subject to a three (3) year statute of limitations.  K.S.A. § 60-512.  As such, any claims stemming back to 2014 are time barred.

elsewhere." (Pet. ¶ 20, Count IV). Lastly, Plaintiff alleges that on July 17, 2017, he made a demand to Defendants for all past due wages and commissions. (Pet. ¶ 21, Count IV).

First, Kansas Statutes Annotated § 44-316 does not address restrictive covenants. Indeed, Kansas courts have explicitly held that restrictive covenants are enforceable. *See Weber v. Tillman*, 913 P.2d 84, 96 (Kan. 1996) (holding that Kansas courts will not generally interfere with an employer and employee's freedom to contract and upholding a non-compete agreement). Second, § 44-316 does not prohibit severance agreements; rather, it prohibits employers from requiring employees to sign away their rights to *earned* wages. *See A.O. Smith Corp. v. Kan. Dep't of Hum. Res.*, 36 Kan. App. 2d 530 (Kan. Ct. App. 2009) (explaining that severance serves a function distinct from wage payment statutes). Plaintiff's interpretation of this statute is grossly flawed.[4]

> iv. *Allegations under § 44-319 should be dismissed because Plaintiff does not allege facts to support a violation of § 44-319.*

Kansas Statutes Annotated § 44-319 states that wages cannot be withheld unless required by law or agreement. Plaintiff alleges that Defendants have "withheld the sum of $5,000 by way of deduction from Plaintiff's portfolio profit compensation characterizing the same as $2,500 base and $2,500 draw." (Pet. ¶ 22, Count IV). Defendants cannot determine from this allegation in what manner Plaintiff's wages were withheld. To the extent Plaintiff is claiming that the amount "withheld" was a draw against commissions, (*see* Pet. ¶ 22, Count IV), Plaintiff has not plead a violation of § 44-319 because a draw against commissions is not a withholding of wages. Rather, a draw serves as an advance on commissions covered and reimbursed by subsequent commissions earned. Indeed, Plaintiff's allegation really seems to assert not that Defendants withheld the

---

[4] Plaintiff also alleges the same theory of recovery under Kansas Statutes Annotated § 44-321, which prohibits the waiver of rights under Chapter 44. (Pet. ¶¶ 23, 24, Count IV) The Court should dismiss this claim for the same reasons the Court should dismiss Plaintiff's claims under § 44-316.

Electronically Filed - Jackson - Kansas City - January 14, 2019 - 07:00 PM

$5,000, but instead that Defendants *paid* the $5,000, but simply "mis"-characterized the sum as "$2,500 base and $2,500 draw."

To the extent Plaintiff otherwise claims withholding of wages in Paragraph 22 (Count IV) of his Petition, any such allegations are not sufficiently specific to meet the pleading standard. *See Bohac v. Walsh*, 223 S.W. 3d 858, 862 (Mo. Ct. App. 2007) (explaining that the court will not consider the pleader's conclusions and that "the petition must allege facts to support each essential element of the cause to be pleaded"). Plaintiff has not provided any information as to the type of compensation withheld; the amounts withheld; or the when the alleged amounts were withheld.[5] Regardless of how one characterizes Plaintiff's allegations, however, Plaintiff's vague pleading precludes Defendants from properly preparing a responsive pleading, engaging in meaningful discovery, or preparing for trial. Accordingly, the Court should dismiss all claims under § 44-319.

> v.     *Section 44-324 does not provide a private cause of action.*

In Plaintiff's quest to allege that Defendants violated nearly every section of Chapter 44, it seems Plaintiff failed to analyze critically the statutes themselves. Plaintiff alleges that Defendants violated Kansas Statutes Annotated § 44-324. This section contains four subsections: subsection (a) grants jurisdiction to a court of competent jurisdiction to hear a proceeding by an employee under the KWPA; subsections (b) and (c) explain the process when the secretary of labor determines an employee has a valid claim for unpaid wages; and subsection (d) establishes a wage claims assignment fee fund. K.S.A. § 44-324. Lacking from § 44-324 is any language requiring an employer to take an action or providing an individual employee with a cause of action against an employer.

---

[5] Plaintiff states only that the alleged violations of § 44-319 "were committed each and every month by CardConnect . . . ." (Pet. ¶ 22, Count IV).

Plaintiff claims that Defendants violated § 44-324 in February 2014[6] and have been continuously violating § 44-324 since May 8, 2017. (Pet. ¶ 30, Count IV). Plaintiff provides no facts as to how Defendants purportedly violated this statute. Indeed, Plaintiff cannot provide facts alleging that Defendants violated § 44-324 because § 44-324 provides no individual cause of action and imposes no obligations for Defendants to violate.

Plaintiff also alleges that this section requires commission payments to be paid within 30 days following termination. Nothing in this statute, however, discusses commission payments or the timing requirement for paying commissions after termination. Finally, Plaintiff alleges that Section 44-324(b) provides for a 1% daily penalty for each day his commission is not timely paid. Section 44-324(b), however, imposes no such penalty and in any event is applicable only to claims brought by the secretary of labor. *See Michaeux v. Amalgamated Meatcutters & Butcher Workmen*, 231 Kan. 791, 793 (Kan. 1982) (explaining that K.S.A § 44-324(b) is the avenue by which the secretary takes assignment of a claim); *Shelley v. State*, 27 Kan. App. 2d 715, 723 (Kan. Ct. App. 2000) (stating that "[t]he statute further provides that the amount recovered is to be placed in the wage claims fee fund."). Accordingly, this Court should dismiss all claims under § 44-324.

> vi.    *Plaintiff does not plead specific facts showing violation of § 44-342.*

Under Kansas Statutes Annotated § 44-342, a commissioned employee must be paid earned commissions no later than thirty days after the last day of the contractual relationship. Plaintiff alleges that CardConnect knowingly and willfully refused to pay him commissions in the amounts due throughout his employment. (Pet. ¶ 26, Count IV). This broad assertion does not meet the Missouri pleading standards. Plaintiff has not provided any facts regarding the allegedly owed

---

[6] As discussed *infra* Section B, Plaintiff's claims accruing prior to May 10, 2015, are time-barred by the statute of limitations.

commissions, such as dates and amounts, how the commissions were earned, and when the commissions became due. *See Phillips v. Noland*, 2011 Kan. App. Unpub. LEXIS 236, at *4 (Kan. App. April 8, 2011) (upholding lower court's dismissal of unpaid commission claim because plaintiff "failed to plead the occurrence or performance of the condition precedent" and "a plaintiff must at least allege occurrence or performance to state a claim."). Accordingly, this Court should dismiss Plaintiff's claims under § 44-342.

     vii.  *Plaintiff does not seek payment of undisputed commissions under § 44-343.*

    Kansas Statutes Annotated § 44-343 states that if the amount of commission is disputed, the employer is to pay the employee all commissions which in good faith the employer believes were earned, leaving the employee to rely on other sections of Chapter 44 to bring claims for unpaid commissions. In other words, § 44-343 provides that an individual not paid ***disputed*** commissions is to use other sections of Chapter 44 to seek recovery of unpaid commissions from his employer. Plaintiff, however, does not allege that Defendants failed to pay ***undisputed*** commissions. (Pet. ¶ 32, Count IV). Accordingly, Plaintiff cannot rely on § 44-343 to state a claim, and this Court should dismiss any such claim.

     viii.  *Plaintiff has not pled a claim under § 44-347 because it does not provide a right of action.*

    Plaintiff asserts that Kansas Statutes Annotated § 44-347 gives a commissioned employee the right to recover commissions arising not just from sales made before termination but also by virtue of sales made ***after termination*** based on a contract signed before termination. (Pet. ¶ 33, Count IV). Specifically, Plaintiff alleges that his sales occurred "as a result of a prospective customer signing a contract for the provision of financial transaction processing and related services. Plaintiff's procurement of the customer's agreement constituted his sale and vested his

right to ongoing payment from the CCPROFIT accrued from the customer." (Pet. ¶ 34, Count IV). Section 44-347, however, does not provide what Plaintiff alleges.

Section 44-347 simply provides that nothing in Chapter 44 prevents a salesperson from collecting commissions on merchandise ordered prior to the last day of the contractual relationship or paid after termination. In other words, "[t]his statute permits a commission salesperson to collect commissions based upon business sold but not yet collected prior to termination, but *does not require the employer to pay such commissions*." *Colboch v. Morris Communs. Co., LLC*, 2007 U.S. Dist. LEXIS 7621 (D. Kan. Jan 31, 2007) (emphasis added). Instead, a plaintiff must plead that he is entitled to commissions after termination pursuant to a "contractual provision requiring the payment of such commissions," and without such a contractual provision, Plaintiff "is relegated to proving [he] is owed by virtue of the employer's policy and practice." *Id.* Here, Plaintiff has not plead contractual entitlement to post-termination commissions nor that Defendants' policy and practice is to pay continuing commissions after termination. To the contrary, Plaintiff pleads that the parties specifically did not enter into an agreement and pleads that he was not paid continuing commissions after his previous separation from employment in February 2014. (Pet. ¶ 53, Facts Common to All Counts). Thus, this Court should dismiss Plaintiff's allegations under Kansas Statutes Annotated § 44-347 with prejudice.

> ix. *Plaintiff has not alleged any criminal proceedings required for violation of §§ 44-117 to 44-119.*

Plaintiff seems to assert claims under sections 44-117 and 44-119 of the Kansas Statutes Annotated alleging that: (1) CardConnect's "threats" in the proposed severance agreement constitute a written violation of the statutes; and (2) CardConnect made comments in violation of the statutes. (Pet. ¶ 40, Count IV). Plaintiff further alleges that because of these violations, Plaintiff is entitled to treble damages and attorney's fees under § 44-119. (Pet. ¶ 41, Count IV).

17

First, as stated *supra* Section IV.A.iii., neither a severance agreement nor a restrictive covenant agreement is prohibited under Kansas Statutes Chapter 44. Nor was § 44-117 written to preclude severance agreements. Rather, § 44-117 is "intended to prevent blacklisting and requires a criminal blacklisting conviction of an employer in order to bring a civil blacklisting claim." *Hawkins v. MCI*, 2005 U.S. Dist. LEXIS 45163 (D. Kan. May 13, 2005); *see also Anderson v. United Teleph. Co. of Kansas*, 933 F.2d 1500 (10th Cir. 1991) (holding that "a criminal blacklisting conviction is an element of a civil blacklisting claim against an employer under Kansas law"); *Michaelson v. Equitable Life Assur. Soc.*, 1990 U.S. Dist. LEXIS 17878, at *11-12 (D. Kan. December 19, 1990) (same).

Plaintiff does not allege there has been any criminal conviction of CardConnect, or any Defendant, which is an express prerequisite to suit under § 44-117. Because Plaintiff does not, and cannot, allege that any Defendant has been subject to such a criminal conviction, Plaintiff cannot state a claim under § 44-117, and cannot establish remedies under sections 44-118 and 44-119, and this Court should dismiss his claims with prejudice.

**Plaintiff's Claims Are Barred by the Statute of Limitations.**

In Count IV, Plaintiff alleges that Defendants failed to pay certain wages and/or commissions dating back to 2014 under various statutory theories. Even if Plaintiff has properly pled all allegations in Count IV, which he has not, all claims for unpaid wages prior to May 10, 2015, must be dismissed with prejudice as they are time barred. The statute of limitations on claims under the KWPA is three years. K.S.A § 60-512; *see also Endecott v. Commercial Floorworks, Inc.*, 2018 U.S. Dist. LEXIS 176333, *24-25 (D. Kan. Oct. 15, 2018). Plaintiff filed his petition on May 10, 2018. Accordingly, Plaintiff is not entitled to any recovery under the KWPA accruing prior to May 10, 2015.

18

**V.** **This Court Should Dismiss Count V Because Plaintiff Does Not Allege that He Was Not Paid the Minimum Wage.**

This Court should dismiss Count V because Plaintiff does not plead a violation of Missouri Revised Statutes section 290.527. As a threshold matter, an unpaid wages claim under this statute is subject to a two-year statute of limitations. As such, any claim for unpaid wages accruing prior to May 10, 2016 (two years prior to the May 10, 2018, filing date) must be dismissed with prejudice. As applicable to Plaintiff's claims, the Missouri Minimum Wage Law, sections 290.500, *et seq.*, of the Missouri Revised Statutes, requires payment of minimum wage. Plaintiff, however, does not plead that he was paid less than the minimum wage. Plaintiff pleads only that he was paid a salary of $10,000 per month (Pet. ¶ 11, Count V) and then a salary of $5,000 per month (Pet. ¶ 2, Count V). The Missouri Minimum Wage Law does not provide a vehicle to collect allegedly owed amounts over and above the minimum wage. Accordingly, this Court should dismiss Count V with prejudice.

**VI.** **Count VI Should Be Dismissed With Prejudice Because Plaintiff Has Not Complied With The Statutory Requirements and The Statute of Limitations Has Run.**

This Court should dismiss Count VI because (1) the cited statute is inapplicable to commissioned employees, (2) Plaintiff did not make a written request under the statute, and (3) even if the cited statute were applicable and Plaintiff had made a written request, the statute of limitations has run on Plaintiff's claim. Under Missouri Revised Statutes § 290.110, an employer is required to provide a discharged employee with his final paycheck on the day of discharge. "The time limits imposed on employers by this are triggered after the employee makes a written request." *Henderson v. Cypress Media, Inc.*, 2012 U.S. Dist. LEXIS 116331, *6-7 (D. Mo. August 17, 2012). The language of the statute, however, states that it "shall not apply in the case of an employee whose remuneration for work is based primarily on commissions . . . and where an audit is necessary or customary in order to determine the net amount due." R.S. Mo. § 290.110. As

19

Plaintiff explains numerous times throughout his Petition, Plaintiff was compensated primarily through commission payments. (*See e.g.,* Pet. ¶¶ 20, 21, 33, "Facts Common To All Counts"). As a commissioned employee, Plaintiff cannot bring a claim under § 290.110 based on the plain language of the statute. Count VI should be dismissed with prejudice on this basis alone.

Even if § 290.110 were to apply to Plaintiff, however, Plaintiff has not and cannot assert that he has provided Defendants with the required written request, which is a prerequisite to suit under § 290.110. *See Henderson*, 2012 U.S. Dist. LEXIS, at *7 (holding that a verbal request is not sufficient to trigger a plaintiff's right to sue for violation of R.S. Mo. § 290.11). Further still, even if Plaintiff had provided Defendant with a written request pursuant to § 290.500, which he did not, Plaintiff failed to attach the alleged written request as required by Missouri Rule of Civil Procedure 55.22.

Notwithstanding the above, the Court should dismiss Count VI with prejudice because the statute of limitations has run. The Missouri Supreme Court has said that, "requests for unpaid wages under Section 290.110 made more than ninety days after termination are untimely as a matter of law." *Jones v. Galaxy 1 Mktg.*, 478 S.W. 3d 556, 574 (*citing Monterosso v. St. Louis Globe-Democrat Publ'g Co.*, 368 S.W. 2d 481, 489 (Mo. 1963)). Plaintiff was terminated on May 8, 2017; therefore, the statute of limitations on any claim he may have had under § 290.110 ran on August 6, 2017. Plaintiff filed his Petition nine months later. Accordingly, the Court should dismiss Count VI with prejudice.

VII. **This Court Should Strike Certain Allegations Because They Are Immaterial, Impertinent, and Scandalous.**

Missouri Rule of Civil Procedure 55.27(e) provides, in pertinent part, that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Plaintiff includes several allegations in his Petition that are

immaterial, impertinent and scandalous to the causes of action in the Petition, and accordingly, which this Court should strike.

In paragraphs 10, 17, and 19 in the section titled "Facts Common To All Counts," and in paragraph 9 of Count I, Plaintiff alleges that CardConnect engaged in fraud and cites to two separate, and unrelated, lawsuits. (Pet. ¶¶ 10, 17, 19, Facts Common To All Counts; Pet. ¶ 9, Count I). Reference to "fraud" and to two unrelated lawsuits are wholly impertinent and immaterial to Plaintiff's allegations that Defendant violated certain employment statutes under Missouri and Kansas law. These allegations could have only been included for purposes of harassing Defendants and, later, to seek to present such scandalous and impertinent matters to the jury. Accordingly, the Court should strike the above-referenced allegations under Rule 55.27(e).

Plaintiff also includes in his Petition allegations that Plaintiff was given a severance agreement containing "grossly unconscionable and some unlawful terms." (Pet. ¶ 37 (page 8), Facts Common To All Counts). This allegation is a conclusion of law and is an improper pleading. Further, Plaintiff does not go on to allege a cause of action pleading that the severance agreement was unconscionable or unlawful nor does Plaintiff provide any facts to support this broad assertion. The Court should also strike this Paragraph under Rule 55.27(e). Finally, the allegations in Paragraph 55 in the section titled "Facts Common to All Complaints" should be stricken because it concerns a purported admission made in 2014, which is untimely under every relevant statute of limitations at issue in the Petition.

## CONCLUSION

WHEREFORE, Defendants respectfully request that the Court (1) dismiss Plaintiff's Petition in its entirety due to its numerous pleading deficiencies; (2) dismiss Counts II-VI of

21

Plaintiff's Petition for failures to state claims; and (3) strike certain allegations from Plaintiffs Petition.

DATED: January 14, 2019                    Respectfully submitted,

                                           JACKSON LEWIS P.C.

                                           */s/ Kyle B. Russell*
                                           Kyle B. Russell, MO Bar # 52660
                                           7101 College Blvd, Suite 1200
                                           Overland Park, KS 66210
                                           Telephone: (913) 981-1018
                                           Facsimile: (913) 981-1019
                                           Kyle.Russell@jacksonlewis.com

                                           Jenna Rinehart Rassif (*pro hac vice*)
                                           Arielle S. Eisenberg (*pro hac vice*)
                                           One Biscayne Tower
                                           Two South Biscayne Boulevard, Suite 3500
                                           Miami, FL 33131
                                           Telephone: (305) 577-7600
                                           Facsimile: (305) 373-4466
                                           Jenna.Rassif@jacksonlewis.com
                                           Arielle.Eisenberg@jacksonlewis.com

                                           **ATTORNEYS FOR DEFENDANTS**

**<u>CERTIFICATE OF SERVICE</u>**

On this 14th day of January 2019, I certify that a true and accurate copy of the foregoing was electronically filed via the Court's Case Net electronic case filing system which will send a notice of electronic filing to the following counsel:

Stephen Bradley Small, Esq.  MO #533097
LAW OFFICES OF
STEPHEN BRADLEY SMALL, LLC
Box 414678
Kansas City, MO 64141-4678
SBSESQ@aol.com

**ATTORNEY FOR PLAINTIFF**

*/s/ Kyle B. Russell*
**ATTORNEY FOR DEFENDANTS**

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

MIKE DAVIS,             )

                    )

         Plaintiff,     )

                    )

v.                   )     Case No.: 1816-CV12118

                    )     Division 15

RENNY PALUMBO, et al.,   )

                    )

        Defendants.    )

## ORDER GRANTING DEFENDANTS' SECOND MOTION FOR CONTINUANCE OF THE CASE MANAGEMENT CONFERENCE

NOW on this __8th__ day of February, 2019, the Court takes up and considers *Defendants' Second Motion for Continuance of the Case Management Conference*, and the Court being fully advised of the premises orders as follows:

IT IS HEREBY ORDERED that *Defendants' Second Motion for Continuance of the Case Management Conference* is **GRANTED**. The case management conference currently scheduled in this matter for February 11, 2019 will be continued until _March 4_____, 20_19_ at ____9_:_00__ AM.

IT IS SO ORDERED.

Date: __February 8, 2019__                               

                                        Circuit Court Judge Jalilah Otto

Page **1** of **1**

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
KANSAS CITY

MIKE DAVIS,                        }
                                   }
                                   }        Case No.: 1816-CV12118
                                   }        Division 15
                                   }
          PLAINTIFF,               }
                                   }
VS.                                }
                                   }
RENNY PALUMBO,                     }
          et al.                   }
                                   }
     Defendants.                   }

ORDER

Now on this  25th  day of  _____February_____ , 2019 the court grants Plaintiff 15 days from

entry of this Order within which to file a First Amended Petition.  Defendants shall file their

responsive pleading within  __30__  days of Plaintiff's filing of his First Amended Petition.


          So Ordered.

                              _____
                                   Hon. Jalilah Otto
                                   Circuit Judge, Division 15

4

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

**MIKE DAVIS,**

               **Plaintiff,**               **CASE NO.   1816-CV12118**

**v.**                                    **DIVISION   15**

**RENNY PALUMBO, et al.,**

               **Defendants.**

## CASE MANAGEMENT ORDER, NOTICE OF PRE-TRIAL
## CONFERENCE AND NOTICE OF TRIAL SETTING

On the 4th day of March 2019, this cause came on for a Case Management Conference. Plaintiff, Mike Davis, appeared by counsel. Defendants, Renny Palumbo, Cardconnect LLC, Cardconnect Corp, First Data Corp, appeared by counsel.

1.      Discovery cut-off date**:** Parties to submit an agreed upon Scheduling Order by **APRIL 4, 2019.**

2.      Trial Date:  **NOVEMBER 2, 2020, at 9:00 a.m.  (2 WEEKS)**

3.      Pre-Trial/Settlement Conference:  **OCTOBER 23, 2020, at 11:00 a.m.**

This cause is set for a pre-trial conference.  Counsel who will actually try the case must attend this pre-trial conference with their clients.   If the client is not an individual, a representative capable of making settlement decisions for the client must be present.  No later than one week before this conference, counsel shall meet with each other for an informal pretrial conference, at which they shall:

    1. Discuss and thoroughly exhaust all settlement possibilities;

    2. Enter into all possible stipulations of fact; and

    3.  Exchange key exhibits and stipulate, whenever possible, as to waiver of foundation and identification of exhibits.

On the day of the Pre-Trial Conference, counsel shall be prepared to discuss the following subjects:

    1. Report any settlement negotiations and examine the possibility of settlement;

    2. Length of trial;

3.  Number of prospective jurors to be requested;

4.  Invoking the rule;

5.  Special or unusual proposed voirdire questions (such as insurance);

6.  Legal and evidentiary issues;

7.  Motions in Limine;

8.  Proposed jury instructions (prepared in accordance with Rule 70.02(d), Mo. R. Civ. P.), which shall be electronically filed prior to the pre-trial conference, with copies emailed to the law clerk;

9.  Reasons for reading portions of witnesses' depositions (instead of live testimony), foundations for same, including possible waiver thereof or agreement thereon, and objections to the reading of certain portions of depositions;

10.  Designation of any answers to interrogatories or responses to request for admissions which any party proposes to read at trial;

11.  Advise the Court of stipulations of fact and stipulations as to exhibits; and

12.  Submit any respective trial briefs and electronically file a copy of the same.

**NO FURTHER NOTICES WILL BE GIVEN BY THE COURT OF THE SCHEDULED EVENTS IN THIS CASE.  TRIAL DATES SET BY THE ATTORNEYS ARE FIRM.  NO CONTINUANCES WILL BE GRANTED EXCEPT FOR GOOD CAUSE SHOWN AND FOR THE REASONS BEYOND THE CONTROL OF THE ATTORNEYS AND/OR THEIR CLIENTS.**

**IT IS SO ORDERED.**

Dated:  _MARCH 4, 2019___

**JALILAH OTTO, Judge**

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

KANSAS CITY

| | | |
|---|---|---|
| MIKE DAVIS, | } | |
| | } | |
| | } | Case No.: 1816-CV12118 |
| | } | |
| ' | } | Division: 15 |
| PLAINTIFF, | } | |
| | } | |
| VS. | } | |
| | } | |
| RENNY PALUMBO, | } | |
| et al., | } | |
| | } | |
| DEFENDANTS. | } | |

## ORDER

The court takes up and considers Plaintiff's Motion for an additional 10 days extenuation of time within which to file his First Amended Petition due to issues having arisen from merchant class actions filed against Defendants.

For good cause shown the Motion is granted. Plaintiff is granted 10 days from the entry of this Order within which to file his First Amended Petition.

**Date:** April 22, 2019 _____

Hon. Jalilah Otto
Circuit Court Judge, Division 15

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

**MIKE DAVIS,**
                **Plaintiff(s),**

                                    **Case No. 1816-CV12118**
                                    **Division  15**

**RENNY PALUMBO,**
**et al.,**

                **Defendants.**

## SCHEDULING ORDER

Now on the __4th__ day of ___March___, 2019, the above matter came before the court for Case Management Conference/Scheduling Conference.  Based on discussions had, the Court makes the following orders:

1.    **TRIAL:**      This matter is set for trial on November 2, 2020, at 9:00AM in Division 15. No docket will be published.  This order is notice of the trial setting, which is a firm setting.

2.    **PRETRIAL CONFERENCE:**  This matter is set for a pretrial conference on October 23, 2020, at 11:00 AM in Division 15.

3.    **JOINDER OF ADDITIONAL PARTIES:**  All motions for joinder of additional parties shall be made no later than ninety (90) days from the date of this order.

4.    **DISCOVERY:**  All discovery must be completed by May 4, 2020, with the exception of completion of expert depositions**.**

5.    **MEDIATION:**  The Court orders mediation in this case by  June 30, 2020. The parties shall agree on a mediator, or may file a timely motion for the court to appoint a mediator.

6.    **EXPERT WITNESSES:**  Plaintiff shall designate retained and non-retained experts by April 20, 2020, and shall make them available for deposition by May 15, 2020.

           Defendants shall designate retained and non-retained experts by June 10, 2020, and shall make them available for deposition by June 30, 2020.

7    **DISPOSITIVE MOTIONS::**  Dispositive motions shall be filed no later than

1

four (4) months prior to the trials setting.  No extensions will be granted for surreply filed less than 30 days prior to trial.

8. **DEPOSITION DESIGNATIONS: DEPOSITION DESIGNATIONS:**  By 14 calendar days before trial, parties shall serve and file designations by page and line, of deposition testimony that the offering party intends to read at trial.  By 10 calendar days before trial, each party shall serve and file any objections to the other party's disposition designations and shall provide any counter designations of testimony proposed to be read with the other party's designations.  No more than 3 calendar days before trial, the parties shall serve and file with the court any objections to the other parties' counter designations .

9. **PROPOSED VERDICT DIRECTORS** shall be filed with the court prior to the pre-trial conference.

10. **WITNESS AND EXHIBIT LISTS** shall be filed the Friday before trial.

11. **OTHER ORDERS:**  DAUBERT MOTIONS shall be made no later than September 11, 2020.

MOTIONS IN LIMINE shall be filed no later than October 16, 2020.

JURY INSTRUCTIONS shall be filed no later than October 23, 2020

**IT IS SO ORDERED.**

June 28, 2019
**DATE**                                    JALILAH   OTTO, **Circuit Judge**

**<u>Certificate of Service</u>**

This is to certify that a notice of the entry of the foregoing was automatically forwarded to the attorneys of record through the Court's eFiling system.
**All Counsel of Record.**

2

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

**MIKE DAVIS,**

        **Plaintiff,**                **CASE NO.   1816-CV12118**

**v.**                                        **DIVISION   15**

**RENNY PALUMBO, et al.,**

        **Defendants.**

## ORDER TO FILE FIRST AMENDED PETITION

On this 28th day of June, 2019, the Court take us *Defendants' Motion to Dismiss Plaintiff's Petition and to Strike Scandalous Allegations* filed January 14, 2019.  The Court notes the following:

On January 30, 2019, Plaintiff moved for an extension of time to file his response to Defendant's Motion to Dsimiss/Strike and to file a First Amended Petition.

On February 25, 2019, the Court granted Plaintiff's request for an extension of time and Ordered Plaintiff to file his First Amended Petition within 15 days.

On March 13, 2019, Plaintiff moved for a second extension of time to file a First Amended Petition.

On April 22, 2019, the Court granted Plaintiff's second extension of time and Ordered Plaintiff to file his First Amended Petition within 10 days.

To date no First Amended Petition has been filed.  Plaintiff is hereby ordered to file his First Amended Petition within 30 days of the date of this Order, or this case may be removed from the trial docket and reset for a Case Management Conference.

      **IT IS SO ORDERED.**

Dated:  _June 28, 2019____

                                               **JALILAH OTTO, Judge**

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent through the eFiling system to all counsel of record on June 28, 2019:

_____
Law Clerk/Judicial Administrative Assistant

IN THE CIRCUIT  COURT OF JACKSON COUNTY, MISSOURI
KANSAS CITY

Mike Davis,                                    }
                                               }
            Plaintiff,                         }        Case No.:1816CV-12118
                                               }
                                               }        **Plaintiff Demands Trial By Jury**
VS.                                            }
                                               }
Renny Palumbo,                                 }
                         Defendant,            }
CardConnect, LLC                               }
        A Delaware Limited Liability Co,       }
                         Defendant,            }
CardConnect, Corp.,                            }
                         Defendant,            }
First Data Corporation,                        }
                         Defendants,           }
                                               }
FISERV, INC.                                   }
Serve:  Jeffery WQ. Yakubi, CEO               }
 a Wisconsin corporation,                      }
255 FISERV DRIVE,                              }
BROOKFIELD, WI    53045                        }
                         Defendant,            }
                                               }
 along with their respective intermediaries,   }
conspirators, successors, officers, directors, }
 transferees and their respective transferees  }
and assigns,                                   }
             Defendants.                        }


**First Amended  Petition For Declaratory Relief,
Equitable Disgorgement, Unjust Enrichment, Quantum Meruit,
Breach of Contract,  Defamation, Missouri Service Letter Statute, Missouri
Statutory Remedies , Kansas Statutory Remedies,
Tort of Outrageous Conduct**

Comes now Plaintiff and in support of this Petition states:

**I.        Parties,  Jurisdiction  & Venue**

1

1.)  Plaintiff is and at all times relevant has been a resident of  resident of Lee's Summit, Jackson County, Missouri.

2.)  Plaintiff was engaged by CardConnect Corporation and CardConnect, LLC to engage in the acquisition of merchant financial transaction processing business accounts.

3.)  Once an account signed a contract Plaintiff had fully performed and was entitled to receive a portion of the income generated from the account for as long as the account remained active.   Defendants agreed to provide all customer service and support services necessary to service the accounts procured by Plaintiff.

4.)  Defendant Palumbo (hereinafter, "PALUMBO") at all times relevant has been a resident of Kansas City, Jackson County, Missouri and an employee, agent and servant of the corporate defendants. All acts of Defendant Palumbo were done in the furtherance of the corporate business interests of. and for the benefit of  the corporate defendants and were within the course and scope of Mr. Palumbo's authority, employment, agency or service.  Defendant Palumbo's liability is imputable to the corporate defendants by vicarious liability or respondeat superior.

5.)  Defendant CardConnect, LLC became known as CardConnect, Corp. (collectively, hereinafter "CardConnect").  CardConnect utilized Plaintiff's services to procure merchant processing accounts by which customers could pay merchants with a credit or debit card or other electronic method.  In his most recent relationship with CardConnect Plaintiff was treated as an Independent Sales Organization ("ISO") in having the independence to set his own hours as well as to work from his Jackson County, Missouri residence, but Plaintiff could optionally work  from CardConnect's offices if he wished.

2

6.) CardConnect has maintained a substantial and continuos presence in Missouri through utilization of Plaintiff and other Missouri residents to conduct sales work and maintain offices in Missouri.

7.) CardConnect has also maintained substantial and continuos contacts with Missouri by processing financial transactions involving Missouri residents and entering into contracts with Missouri merchants to handle their payment processing of sales by credit card, debit card or electronic payment.

8.) CardConnect has submitted to the jurisdiction of the courts of the State of Missouri by entry into contracts in Missouri with Plaintiff, and with other sales agents, and with Missouri merchants, and in handling financial transactions for Missouri resident consumers. CardConnect also committed tort in Missouri first causing injury to Plaintiff in Jackson County, Missouri by defamation, as well as in breaching the contract it entered into with Plaintiff in Missouri. .

9.) Through intermediaries CardConnect was acquired by First Data Corporation ("FirstData") a payment processing business for $ 750 million in or around 2017 rendering FirstData liable in (a) respondeat superior or by (b) vicarious liability or by (c) assumption of liabilities of CardConnect, and separately as a transferee in the portfolio of Plaintiff's work including hundreds of merchant accounts and the profits and revenues therefrom as well as their component values in the acquisition of CardConnect, and is subject to equitable disgorgement of Plaintiff's portfolio of accounts, account leads, and all income and profits therefrom as well as the contribution of Plaintiff to the enterprise value of CardConnect.

10.) FirstData has maintained a substantial and continuous presence in the State of Missouri by processing transactions for Missouri merchants, Missouri consumers, and utilizing

3

CardConnect to conduct business in Missouri as well as in conducting business in Missouri prior to and since the CardConnect acquisition.

11.)    FirstData committed tort in Missouri by taking and retaining the value of the Plaintiff's portfolio of accounts  and sales leads as well as the income and profit generated therefrom without having paid Plaintiff for those assets or any of the revenue, income, profit or contribution to FirstData enterprise value attributable thereto.

12.)    Within the past year defendant Fiserve, Inc. ("Fiserve") acquired FirstData Corporation  for $22 Billion.

13.)    Fiserve has taken the benefit of Plaintiff's portfolio, leads, and ongoing profits from Plaintiff thereby causing injury to Plaintiff in Missouri by refusing to pay him and has thereby submitted to the jurisdiction of Missouri courts.  Fiserve is subject to disgorgement of all benefits conferred by Plaintiff to CardConnect and to FirstData including the portfolio, sales leads, income, revenue and profits generated therefrom as well as contribution to enterprise value.

14.)    Fiserve has maintained a substantial and continuos presence in Missouri through its acquisition of the CardConnect, LLC, CardConnect, Corp., First Data Corporation, and their business contracts and relationships, as well as the continued misappropriation and exploitation of the Plaintiff's portfolio without compensation to his damage in Missouri.

15.)    The  assets created, procured or generated  by Plaintiff, hereinafter  the "Portfolio" which includes the sold accounts, the sales leads, endorsements obtained from trade associations, work in process, revenues, income, profits, and contributions to enterprise value are subject to this court's equitable jurisdiction to disgorge from CardConnect, LLC,  CardConnect, Corp., FirstData Corporation, and Fiserv, Inc. , collectively, hereinafter "Defendants".

16.) The court has equitable jurisdiction to trace completely the revenues, income, profits and proceeds of the Portfolio through the chain of transfers and or sales or assignments or other disposition of the Portfolio, as well as contribution of equity to each of the Defendants and to disgorge fully the same from all into whose hands the Portfolio, and financial benefits attributable thereto have come in order to render full and complete relief.

17.) Fiserve has submitted itself to the jurisdiction of this court by regularly and continuously engaging in substantial business in the state of Missouri by serving merchants and customers, and by operating FirstData and CardConnect processing accounts involving Missouri resident businesses and consumers and in continuing to benefit from the Portfolio without having paid Plaintiff.

18.) Fiserve is liable in respondeat superior or vicariously for the acts of CardConnect, LLC, CardConnect, Corp., and First Data Corporation.

19.) The Defendants are further subject to the jurisdiction of the court to declare the parties rights and status with respect to the ownership of the portfolio, equitable interest in the Portfolio, interest in sums owing the Plaintiff measured by the revenue, income, profit and contribution to enterprise value by the Portfolio.

20.) The court further has equitable jurisdiction in rem as to the portfolio assets themselves, as well as all traceable revenue, income, and profits therefrom, and the sums realized therefrom by CardConnect, LLC, CardConnect, Corp., First Data Corporation, Fiserv, Inc. and their respective transferees in the Portfolio, revenues, incomes, profits generated therefrom, and value attributable thereto in whosoever hands the same has come.

21.) Plaintiff invokes the courts' equitable jurisdiction to trace and recover the full benefits of conferred by Plaintiff upon Defendants including the Plaintiff's portfolio of accounts,

5

the revenue, income and profits therefrom and the contribution thereof to the acquisition prices of FirstData and CardConnect.

**HISTORY**

22.) In 2015 CardConnect filed an SEC report showing barely over $1 million in profit. During that same year Plaintiff's portfolio generated approximately $1 million in profit, the near if not entire profit reported by CardConnect. Without profit attributable to Plaintiff CardConnect would have perhaps broken even or lost money from operations. CardConnect also would not have been a viable investment for $350 million - $750 million and was informed so by the intermediaries who arranged to acquire CardConnect to be transferred to First Data Corporation.

23.) In the joint CardConnect, Corp. First Data Corporation SEC filing outlining the history of the merger wherein First Data Corp. acquired CardConnect, Corp., the Defendants relate that CardConnect was advised it must restate its financial report figures to be considered an acquisition candidate despite CardConnect's opinion it was worth $350 million based in part upon the fact that it was profitable and earned approximately $1 million.

24.) To restate its financial data meant that it must show lower operating expenses including sales compensation, as well as increased income, revenue and profit.

25.) In order to accomplish a restatement of CardConnect's financial picture it implemented a number of inequitable, fraudulent and arguably criminal schemes to obtain money to which it was not entitled including refusing to pay Plaintiff, holding and exploiting his portfolio of accounts as its own without regard to payment of the portfolio profit percentage due Plaintiff as well as his salary, and CardConnect overcharged its customers, as well as

6

shareholders commenced litigation asserting that management did not treat them fairly and breached their fiduciary duties to the company and its shareholders..

26.)     With respect to cheating merchant customers CardConnect failed and refused to countersign merchant processing agreements or have its banks sign acceptance of them.  The purpose in failing to execute the agreement but at the same time behaving as though it had, was so that CardConnect could fabricate a defense should merchant customers complain they were cheated of revenue based upon planned unilateral increases in processing expenses to boost CardConnect's purported profit, at the unjust expense to the merchants from their sales proceeds.

27.)     In 2016  KAO  on behalf of themselves and all others similarly situated filed a merchant class action against . CARDCONNECT CORP., in the United States District Court for the Eastern District of Pennsylvania Case No. 2:16-cv-5707 and that case was consolidated with a second merchant class action with similar complaints  Tech Lounge SP, LLC and Law office of Kevin Adams, PLLC on behalf of themselves and all others similarly situated v. CARDCONNECT CORP.

28.)     The merchant class definition  include all of Plaintiff's customers and portfolio accounts.

29.)     The merchant class claims in essence are that CardConnect took more of their sales proceeds than was agreed and imposed unilateral additional expense upon the merchants in higher fees, junk fees, and otherwise without their consent or knowledge, and without the merchant's agreement.  In essence  it is asserted that CardConnect shortchanged the merchants of sums due them in sales remittances.

30.)     CardConnect has contended that it did not sign the merchant processing agreements and therefore was not bound to the fees quoted therein and had the right to increase

7

charges and fees because it was not bound by the contract it proposed and did not sign, but did in fact implement for performance. CardConnect enabled the merchants to use the service to process financial cards, but charged more than the merchants agreed to pay.

31.) In overcharging merchants CardConnect was able to show increased earnings despite the fact the increased rates amounted to fraud, breach of fiduciary duty and theft from the merchants.

32.) CardConnect retained money, merchants retail sales proceeds, to which CardConnect was not entitled. A nutshell presentation of the parties posture and procedural posture is contained in Docket No. 97, an Order referencing the denial of CardConnect's motion for certification for interlocutory appeal of June 26, 2019. Exhibit "___" and a pre-class certification scheduling order was entered on July 3, 2019. Docket No. 101.

33.) CardConnect's purported defense is that it is not bound to the fees and expenses specified by the contracts it proposed and implemented because it did not sign them. What CardConnect actually meant is that it never intended to pay the merchants as agreed in the terms CardConnect proposed.

34.) The merchant class actions are relevant here in that CardConnect engaged in nearly identical conduct at its core as against Plaintiff in cheating him of the payment of the promised monthly salary and his share of the portfolio profits so long as the accounts generated sales.

35.) In order to restate its expenses CardConnect with the acquiescence of First Data progressively reduced the amount it paid Plaintiff on already closed sales, over time reducing Plaintiff's profit payout from 30% incrementally to 0% on already existing sales from which

Plaintiff was promised ongoing profit share at the 30% rate for the life of every account he procured.

36.) CardConnect also employed deceit in pretending to include the $5,000 monthly "salary" Plaintiff was promised as a guarantee in exchange for reduction of the 90% of the profits he would have been entitled to as an ISO.

37.) Each month CardConnect charged the Plaintiff's portfolio profit percentage payment by $2,500 for a "draw" and $2,500 for an expenses so as to effectively paid $0 net salary. This was a further tactic to reduce expenses and thereby artificially inflate its financial picture.

38.) By shortchanging merchants and Plaintiff CardConnect was able to artificially boost its purported profits and reduce its actual expenses to a deflated value. In both regards CardConnect acted inequitably in cheating its customers and Plaintiff.

39.) CardConnect's purpose in aggressively converting sums owing the merchants in sales proceeds and Plaintiff in portfolio profit share was for the purpose of creating a falsely inflated financial picture which resulted in it being acquired by First Data Corporation through an intermediary in very short order for $750 million.

40.) Plaintiff procured and conferred the benefit of over 500 valuable merchant accounts on Defendants promise he would be paid a monthly salary plus a percentage of the profit generated from the merchant accounts for as long as each account generated income.

41.) Plaintiff's portfolio conferred over tens of millions of dollars in revenues to the corporate defendants, millions of dollars in profits annually, and substantial contribution to the enterprise value of CardConnect in its merger with FirstData and likewise with respect to First Data in its merger into Fiserv.

9

42.)    Plaintiff's portfolio generated virtually the entire net profit of CardConnect in 2015. Without the revenue and profits contributed by Plaintiff's portfolio  CardConnect would not have been acquired for $750 million or at all  by FirstData and FirstData  would not have been a takeover by Fiserve for $22 billion without the contribution of CardConnect.

43.)    Plaintiff's portfolio consisted of predominantly business-to-business accounts, without fraud problems, at a high profit margin, of long-standing duration, and with little turnover; as such, Plaintiff's accounts were of such high quality as to warrant projected future earnings as a revenue stream and profits  therefrom.

44.)    A portfolio of merchant accounts is regarded as a financial asset in that it churns out a profit or yield monthly for the duration of its life span.  Portfolios are bought and sold as financial investments and priced  based upon various factors, including current and projected profits or yield and expected duration of the yield.

45.)    The Kao merchant class court has rejected CardConnect's defenses as to the nonexistence of an agreement with the merchants and determined the matter shall proceed to determine the amount of money that must be disgorged from CardConnect and paid by CardConnect to the merchants.

46.)    "Merchant acquisition" is the business of a salesperson persuading a merchant to utilize financial transaction processing offered by the salesperson.   Plaintiff offered merchants processing to be handled by CardConnect.

47.)    CardConnect utilized employees to sell for it and also utilized ISOs (independent sales organizations).  An ISO may be a company or an individual.

48.)    CardConnect agreed to remit 90% or more of the profit generated by the portfolio or collection of accounts referred  by an ISO.

10

49.) CardConnect employees had varying compensation plans, but the distinguishing economic factor between an ISO and employee was that an employee would receive a salary whereas an ISO would not receive a "salary" and would work independently. CardConnect could approve or reject merchant accounts and their terms whether generated by an employee or an ISO.

50.) Plaintiff was engaged by CardConnect for a guaranteed income payment of $5,000 per month in exchange for accepting less than 90% of the processing profit generated from the processing transactions from merchant account he procured. The trade off was that Plaintiff would cede a majority of the processing profit, but have no independent expense burden such as office, administrative burden and staff, etc.

51.) Initially the arrangement was $5,000 per month plus 25% of the transaction processing profits from all of Plaintiff's portfolio accounts. CardConnect offered an incentive of an increase of the percentage on all existing and further accounts procured by Plaintiff to the $5,000 per month plus 30% after it wrongfully terminated its relationship with him and refusing to pay him for several months while at the same time it was interested in increasing the number of highly profitable merchants for processing and from which it would earn additional substantial profit by which to further boost its financial picture.

52.) Plaintiff was the most productive salesperson CardConnect had in that he procured significant numbers of highly profitable merchant accounts, as well as Plaintiff procured at least 5 of the 10 most valuable trade association endorsements as a component of his portfolio. The trade association endorsements warmed trade association members to sales calls on behalf of CardConnect resulting in Plaintiff achieving a sales closure rate (sale) of over 90%. Plaintiff also outperformed all yardsticks by which sales people were measured.

11

53.)     Although Plaintiff's concession of 70% of the processing profits was substantial he was free to work independently, and without any overhead, while at the same time having a financial pillow, albeit modest, of $5,000 per month for as long as CardConnect maintained his portfolio accounts and they generated at least some revenue.

54.)     The percentage CardConnect agreed to pay was stated to be based upon the difference between the actual processing expenses attributable to a merchant and the higher amount the merchants agreed to pay CardConnect.

55.)     CardConnect represented the "profits" or "CCPROFIT" would be calculated as follows:

Charges to Merchants (- )  Transaction specific processing charges incurred to third parties involved in the transaction  (Interchange) = CCPROFIT.

56.)     By way of example, if the portfolio of accounts generated  $100,000 CCPROFIT during a month  that  sum would be net of all expenses attributable to the merchant accounts.

57.)     CardConnect falsely told Merchants it was passing certain expenses through to them at cost when in reality it had inflated those expenses resulting in greater profit by fraudulent misrepresentation toward the merchants.   For example if the merchant were quoted a rate of 4.00% discount for handling its transactions this would mean that for every $100,000 in merchant sales CardConnect would take $4,000.  The inflation of expenses imposed upon merchants as such also reduced the disclosed profit from the portfolio to shortchange Plaintiff.

58.)     CardConnect falsely represented to Plaintiff the actual cost of the Interchange expenses for use in selling CardConnect services to merchants to secretly inflate the actual portion of the profits CardConnect would yield from Plaintiff's portfolio of accounts and to conceal from Plaintiff the actual profit generated.

12

59.)    By 2015 Plaintiff had procured and built a portfolio of over 500 merchant accounts which were generating disclosed  profit of approximately $1 million in 2015.

60.)    The business of "merchant acquisition" boils down to a salesman persuading a merchant to agree to have a particular financial transaction processor handle the processing of credit card, debit card, and electronic payment transactions for the merchant.  That is all the salesman is obligated to do.  Once a merchant signs an agreement the salesman is entitled to his percentage of the profit for as long as the account continues to process transactions.

61.)    In order to find lucrative prospects  Mr. Davis determined worked with  directors of industry trade associations who would be willing to "endorse" CardConnect to their membership to utilize as a processor.  Mr. Davis would join the association, be granted access to its membership, the association would recommend CardConnect.  The association would also receive a small percent of the profit generated from its members and could thereby warm the membership to switching to CardConnect as a vendor the association recommended.  Mr. Davis who had better than a 90% closing percentage of proposals made.

62.)    Mr. Davis focused on industries that high individual sales tickets, sometimes into the low-to-mid six figure magnitude in a single transaction, in business to business sales, such as in heavy equipment,.  For example, a farm equipment dealer may sell a tractor for $200,000 to a farmer who paid by credit card generating very significant processing profits.

63.)    CardConnect would charge the merchant the transaction costs that would be imposed by third parties such as the bank card issuer, bank card brand (Visa, Mastercard) and other transaction specific expenses, plus a markup of an agreeable number of basis points (100/ths of 1 %) in  addition  as profit.   Profit could also be earned from components of

13

expenses charged the merchant by CardConnect.   Davis and CardConnect were to split the profit. All Davis was required to do was to sell merchants on using CardConnect. .

64.)    Plaintiff relied upon CardConnect's statement as to the actual component costs referred to as interchange in quoting the fees to merchants.  Those expenses could include charges from a variety of participants including the card holders card issuing bank, may vary by type of card, and by brand (MasterCard, Visa, Discover Card, and American Express, etc.). After analyzing a prospective customer's current processor's billing statement Plaintiff would develop a proposal that would effect savings and approximately 90% of the time win the sale.  Once the customer signed and the account was operational Plaintiff's entitlement to his share of the profit generated by the merchant's account was vested for as long as the merchant utilized CardConnect (and its assignees, successors, etc.) without further performance obligation upon Plaintiff, and the right to payment for the life of the account whether or not Plaintiff remained howsoever affiliated with CardConnect.   Plaintiff's entitlement was as the procuring cause.

65.)    By working with Associations Plaintiff was able to very profitable accounts and exceeded all expectations of CardConnect including 5 of the 10 most profitable association endorsements.  Plaintiff also had procured additional endorsements.

66.)     In procuring the endorsements Plaintiff cultivated sales leads from membership directories that were not business proprietary, trade secret nor developed by CardConnect by resulted from his efforts and were intended for his benefit as sales leads.

67.)    When a consumer uses a credit card to pay a merchant the merchant incurs the discount rate set forth for the type of transaction set forth in the CardConnect contract.  So if the sale is $ 1000 and the discount rate is 5%  CardConnect takes $50 for that transaction from the merchant's bank account.

14

68.) For example, if the tractor dealer had one sale for $200,000 and the discount rate for the transaction was 3.50 %, the merchant would net $193,000 in settlement of the $200,000 sales ticket after the discount.

69.) CardConnect would receive $7000 from the transaction less the interchange expense from third parties in handling the transaction. The resulting sum was referred to as CCPROFIT. If the markup was 50 basis points ( 50/100ths of 1%, or 1/2 of 1% of the sale price charged the retail customer) CardConnect would have earned profit on the transaction of $1,000.00 assuming it passed through the expenses without additional markups or fees. CardConnect agreed that Davis was entitled to $300 from such a transaction, in addition to his $5,000 monthly guarantee, plus any incentive bonuses.

70.) An "ISO" or "Independent Sales Organization" may be a person or firm that sells merchant transaction processing services for an aggregator such as CardConnect. CardConnect did not actually process the transactions but instead routed them through Wells Fargo Bank and others to actually process.

71.) CardConnect offered to handle the processing for ISO's for 10% (or less) of the ISO's profit from its merchant transaction volume. A very productive ISO may be able to negotiate a lower rate. As an ISO, the salesman and CardConnect would for example agree that the PROFIT (discount to the merchant's receivable from a sale, less interchange charges, etc.) would belong 90% to the ISO and 10% to CardConnect.

72.) Plaintiff and CardConnect reached a hybrid agreement whereby in exchange for payment of a modest $60,000 annual guarantee which CardConnect has referred to as a "salary" (payable to Davis $5,000 monthly) Davis would receive 30% of the PROFIT and CardConnect would receive 70%.

<div align="center">15</div>

73.)    CardConnect further agreed to provide reimbursement of certain selling expenses to Davis.

74.)    The salary and expense reimbursements were to be paid in addition to 30% of the processing profits as described above.

75.)    The $60,000 salary amounted to only around 6% of the profit generated by Plaintiff and was to be paid in addition to 30% of the CCPROFIT generated by the Davis portfolio.

76.)    CardConnect employed deceitful and fraudulent accounting methods and practices to take a deduction of $5,000 monthly from Mr. Davis commission so that it failed to pay the $60,000 salary, treating the monthly payments as an "advance" of $2,500 and "expenses" of $2,500 and thereby wholly depriving Davis of the monthly guarantee.

77.)    The merchant class allegations are relevant in that CardConnect neither intended to honor the pricing it offered the merchants, nor intended to honor its promise to pay the $5,000 guarantee along with 30% of the CCPROFIT to Davis.

78.)    In the case of merchants CardConnect controlled the proceeds that would be paid and the sums taken as expenses from the merchants' bank accounts.  In the case of Davis CardConnect controlled the flow and accounting respecting sums paid or taken from the portfolio merchants.

79.)     CardConnect prepared reports on a monthly basis which contended the amount of profit earned and the payment due Davis; however, rather than abide the agreed compensation CardConnect would always deduct $5,000 from the amount it said it owed Davis, for example:

|  |  |
|---|---|
| PORTFOLIO PROFIT | $100,000 |
| Payable to Davis (30%) | 30,000 |
| less  advance | 2,500- |

16

|   |   |
|---|---|
| less  expenses | 2,500- |
| Remittance (pretax) to Davis | 25,000 |

80.)     By the foregoing means CardConnect breached its agreement to remit 30% in addition to $5,000 salary. Davis should have received compensation of $30,000 commission plus his $5,000.00 salary.   Instead CardConnect took two $ 2500 deductions to recover the $5,000 it paid Davis so that Davis received effectively no salary at all, and rather than be paid $35,000 for the month Davis would be paid only $25,000.

81.)     If Davis procured  a flat $100,000 profit per month, or $1.2 million during a calendar year, he was to receive 30% of the $1.2 million or $360,000 as the portfolio profit split plus $60,000 during the year as salary in addition thereto, or $420,000 in addition to such other incentives or bonuses may be offered.   Instead, each month CardConnect reduced the commission payment by $5,000 or by $60,000 over the year by taking from Davis monthly a deduction equal to his "salary."   By this shortchange CardConnect deprived Plaintiff of the entirety of his salary and $60,000 of his commissions annually.

82.)     In accepting the benefits of Davis work and portfolio understanding that Davis provided his beneficial work with expectation of payment of the salary and profit percentage, and by CardConnect refusing to pay Davis as agreed CardConnect has been unjustly enriched by the revenue, income, profits, and addition to enterprise value represented by Davis work, his portfolio and the financial benefits it generated.   The owners of CardConnect and their successors have also been unjustly enriched by the addition in enterprise value added by Davis.

83.)     The addition to enterprise value by Davis was substantial in that CardConnect was informed it was not an acquisition candidate unless it could restate its financials as related in the History of the Merger section of the merger prospectus filed by CardConnect and FirstData with

17

eh Securities and Exchange Commission, under oath. By eliminating Davis' compensation converting his portfolio, and cheating his customers, CardConnect became a viable merger candidate.

84.) CardConnect agreed to pay Plaintiff for as long as accounts generated profit and in fact paid Plaintiff on accounts he had generated over the period of approximately a decade for the life of the accounts until it ceased doing so. Each month CardConnect would assemble a report purporting to show the processing income, expenses and resulting CCPROFIT on purportedly all accounts procured by Plaintiff, and showed the contribution of each account to Plaintiff's monthly profit share.

85.) . There was not any agreement that CardConnect could reduce or eliminate payment of the profit by changing Davis job title or terminating its relationship with him. Instead it was at least implicitly agreed that if Davis were to stop selling for CardConnect he would nonetheless be entitled to his CCPROFIT percentage for the life of the accounts or that the accounts would be returned to him to place elsewhere to ensure his continued income.

86.) . Each month CardConnect had data that itemized profit earned by each account, along with the establishment date of the account. Davis had accounts of nearly a decade's duration continuing to generate profits demonstrating the agreement to pay ongoing CCPROFIT over the life of the account by performance of CardConnect in accounting as such and purportedly paying pursuant to that agreement. .

87.) Davis was told that as he watched his portfolio grow month over month that he would also see his income increase. CardConnect was paying Davis on accounts regardless of age and that is why Davis income grew substantially.

88.)    A group of accounts procured by an ISO is referred to as a "portfolio or group of financial assets.  As such the portfolio itself was of investment quality due to the high yield it generated in monthly income and profit.  The value of a portfolio is ascertained from factors such as :

a.)    Attrition.   Is the portfolio shrinking in number of  merchant accounts ?

b.)    Expansion.     Are new merchant accounts being added ?

c.)    Fraud.        What is the incidence, if any, of fraud occurring with the accounts?

d.)    Growth.     Is the portfolio yielding increasing profits over time?

e.)    Longevity.  How long have the merchants remained in the portfolio ?

f.)    Basis Yield.   What is the yield in terms of the percent of profit stated

        in basis points ?

g.)    Nature.        What is the composition of the portfolio by type of

        industry, and other metrics,

89.)    Davis portfolio experienced only insignificant attrition and until CardConnect told him he was eliminated was growing, had nonexistent fraud, was increasing in profits year over year, included very loyal merchants who had remained with Davis for many years, was yielding a high basis point yield of approximately  55 basis points ( 55/100ths of 1 %) of the merchant's sales as net profit on many millions of dollars in transaction volume, with mostly business-to-business, big ticket transactions resulting in profit of approximately $1 million in 2015.

90.)    In December 2016 management told Davis it could not afford to pay him in excess of $300,000 in 2016, that CardConnect was going to miss its earnings, and in an attempt to close the gap between its inflated earnings projection and its actual earnings it would

19

commence adding a "one time annual fee" charge of $ 99 to all merchant accounts and that Davis could expect to lose 10-15% of his customers by reason of dissatisfaction with the charge.

91.) CardConnect reduced the profit split to 25% without consideration to Davis and without his consent as to then existing portfolio and work in progress. Shortly thereafter CardConnect further reduced the commission and by late summer 2016 refused to pay any of the profit from the portfolio to Davis.

92.) CardConnect management needled Davis that he was a grumpy old man and they needed to hire new youngsters. It also terminated workers over 50 years of age, hired younger replacements and then asked Davis to train them [as his replacements ] for a salary significantly less than his portfolio profit percentage of $10,000 per month; however, after CardConnect immediately terminated the payments and ratcheted Davis down further promising him a $5,000 monthly salary payment plus bonuses based upon office profitability, and by May 2017 sent Davis a Letter stating his position had been eliminated and he could receive a total of $25,000 for a release, non-compete agreement that would require he consent to entry of TRO and injunction without due process and by stipulation, at his expense including CardConnect's legal expenses, damages and other draconian relief. Davis would have to fully release any and all rights to receive the $25,000 falsely characterized as 5 months salary. The proposal did not release the portfolio to Davis to have serviced elsewhere, CardConnect would become entitled to the annual $1 million profit generating valuable portfolio procured by Davis and retain all of the salary it shortchanged Plaintiff of and all of the past due profit percentage payments in addition to the inventory of trade association endorsements and sales leads.

20

93.) The terms of the proposed "Severance Agreement" and offer are shocking to the conscious and would have worked a forfeiture to the unjust enrichment of CardConnect and were not accepted.

94.) Demand was made for an accounting, payroll and employment records and none were provided.

95.) Demand was made for immediate payment of all past due salary, and profit percentage payments which has been refused and remains unpaid.

96.) Demand was made for relinquishment of the portfolio to be taken elsewhere which has been refused as has been payment for it along with the outstanding compensation past due on its CCPROFIT.

97.) CardConnect's progressive reductions in remittance of sums due from the profit and salary were designed to eliminate the expense of paying Plaintiff so CardConnect could inflate its profit to boost its valuation as an acquisition or merger candidate. With roughly only $1 million in profit, nearly the entirety is attributable to Plaintiff's portfolio, refusing to pay Plaintiff would immediately create the opportunity to increase profit projections by roughly 36%, making it more likely CardConnect could be acquired and at a greater price

98.) By overcharging the merchants for transaction expenses rather than as incurred, and adding "junk fees" such as the $99 one time annual fee, as well as increasing various transaction expense charges beyond that agreed by the merchants, CardConnect could further increase it's perceived profitability and thereby its value as a target for merger/acquisition. "

99.) In a merger" prospectus" filed with the SEC CardConnect and FirstData reveal that there was a third party "blank check" firm formed to as an intermediary step in a chain of transactions ultimately whereby FirstData acquired CardConnect.

21

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

100.)    In the Prospectus CardConnect and FirstData waived the right to enforce
representations and warranties and further misrepresented it had no employment liability issues.
In addition defendants concealed the fact of Davis dispute and that  CardConnect had been
defrauding, breaching its merchant processing agreements, misappropriating and converting
sums due the merchants and the massive liabilities attendant thereto in two merchant class
actions wherein it is understood to have agreed that CardConnect was not entitled to charge or
retain higher expenses than the merchants agreed to pay.

101.)    In the  class action  TEH SHOU KAO, et al. v. CARDCONNECT CORP. Civil
Action No. 16-CV-5707 now pending in the United States District Court for the Eastern District
of Pennsylvania on September 26, 2018 entered an order finding implied contract despite lack of
signature and the terms were as represented to the merchants:

> "CardConnect agreed to provide its services for the fees and rates set forth
> in each Plaintiff's service contract and is limited to those terms absent a mutual
> modification of the implied contract. All unsolicited and unilateral changes made
> in various billing statements that were not by mutual agreement are not binding on
> the plaintiffs. In the absence of an allegation by CardConnect that a plaintiff
> agreed to a contract modification, the fees originally set forth stand."

102.)    On 9-26-17 a separate merchant class action Tech  Lounge SP, LLC  et al vs.
CardConnect Corp.,  No. 17-4014. United States District Court (ED PA) was ordered
consolidated with and under the KAO case and a pretrial conference was scheduled for April 29,
2019.

103.)    The Memorandum and Order establish a judicial determination of fact, that
CardConnect made unilateral changes in billings that were not by mutual agreement and are not
binding upon CardConnect merchants.   This is relevant in part in that all of Plaintiff's more than
500 accounts are members of the class action plaintiff class.

22

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

104.)   CardConnect played the same types of tricks on Plaintiff in reducing his portfolio percentage from 30% to 25% to 20% to 0% on vested accounts unilaterally and without Plaintiff's consent as to his existing accounts at each decrement in profit.  CardConnect also unilaterally defrauded Plaintiff of his $5000 monthly guarantee.    Plaintiff is entitled to a similar finding and order as that in the merchant class actions, that he did not agree CardConnect could reduce or eliminate his compensation on existing accounts and that it must account to him and pay over the unpaid CCPROFITS and monthly guarantee for the life of the accounts, which was the agreement of the parties and is evidenced during the period CardConnect honored it by paying the percentage on monthly compensation statements with an accounting as to the amounts generated by each account, including some as old as 9 years.

upon the entirety of them for no consideration to the merchants

105.)     There is no federal statutory cause of action plead here, nor is there complete diversity of citizenship in that Plaintiff and Defendant Palumbo have resided in Jackson County, Missouri at all relevant times. The corporate  defendants established sales operations in Missouri at the residence of Plaintiff and at the residences of others in Missouri, and the corporate defendants engaged in regular, daily and ongoing financial service transactions on behalf of Missouri residents and merchants.

106.)   Kansas City, Jackson County, Circuit Court is the exclusive venue for this action in that it is where Defendant Palumbo resided when his unprivileged defamatory allegation that Plaintiff had stolen accounts from CardConnect and taken them to a competitor Basys were published and repeated by other CardConnect employees to Plaintiff in Jackson County, Missouri  as first identified  Missouri publication of false statements that Plaintiff had taken and was diverting accounts from CardConnect to a firm named  Basys commencing spring 2017 when in

23

fact Plaintiff had no relationship with Basys and did not divert any account from CardConnect to them and Palumbo's representations were false. .

107.)   Plaintiff Davis commenced a sales career with Marathon Solutions ("MSI") over a decade ago in the lucrative field of "merchant acquisition" which includes the selling of financial transaction processing services to businesses who accept credit cards, debit cards, or other electronic payments.

108.)   MSI was acquired by CardConnect, LLC, which later became CardConnect Corp. ("CardConnect") and through the series of acquisitions CardConnect converted Plaintiff's portfolio of merchant accounts of a value in excess of $5 million for CardConnect, FirstData and now Fiserve's unjust enrichment and benefit.

109.)   In _Tech Lounge Sp, LLC & Law Office of Kevin Adams , on behalf of themselves and all others similarly situated_, Class Action Case No. 2:17-cv-04014-WD United States District Court (ED Penn.) (hereinafter, "Tech lounge") plaintiffs allege multifarious breaches of good faith, fair dealing, fraud, unconscionability by CardConnect against its merchants, resulting in financial losses to the merchants and unjust enrichment to the corporate defendants.

110.)   Plaintiff complains here of similar financial malfeasance and inequitable conduct with respect to that complained of by the merchant class members who in part alleged:

a.)  The plaintiff class is defined as "All United States persons or entities charged unauthorized amounts for payment processing services by CardConnect."  Complaint, at ¶ 76.

Mr. Davis' portfolio is a subset of the merchant class members.

b.)  "CardConnect has also seized or kept additional funds from Plaintiffs' accounts based upon improper fees, charges, assessments, and practices.  Despite many written and verbal complaints from Plaintiffs and their representatives, Defendant has failed to provide a

proper accounting of all funds which it has refused to properly credit to Plaintiff's accounts. The total extent of such amounts improperly retained by Defendant will not be known until discovery is undertaken." Complaint, ¶74.

Plaintiff complains that corporate defendants have seized and kept the entirety of Plaintiff's portfolio as well as the endorsements, his profit percentage and salary and have refused to allow him to work otherwise by threatening him should he do so in their proposed severance agreement..

c.) "Plaintiffs' experiences with CardConnect are not isolated, but rather are illustrative of Defendant's improper business practices towards its customers." Complaint, ¶ 75.

Mr. Davis asserts that the class action allegations demonstrate a pattern and practice of similar malfeasance relevant to this action.

d.) The common questions of fact and law among the merchant class claimants include (Complaint, ¶ 82):

" a.  Did CardConnect require merchants to enter the same or materially similar contracts during the Class Period;

b.  Whether CardConnect and Wells Fargo (or other bank as applicable) signed any customer contracts, thus accepting the terms as a condition precedent to the formation of a valid contract;

c.  When did CardConnect begin assessing or increasing each improper charge;

d.  Which of these charges are improper or unauthorized;

e.  Did merchants receive any tangible benefit from the improperly assessed charges;

f.  Was CardConnect unjustly enriched by its conduct;

g.  If a contract exists, did such contract include unconscionable or otherwise unenforceable provisions, including but not limited to those purporting to

25

limit Defendant's liability, require early termination fees, require payment of Defendant's attorney fees, and allow Defendant to disregard the agreed upon fees and charges;

h.  Did CardConnect breach contractual provisions in assessing improper charges; and

i.  *Did CardConnect breach the covenant of good faith and fair dealing*."

111.)  Other questions of law and fact common to the Class include:

a. The proper method or methods by which to measure damages; and

b. The declaratory or other equitable relief to which the Class may be entitled.  (Complaint, at ¶ 83).

112.)  The Tech lounge class plaintiffs complain of strikingly similar financial malfeasance to that complained of by Mr. Davis, inequitable conduct, breaches of good faith and fair dealing, fraud, unjust enrichment by taking greater sums from the merchants sales proceeds than that to which the corporate defendants were entitled and refusing to pay proceeds or to account.  In addition Tech lounge plaintiffs seek a declaration there were no enforceable contracts because despite provisions requiring CardConnect and its banks countersign they failed to do so in order to unilaterally increase deductions from the merchant's sales proceeds rendering the contracts illusory.

113.)  CardConnect unilaterally repeatedly reduced Plaintiff's compensation on completed work that was generating revenue and profits;

114.)  CardConnect also informed Mr. Davis that he was too old and that it was bringing in younger blood.   CardConnect also terminated numerous older workers in connection with its desire to hire younger aged employees who it would pay less.

115.)  CardConnect also directed Mr. Davis to train younger sales people whom it intended to replace him with.  Mr. Davis was over 50 years of age.

26

116.)    Mr. Davis was engaged to acquire merchant accounts on the understanding that as his portfolio grew he would realize ever increasing monthly income.   There was no agreement that he would ever be deprived of the agreed percentage of the portfolio profit.  CardConnect unilaterally ceased paying the profit percentage as agreed on the portfolio accounts in existence.

117.)    Mr. Davis was not agreeable to deduction of his salary from his commission, to have to train replacements, to surrender his  to train others or do more than acquire

118.)    Mr. Davis is without adequate remedy at law to recover his accounts in that the contracts were entrusted to  CardConnect and may have been assigned or transferred to First Data, to Fiserv, sold or otherwise conveyed,  therefore it is necessary for the accounts to be disgorged as unjust enrichment.

119.)    Mr. Davis is without adequate remedy at law to recover unpaid commissions and salary wrongfully withheld in that there is no written contract and CardConnect refuses to pay on grounds it is entitled to the accounts and profits despite having failed to pay any salary over and above the profit percentage and having refused to pay the agreed percentage..

120.)    It is necessary to exercise equitable jurisdiction for an accounting. The matter of the quantification of sums due on hundreds accounts over several years will be complicated and require discovery, as will be the determination of who has wound up with the accounts to effect their disgorgement and to determine the revenue and profits realized therefrom to be disgorged.

121.)    It is further necessary to exercise equitable jurisdiction by accounting to determine the value contributed by Mr. Davis portfolio in the CardConnect-FirstData and FirstData-Fiserve acquisitions so that those sums may be disgorged.

122.)    It is further necessary to exercise equitable jurisdiction in granting a declaratory judgment that by reason of deducting the salary rather than adding it monthly to the portfolio

27

profit percentage that corporate defendants treated Mr. Davis as an ISO entitled to 90% of the profit generated up to the point the accounts are ordered disgorged.

123.)    The combination of CardConnect with FirstData generated shareholder class action based upon financial malfeasance which is relevant here as further evidence of pattern and practice of corporate defendants inequitable conduct.

124.)    In late 2015 management informed Mr. Davis that it would be imposing a $99 "one time annual fee" against each customer's sales proceeds and that if fully expected to lose 10-15% of the merchant's business as a result.

125.)    When customers received their statement and noted the "one time annual fee" which was described in small type buried in their statement they complained and some terminated CardConnect as their processor.

126.)    CardConnect's financial victimization of the portfolio merchants was in breach of its duty of good faith and fair dealing toward the merchants and toward Davis in that it alienated the merchants resulting in losses of accounts and the imposition of customer service burdens upon Davis to attempt to preserve the relationships.

127.)    CardConnect's customer service was the subject of complaints and merchants would complain to Mr. Davis whose job it was not to address such complaints.

128.)    Once a merchant's account was activated every time the merchant's customer made a purchase by credit or debit card or electronic check Mr. Davis was entitled to the agreed percent of the profit that transaction generated, for however long the account produced transactions.  CardConnect's abuses of the merchant portfolio materially jeopardized the income streams from merchants affected.  If Davis could not persuade CardConnect to remove the

28

charges he would lose the ongoing income that would otherwise had been generated had CardConnect not abused the merchants.

129.)   Trade Associations are organizations whose membership largely consists of members who are in business in the type of trade the Association was established to serve.

130.)   Trade Associations screen vendors for their membership and provide their membership a list  of vendors whom the Association has approved and endorses the members use.  An endorsement amounts to notice from the Association from the membership that they should consider using the particular vendor which has been endorsed by the Association. Associations may also inform their membership that use of an endorsed vendor will generate revenue for the Association, so in patronizing  the endorsed vendors the member is also supporting the Association financially.

131.)   Associations directors must be careful to endorse only competent and honest vendors, if the endorsed vendor fails to keep its promises, fails to provide adequate customer service, or cheats the members the members complain to the Association about the problem with the vendor and may ask the Association to intervene.

132.)   Mr. Davis received complaints from Associations whose endorsements he had procured about  surprise increases in CardConnect charges such as the one time annual fee of nearly $ 99, and other unilaterally imposed charges taken by CardConnect from the remittance of the member's sales proceeds as well as terrible customer service which aggravating the member.

133.)   Association directors  issued an  ultimatum that either Mr. Davis get the situation resolved at CardConnect or risk loss of the endorsement and opportunity to sell to the membership.

134.) Association and merchant complaint resolution was not Mr. Davis obligation to be entitled to his salary or profit percentage, but he was effectively forced to take on that additional burden or risk losing his goodwill with the Association, the endorsement, the customers procured from the membership list and the ongoing revenue stream from the profit generated from the member accounts.

135.) An Association director complained that when CardConnect causes his members to complain that reflects poorly on the Association who then could risk loss of members as well as the appearance that the directors incompetently endorsed the vendor.

136.) Mr. Davis received communication from Association directors respecting their membership's dissatisfaction with CardConnect's increasing charges as well as customer service failures that would become protracted.

137.) It is necessary to invoke equity to disgorge the Association endorsements from CardConnect and to determine which merchants terminated due to overcharges or for other breaches, abuses or failures by CardConnect, and the value of the loss of the accounts &/or Association endorsements from the portfolio as portfolio assets as well as in terms of the lost opportunity in streams of income terminated by reason of CardConnect's abuse of the Associations and merchants.

138.) In behaving inequitably toward the merchants in Mr. Davis portfolio CardConnect also acted inequitably toward Mr. Davis by jeopardizing the income stream from the merchants and warm leads created by the endorsements. The merchant class action court order aforementioned highlights the need for the court to declare a quasi contract in the event Card Connect argues here it had no contract with Davis because it did not sign one. As in the class action this court can find a contract implicit in the performance of the parties or it may determine

30

that if CardConnect does not affirm a contract existed it may equitably disgorge all benefits conferred by unjust enrichment.

139.)    CardConnect's misappropriations from the Davis portfolio merchants constitutes a breach of CardConnect's duty of good faith and fair dealing toward Davis in jeopardizing the work invested in procuring the accounts and revenue to be enjoyed therefrom.

140.)    The merchant and shareholder class litigation is relevant here.  The merchant class action has demonstrated managerial patterns of inequitable practices toward the merchants including those procured by Davis.  Matters decided in those regards against Defendants collaterally estop re-litigation of those issues in this litigation and thereby reduce the burden on the court.    Rulings against defendants in those cases may be dispositive of a variety of facts and or issues here including plans, schemes, patters, policies, credibility, unclean hands and otherwise.

141.)    As to employees, and customers described in the class actions  CardConnect has engaged in inequitable and fraudulent conduct respecting money belonging to or entitled to be received by others who entrusted their work, investment or accounts receivable to CardConnect; thus, the conduct complained of by each plaintiff is relevant to establishment of evidence of a course of business patterns, practices and policies employed by the Defendants as a matter of habit.

142.)    The conduct complained of in each case evidences ultra vires behavior if not criminal behavior in addition to inequitable and fraudulent behavior and breaches of contract, as well as a policy and practice of forcing litigation to disgorge sums to which Defendants are not entitled to withhold.   Each of the litigation has invoked equitable remedies.

31

143..)   CardConnect accepted the benefits of Plaintiff's performance resulting in not only over $1 million and growing annual profit from Plaintiff's portfolio of accounts but contribution of significant enterprise valuation in the acquisition of CardConnect by FirstData, which contributed significant value to FirstData in its acquisition by Fiserve, Inc. for which Plaintiff enlists the court to equitably trace and to disgorged as unjust enrichment due to the series of merger transactions and dissipation of the portfolio assets.

.      141.)   In deducting the prior month's salary from portfolio percentage payment each month Defendants engaged in fraud, deceit, misrepresentation, breach of the duty of good faith and fair dealing, breached their fiduciary duty to account and remit, breached their agreement with Plaintiff, and have been unjustly enriched.

142..)   In a May 2017 Letter CardConnect's told Plaintiff his position was eliminated. CardConnect enclosed a purported "severance agreement" the terms of which would effect an unlawful and unenforceable  restraint of trade.   Rather than offer to return the portfolio and accrued unpaid salary and portfolio commission CardConnect said it would pay Plaintiff $25,000. The proposed agreement appears to have been  authored by an attorney and  is shocking to the conscious and unconscionable.

143.)   The proposal threatens Mr. Davis with legal and equitable action and demands he agree to a TRO and permanent injunction without bond, that he agree to pay CardConnect's attorney's fees, that he agree to pay damages, that he agree to waive a variety of rights, including but not limited to ceding his work product of over 10 years, he waive and liquidate all  sums owing him for years of  promised but in fact unpaid salary and  he agree to forego unpaid accrued portfolio profit percentages and future percentages, that he relinquish any and all rights of whatsoever nature, waive service of process, consent to foreign jurisdiction and law.

32

141.) The Letter intended to make a take it or leave it nonnegotiable demand Mr. Davis agree that defendants may retain all of the benefits Mr. Davis conferred without paying for them as agreed.

142.) For the relinquishment of all of Mr. Davis' rights CardConnect was willing to pay only $25,000 which is insufficient to liquidate sums owing and accruing.

143.) The threats set forth in the proposal coupled with the lack of sufficient consideration rendered it coercion. CardConnect's proposal threatened to sue and sought restraint of trade or employment by Mr. Davis and would be found preemptively unenforceable.

144.) CardConnect's threats amount to extortion and chilled Davis from gainful employment in his field depriving him not only of the sums by which CardConnect has been unjustly enriched but chilled him from resuming work in his field as well as inflicted emotional distress upon him. The proposal was intended to attempt to intimidate and has succeeded effecting a form of extortion in that it constitutes a restraint of trade by its threats, including the implicit threat that Mr. Davis must be put the to the burden and expense of litigation if he were to work or to impoverishment.

145.) The asset value of Mr. Davis portfolio is conservatively valued at 70 times its monthly income. Based upon the 2015 average profit as stated by CardConnect, the portfolio was of a minimal value of $ 7 million if sold as a financial investment.

146.) An accounting is necessary to determine the identification of association members procured by Mr. Davis' efforts and the revenue and profit generated therefrom, the value of the endorsements, the revenue streams from the endorsements, and the value of the work in progress as well as opportunity value in endorsements.

33

147.)   Defendants have also established competing ISO(s) (independent sales organizations) into which to channel Mr. Davis' portfolio customers many of whom have become dissatisfied with CardConnect's service.   CardConnect's competing ISO's have approached members of Mr. Davis' portfolio as an alternative to being dissatisfied with CardConnect and leaving.  The competing ISO's may have as a purpose diversion of portfolio customers to a differently named entity that is operated by employees, officers, or directors of Defendants.

148.)   The merchant class litigation is relevant here in that the merchants claim that CardConnect represented it would pass through interchange at cost, but instead marked it up so as to charge a higher discount.  That in turn resulted in unjust enrichment to Defendants by understatement of their actual profit on the portfolio.

149.)   The Tech lounge class action Complaint at Count Two seeks disgorgement of unjust enrichment of all improperly assessed fees from the merchants because there were no enforceable contracts permitting them.   "CardConnect seized and retained more than" negotiated rates not because costs increased but merely to enrich itself at the expense of the merchants.

150.)   Corporate defendants have seized and retained more than they agreed by refusing to pay Plaintiff his CCPROFIT percentage from the revenue of his portfolio, seized and retained an amount equivalent to his monthly salary each month, refused to pay the salary and the portfolio percentage, all strikingly similar inequitable behavior as to that employed against the merchants.

151.)   The difference between the fraud against the merchants and malfeasance against Plaintiff is merely a matter of degree.  The merchants received some although less than the agreed percentage of their sales; however, the corporate defendants took ALL of Plaintiff's salary

34

and ultimately ALL of Plaintiff's portfolio commission as well as the portfolio to boost the apparent value of their enterprise at Plaintiff's expense resulting in their unjust enrichment.

152.) The merchant class Complaint Count III pleads that CardConnect assessed charges not provided for in the contracts, inflated charges, charged fees for worthless items, marked up agreed charges and fees without basis, and charged markups where markups were to be waived, and did so without notice in breach of contract and the duty of good faith and fair dealing. Complaint, ¶ 106.

153.) The merchants further allege that if Pennsylvania law applies that Pennsylvania law imposes the duty upon all parties of good faith and fair dealing, and that good faith and fair dealing in connection with executing contracts and discharging performance and other terms in accordance to their terms, means preserving the spirit --- not merely the letter -- of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contracts, in addition to the form. Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts. Complaint, ¶ 110.

154.) Tech Lounge Complaint ¶111 notes that "Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty."

155.) Tech lounge Complaint ¶112 notes that:

"By charging fees that are inconsistent with those laid out in the contract, including but not limited to, increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, CardConnect has

35

violated the spirit of the contract and breached the covenant of good faith and fair dealing. Even if CardConnect believed that it had given itself contractual discretion to increase markups and fees, or add new fees, such discretion is constrained by good faith and fair dealing under Pennsylvania law and Defendants actions do not comport with this duty."

156.) The Tech lounge allegations are relevant to this action in that corporate defendants conduct toward Plaintiff in reducing and converting his commission, and his guarantee is virtually identical in its wrongful conversion and retention of sums owing the merchants resulting in the corporate defendants unjust enrichment, violation of its duties of good faith and fair dealing, breach of its contractual agreement to pay salary plus 30% of portfolio revenue as a commission rather than 90% or more on a straight commission basis.

157.) Lounge Complaint Count IV for declaratory relief alleges that CardConnect attempted to immunize itself from liability for its practices by adhesive terms purporting to make it impossible for merchants to obtain relief from the over billing practices. CardConnect attempted to immunize itself from liability to Plaintiff by forcing him to sign an unconscionable proposed "severance agreement" prepared by its counsel or to leave without any income or his portfolio whatsoever.

158.) To date corporate defendants have refused to return the portfolio, pay the promised commission plus salary, and instead threatened to sue Plaintiff, to seek injunction, attorney fees, and other draconian relief in their demand for an unconscionable and unenforceable severance agreement that would amount to an unlawful restraint of trade.

159.) Lounge Complaint ¶120 notes "For example, those provisions which give CardConnect unlimited discretion to make changes or amendments to the contract for any reason or no reason at all (e.g., Program Guide, §§ 19.4, 19.5, 35.7) render the contract illusory and lacking in mutuality ." This issue is relevant here in that CardConnect repeatedly unilaterally

36

reduced and ultimately eliminated Plaintiff's commission rate and his salary rendering its promises to Plaintiff wholly illusory and inequitable for corporate defendants to retain the benefits conferred by Plaintiff such as the portfolio, sales leads generated by Plaintiff, the revenue from the portfolio, the contribution to enterprise value of Plaintiff's portfolio in the acquisition of CardConnect by FirstData and the contribution to the enterprise value in the acquisition of FirstData by Fiserve, Inc.

160.)   Lounge Plaitniffs further complain that conduct by which CardConnect attempted to impose terms to exculpate itself from liability are procedurally and substantively unconscionable.   Unconscionability is inequitable, and relevant to Plaintiff's equity claims here. Should the Lounge court determine CardConnnect engaged in unconscionable attempts to exculpate itself that is relevant to habit, pattern and business practice here given CardConnect's attempt to cram down a proposed severance agreement containing unconscionable terms.

161.)   In the merchant class actions procedural unconscionability has been alleged based upon the merchants inequality in bargaining power and necessity to rely upon the corporate defendants and are thus at the mercy of companies such as Defendant that provide such services as CardConnect acknowledged in its motion to dismiss the Kao case,  (Kao, Dkt. No. 11, p. 22). As in Kao and Lounge the Plaintiff here was at the mercy of the corporate defendants respecting accounting and receipt of payment in a relationship wherein CardConnect continually changed the basis upon which it paid and ultimately withheld entirely Plaintiff's salary and portfolio percentage on a take it or leave it basis.

162.)   Defendants unilateral decreases and elimination of Plaintiff's income was also substantively unconscionable because it was unreasonably favorable to CardConnect and was not the result of negotiation or agreement as to already procured accounts and accrued "salary.".

37

163.)    As a result of the unconscionability practiced on the merchants which is virtually identical to that practiced against Plaintiff by the corporate defendants here  a judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to their relations, and the Court should use its equitable powers  here to order accounting and disgorgement of all unjust enrichment.

164.)    In *Scarantino v. CardConnect Corp*. Case No. Case 2:17-cv-02677-MMB  (E.D. PA 6/13/17) defendants have been sued for federal securities fraud respecting the acquisition of CardConnect by First Data Corp.   This  class actions arose from pre-merger activity by the Defendants to cheat their  investors.

165.)    In May 2014 CardConnect told Davis it had wrongfully terminated Davis in February.  CardConnect failed to pay Davis in connection with the termination.  In May 2014 Davis was induced to return to sales by the promise that he would own his portfolio and it would be fully returned to him.  The monthly commission reports in fact list Mike Davis as the owner of the accounts he had procured.  CardConnect also promised to restore the $60,000 annual salary.

166.)    On May 8, 2017  CardConnect informed Plaintiff his position was eliminated and he was discharged.  Rather than pay past due sums owing in salary and portfolio percentages and to continue the regular payment of the CCPROFIT on those accounts Plaintiff procured CardConnect sent an oppressive proposed severance agreement the terms of which were in violation of both the law of Missouri and Kansas in attempting to extract a release and draconian equitable remedy such as a consent restraining order without bond, attorneys fees and other remedies in exchange for only $25,000.00.

167.)    Plaintiff had been unpaid his commission at 30% since December 2015, and paid none since mid 2016.    Plaintiff's $5,000 monthly salary had been deducted every month from his commission.

168.)    Promptly after his termination Plaintiff demanded his salary and unpaid portfolio commissions as the regular payment of ongoing commission and this was willfully and wrongfully refused.   CardConnect's position was that if Plaintiff did not accept $25,000 by a certain date that its offer would expire.    Plaintiff has entered into no agreement with Defendants to liquidate his rights.

169.)    CardConnect has repudiated its agreement with Plaintiff denying there is any obligation to him.

170.)    Plaintiff remains unpaid the salary and CCPROFIT share from February 2014 through May 2014.

171.)    By April 2014 a CardConnect executive contacted Plaintiff and told him that his termination was wrongful, that he was "pissed off" when he heard about it, that had he known he would have intervened and begged him to return to "do what you do best - close contracts."

172.)    As inducement to returning Plaintiff was offered the return of "your portfolio" a $60,000 annual salary, and freedom to work his own hours, wherever he wished and a 25% payout of the profits on the portfolio revenues.

173.)    As CardConnect's merger plans proceeded it determined it needed Davis to work even harder to achieve its dream of being sold for hundreds of millions of dollars.   Merchant Acquirer's are valued in large part on the value of the portfolio they service.  The price is a multiple of profit and figures into the 70s x monthly profit are not unheard of.   The multiple takes into account various factors including:

39

a.) account life expectancy. Mike's portfolio had accounts nearly 9 years in duration and almost nonexistent attrition of b-2-b customers.

b.) the more valuable big ticket low fraud business to business merchants versus the consumer market which is less valuable. Mike's portfolio was almost entirely highly profitable business to business accounts.

c.) the profit yield of the portfolio.

174..) CardConnect represented that it would raise the payout on his portfolio profit from 25% to 30% if he met performance goals for 6 months and he did so, and the percentage increased. There was no qualification as to the duration for which the 30% would be paid, in accordance with the parties course of dealing it would be paid so long as the accounts produced profit.

175.) By January 2016, and after telling Mike CardConnect cannot pay him more than the $300,000 his portfolio would generate as his share of the profit at 30% CardConnect reduced the payout to 25% then 20% then 0% overall his accounts.

176.) By the fall of 2016 CardConnect effectively terminated Mike for sales purposes and discontinued paying any of the portfolio profit. CardConnect then told Mike he would be paid only $10,000 monthly (rather than the nearly $30,000 he was entitled to) to train new younger noncommissioned sales people how to sell Mike's warm sales leads from his endorsements. CardConnect would not only not pay Mike the vested commission rate on his accounts, but would have him forfeit his sales opportunities to cheaper replacement sales' people it referred to as "kids" who would likewise not be paid any commission.

40

177.)   By January 2017  CardConnect informed Mike his $10,000 salary was over and he was to return to sales for $5,000 a month plus a quarterly bonus based upon the 'kids' sales , rather than his 30% portfolio payout.

178.)   On May 8, 2017 CardConnect sent Mike a note stating his position was eliminated with a proposed severance agreement containing grossly unconscionable and some unlawful terms indicating he would be paid only $25,000 and then only if he released CardConnect.

179.)   Mike demanded his past due salaries and portfolio payouts and return of his portfolio which CardConnect refused and willfully refused to pay any back compensation owing.

180.)   CardConnect through its employee general counsel repudiated the agreements to pay the salary and commissions evidenced by the 2015 commission statements.

181.)   Upon closing inspection of the commission statements Mike discovered that in fact he was not paid any salary as a sales person because CardConnect deducted the entirety of the $5,000 salary from his portfolio commission payments so that CardConnect was first to breach both of his employments to a material and substantial degree.

182.)   CardConnect admitted the 2014 termination was wrongful and it was first to breach  its material obligations up to that point.

183.)   CardConnect is barred enforcement of any employment agreement existing before it rehired him in late April or May 2014 for having been first to breach by failure to pay compensation and for wrongful termination.

184.)   CardConnect has admitted it entered into no new written employment agreement with Mike respecting his second employment commencing Spring 2014.  The parties agreement was oral but evident in performance as reflected in the commission statements.

41

## COUNT ONE - QUASI CONTRACT

### Equitable Disgorgement In Unjust Enrichment or Quantum Meruit

185.)  Plaintiff incorporates paragraphs 1 -184 as though fully restated.

186.)  CardConnect  told he would be paid a salary  plus a percentage of the profit of the portfolio he procured, that  as his portfolio grew so too would his monthly income and that soon he would not believe how much money he was making to encourage him to work very hard to sell CardConnect's services.

187.)  Plaintiff was not informed  that continued employment was necessary to receive the commission respecting accounts he had procured which continued to generate profits to defendants, nor that he could be terminated at any time and so too would his compensation for profitable accounts established to that point, nor that trade association leads he procured for his own sales efforts would be taken and given to noncommissioned sales people to save CardConnect money.

188.)  Plaintiff conferred the benefit of causing the procurement of a portfolio of over 500 very profitable accounts generating over $1 million in profit annually by the end of 2015 and then having an asset value in excess of approximately $7 million as a commodity..

189.)  Plaintiff also conferred the benefit of procuring roughly a dozen significant trade association endorsements resulting in thousands of warmed leads to sales effort due to the association endorsement and approval of CardConnect by Plaintiff's work.

190.)  The leads were very valuable in that they were preconditioned to be receptive to sales efforts from Plaintiff on behalf of CardConnect, so much so that his "closing rate" was approximately 90% of sales proposed.

42

191.)   Plaintiff's role with CardConnect  did not entail more than selling accounts, and if he wished to sell endorsements to increase his sales prospects.   Once an account was sold CardConnect was otherwise responsible for fulfilling all aspects of the sale and for paying Davis the agreed percentage of CCPROFIT generated from each account so long as it continued to generate income..

192.)   In addition to creating accounts and endorsements, and thousands of valuable leads, Plaintiff's efforts procured over $1,000,000 in net profit to CardConnect in 2015.

193.)   CardConnect was going to miss it's earnings estimates and Plaintiff's profit contribution represented the near entirety of its reported income in its form 10-K filed with the SEC.

194.)   Defendants appreciated the benefits conferred upon them by Plaintiff and in fact utilized those benefits to pump up the value of their acquisition by First Data who valued CardConnect in part based upon the portfolios it services and the asset value of Plaintiff's portfolio.

195.)   Defendant's falsely represented in their merger proxy solicitation there were no disputes with employees though they knew as of late 2015 when they informed Plaintiff they would not pay him as agreed that he had a significant dispute

196.)   Defendants dirtied their hands, and acted fraudulently and unjustly in accepting and retaining the benefits conferred by Plaintiff including the account servicing, the endorsements and leads, and the increase in the value of their entity based upon Plaintiff's contribution to the near entirety of its reported profit, and the revenues , incomes and profits generated by Plaintiff's work including the portfolio, endorsements, and sales prospects, as well as his work in progress.

43

197.) The history of the merger negotiations reflects that CardConnect would not have been a target for acquisition by First Data because CardConnect would have lost money or nearly broken even in 2015 without the benefits of the contribution to income and profit from Plaintiff

198.) Acceptance and retention of the benefits conferred by Plaintiff is unjust and inequitable without paying for them as expected.

199.) Upon the representations that Plaintiff would own his portfolio, have a right to ongoing income so long as the merchants generated volume, and would receive a salary Plaintiff provided his labors and intellect in growing his portfolio to over 500 profitable accounts generating approximately $1 million in annual transaction profit by December 2015.

200.) CardConnect accepted the benefits conferred by the labor of Plaintiff knowing that he expected to be paid his salary in addition to the agreed 30% of the portfolio's profit and such other benefits as had been promised..

201.) Trade association endorsements are very valuable reputation enhancing accomplishments that reduce the difficulty of a vendor attempting to sell the membership of the association for two reasons, (a) the vendor gains instant credibility and cost efficient visibility to the members, and (b) the association is supported financially by the members in using endorsed vendors. Association endorsements open the door to sales activity in that the association's endorsement is persuasive to its members. Endorsements by significant associations also enhanced the credibility of CardConnect as a viable vendor in its marketing to others and for the purposes of its acquisition by First Data thereby enhancing the value of the enterprise..

201.) Mike Davis procured at least 5 of the 10 most profitable associations that CardConnect was endorsed by, and others.

44

202.)    CardConnect did not compensate Mike for procuring trade association endorsements and it is inequitable for CardConnect to capitalize thereon by retaining the endorsements, leads, and threatening to sue Davis if he were to sell to those association's members or to seek their endorsements.

203.)    CardConnect has refused to pay promised salary, CCPROFIT share ("commission") or to act in good faith but instead has converted by retention sums which were generated and procured by Plaintiff, converted by unfair extorsive threats the sales leads and endorsements, refused to pay the agreed $60000 salary, provide health insurance and other benefits promised, and also profited by boosting the value of the company to become a merger candidate by its inequitable treatment of Plaintiff and his portfolio customers to become able to be considered a merger candidate for more than the $350 million the investment advisors deemed unrealistic unless the financial picture was restated.

202.)    In order to become a merger candidate, in bad faith, and inequitably, CardConnect took and retained the benefits of Davis work, and used the financial benefits of that work, to restate their financials by denying any employment disputes so as to show decreased selling expenses, increased income, revenue and profits, and increased asset value attributable to Davis portfolio, endorsements and leads.

203)    Davis is without adequate alternate remedy at law in that there is no written contract per se upon which a traditional breach of contract action may rest, instead only by the court imposing quasi-contract can equity be served and unjust enrichment and fraud avoided.

204.)    CardConnect's in house employee counsel's repudiation of its agreements with Davis entitles Davis to and authorizes the court to fashion equitable relief in unjust enrichment for equitable disgorgement of all of the benefits conferred.

45

205.)    The interest of equity requires that the court disgorge all benefits conferred by Davis upon CardConnect and its transferees and assigns, that those be traced to the hands of the recipients of the same and disgorged in their entirety.

206.)    In the alternative, the application of quantum meruit would require that the court find CardConnect agreed to pay a salary of $60,000 per annum and 30% of the Profit generated from the portfolio, declare the same and order payment of the same in quantum meruit.

WHEREFORE,  Plaintiff prays the court disgorge all of the portfolio to Mike Davis and to invoke tracing of all proceeds of the benefits of his contributions to CardConnect in whosoever hands they may have come and to disgorge those from all successors and assigns, to trace the utilization of the leads and disgorge all benefits therefrom, to disgorge the benefit of  all of the endorsements and endorsement based leads, and to disgorge all of the profit earned on the portfolio Mike conferred, as well as the percentage of the merger consideration attributable to the beneficial value Mike created through the benefits he conferred, to bar Defendants counter-restitution as well as any other equitable relief due to their unclean hands, for his costs, attorneys fees, interest,  and for such other and further relief as the court deem appropriate.

## COUNT TWO

## DEFAMATION

207.)    Plaintiff incorporates as though fully restated paragraphs 1-206.

208.)    Defendant Renny Palumbo commenced uttered factually  false and defamatory representations respecting Mike Davis in the spring of 2017.

209.)    Palumbo stated that Davis was stealing CardConnect accounts and giving them to a competitor Basys. These statements were false in that Davis did neither.

46

210.) An employee of CardConnect called Davis in Jackson County, Missouri and confronted him with the allegation that he was stealing accounts from CardConnect according to Renny Palumbo who was the sales manager in the Kansas office.

211.) The employee had no reason to know the allegations in that she was not involved in the supervision of Plaintiff. Instead the defamatory allegations of theft and disloyalty were made in the form of gossip by Renny Palumbo in the course and scope of his employment and for the benefit of CardConnect in damaging Plaintiff's employability elsewhere by characterizing him and disloyal, dishonest and untrustworthy. The full extent of publications will require discovery.

212.) The allegations of theft were false and accused Plaintiff of committing the crimes of theft and misappropriation and are defamatory per se.

213.) At present the first known publication in Missouri was to Plaintiff vesting jurisdiction and venue exclusively in this court.

214.) The allegation of theft has been emotionally damaging to Plaintiff and has sullied his reputation and impaired him in the confidence of others for business and social relations.

215.) The defamatory statement were knowingly made and knowingly false in that Palumbo contacted Basys to inquire about his suspicions and was informed that Davis had brought no business to it and did not work for it. Despite this Defendants failed to take any action to ameliorate their defamatory statements.

216.) Palumbo's contact of Basys accusing Davis of theft, disloyalty, misappropriation were outrageous, and defamatory.

47

217.)   As a result of the defamatory allegations Plaintiff's reputation and standing in the industry and socially have been damaged and he has suffered anguish in an amount in excess of $25,000.00.

218.)   In all regards Defendant Palumbo and the corporate defendants defamatory remarks were made in the course and scope of their employment with CardConnect and First Data and in the furtherance of their business in attempting to render Plaintiff unemployable in the field of merchant acquisition to eliminate him from competition due to his exceptional abilities.

219.)   The Defendants intentionally tortious statements were made knowing the same to be false or with reckless disregard for the falsity thereof amounting to sufficiently outrageous conduct that is intolerable so as to warrant an award of punitive or exemplary damages.

220,)   To the extent Defendants threatened or inferred they would sue Basys or any other competitor should they utilize Davis or permit him to refer accounts, those threats had defamatory effect in that Davis despite being perhaps the best merchant acquiring in the area was not courted by any competitor of CardConnect under the cloud of potential litigation should they engage him.

221.)   As a result of Defendants false and defamatory remarks Plaintiff was damaged.

WHEREFORE,  Plaintiff prays the defendants be held jointly and severally liable for actual damages in excess of $25,000 and fair and reasonable punitive or exemplary damages, his attorneys fees, costs incurred and such other and further relief as the court deem appropriate.

## COUNT III

### MISSOURI SERVICE LETTER STATUTE

222.)   Plaintiff incorporates paragraphs 1 - 221 as though restated.

223.)   Plaintiff was employed by CardConnect and terminated twice.

48

224)   Plaintiff timely requested a "service letter" asking the information set forth in R.S.Mo. 290.140 in a timely manner and by certified mail, obligating CardConnect to respond within 30 days.

225.)   Defendants did not send a compliant response as required by R.S.Mo. 290.140.

226.)   Plaintiff has been distressed by the Letter Defendants did send which strayed beyond requirements of R.S.Mo. 290.140 and wholly failed to address his first employment with them.

227.)   Plaintiff has been deprived of a proper service letter and been unemployed since and thereby damaged in excess of $25,000.00.

228.)   Plaintiff is entitled to actual and punitive damages by reason of Defendants violation of the Missouri service letter statute, and by reason of the outrageous and utterly intolerable conduct of Defendants, along with  his costs and attorneys fees

WHEREFORE, Plaintiff prays the court enter an award of actual and punitive damages, his costs, his attorneys fees and for such other and further relief as it deem appropriate.

## COUNT  FOUR
## KANSAS STATUTORY EMPLOYEE PROTECTION ACT
## K.S.A. CHAPTER 44
## KSA 44-315, et seq.

229.)   Davis incorporates by reference as though fully restated paragraphs 1- 228.

230.)   CardConnect agreed to pay Plaintiff a salary of $5,000 monthly from
 plus initially commissions of 25% on the CCPROFIT from transactions generated by his portfolio of accounts and endorsement leads, which increased to 30% by 2015.   CCPROFIT is the amount charged merchants for service provided less the interchange fees component thereof.

231.)   K.S.A.  44-315 provides in relevant part:

49

44-315. Separation prior to payday; damages for willful nonpayment.

(a) Whenever an employer discharges an employee or whenever an employee quits or resigns, the employer shall pay the employee's earned wages not later than the next regular payday upon which he or she would have been paid if still employed as provided under K.S.A. 44-314 either through the regular pay channels or by mail postmarked within the deadlines herein specified if requested by the employee.

(b) If an employer willfully fails to pay an employee wages as required by K.S.A. 44-314, and amendments thereto, or as required under subsection (a) of this section, such employer shall be liable to the employee for the wages due and also shall be liable to the employee for a penalty in the fixed amount of 1% of the unpaid wages for each day, except Sunday and legal holidays, upon which such failure continues after the eighth day after the day upon which payment is required or in an amount equal to 100% of the unpaid wages, whichever is less. For the purpose of such additional damages, the failure to pay shall not be deemed to continue after the date of the filing of a petition in bankruptcy with respect to the employer if he or she is adjudicated bankrupt upon such petition nor shall it be deemed to continue after an appeal is filed under K.S.A. 44-322a, and amendments thereto, until the decision on appeal becomes final.

232.)    The CardConnect office for whom Plaintiff worked was located in Kansas, and it provided him office space there at which he provided CardConnect his services in addition to providing services from Jackson County, Missouri.

233.)    CardConnect failed to pay Plaintiff accrued earned wages and those accruing from ongoing CCProfit after the February 2014 admittedly wrongful termination, as well as after the May 2017 termination.

234.)    CardConnect's failure to pay Davis in each of 2014 and 2017 and on an ongoing basis is in violation of K.S.A. 44-315 entitling Plaintiff to an award of all past due and owing wages plus a 100% statutory penalty as described in K.S.A. 44-315(b).

235.)    The sums past due and owing for the 2014 termination include $5,000 monthly salary and CCPROFIT percentage of 25% on the portfolio profits.

50

236. )  CardConnect wrongfully terminated Plaintiff in February 2014 but willfully  then urged him to return to sell for it stating it would give him his portfolio if he returned in addition to $5,000 monthly salary, and he  recommenced his services in late April or May 2014.

(a)     CardConnect willfully refused to pay the salary of $60,000 annually ( payable at the rate of  $5,000 salary per month) in addition to the 25% and later 30% CCPROFIT percentage on Davis' portfolio  ("commission").

(b)     CardConnect failed to pay any compensation for the period of Davis unemployment in 2014 despite ongoing obligation to pay the commission on the portfolio and also terminated non-contingent salary payment installments.

237.)    CardConnect terminated Plaintiff from his sales position in 2016 and has willfully refused to pay him his portfolio percentages on customers he sold from approximately July 2016 through the present entitling him to the promised CCPROFITS at 30% at that time, plus  unpaid salary plus a 100% penalty.

238.)    .CardConnect told Plaintiff his position was eliminated in May 2017 but willfully refused to pay him his unpaid salary of $5,000 per month, plus bonuses based upon office performance and his CCProfit percentage entitling Plaintiff to award of the same plus a 100% penalty.

239.)    CardConnect's termination of Plaintiff in sales  was accompanied by a differently position involving association development at a $10,000 monthly salary plus bonuses.  Plaintiff did not release CardConnect from its obligation to continue to pay the CCPROFIT% on his portfolio nor the value of the endorsement leads.

240.)    CardConnect willfully refused to pay the $10,000 monthly salary after 3 months and reduced Plaintiff's salary to $5,000 per month from late 2016 through May 8, 2017 with the

51

promise of quarterly bonuses based upon volumes of others' sales efforts but has since May 2017 willfully refused to pay any salary, willfully refused to pay the 2nd quarterly bonus or any other compensation whatsoever, as well as any of the vested CCPROFIT percentage commissions.. entailing Plaintiff to an award of the same plus the statutory 100% penalty pursuant to K.S.A. 44-315(b)..

241.)    Plaintiff did not release CardConnect of its ongoing obligation to pay 30% portfolio commission on sales to which he had a vested right to receive ongoing CCPROFIT% by reason of having made the sales.

242.)    Plaintiff has been damaged by the income withheld and the necessity of engaging counsel to sue CardConnect and its successor and assigns to recover sums due so as to warrant an award of attorney fees.

243.)    In that CardConnect agreed to pay CCPROFIT for as long as the portfolio accounts generated any, CardConnect has continued to violate K.S.A. 44-315 each month as it fails to pay the CCPROFIT commission entitling Plaintiff to a 100% penalty on all past due sums owing Plaintiff.

244.)    CardConnect has also willfully refused to pay any portfolio commission accrued from June 2016 to the present at the agreed 30% of CCPROFIT on Plaintiff's portfolio including his accounts and association endorsement leads.

255.)    Plaintiff has been damaged by CardConnect's refusal and willful failure to pay his earned wages and earned portfolio percentages and the conversion of the leads he procured through association endorsement sales, as well as the profits generated therefrom.

256.)    As shown by monthly commission reports, CardConnect showed Davis it was paying him 30% CCPROFIT commission on all of the accounts procured by Davis, some of

52

which were nearly of a decade's duration.  With respect to the CCPROFIT% commission the right to payment vested upon the customer signing a contract and continues so long as the customer procured by Davis by  way of sale generates revenue to CardConnect.

(a)  The parties have no agreement providing that by reclassification or termination of Davis that his portfolio % commission as to already procured business would be reduced or eliminated. '

(b)  Davis did not procure association endorsements so that CardConnect could assign the leads procured therefrom to non-commission sales people to avoid paying Davis. Association leads are very valuable productive sales leads from which Davis was able to accomplish approximately a 90%+ closing rate.

(c)  CardConnect's agreement to pay ongoing commission is evident from its payroll records which indicate that commission was paid to Davis ongoing on  his portfolio accounts regardless of when the account was procured.

(d)  Davis performance obligation was completed when his customers signed an contract with CardConnect for the provision of services.

(e)  Davis was the procuring cause of all of the CardConnect customers in Davis' portfolio, all of the trade association endorsements he garnered, and all of the sales to members of the associations from the endorsement leads Davis procured.

227.)  In its monthly commission reports CardConnect states that Davis is the owner of the accounts in his portfolio.

228.)  CardConnect has willfully refused to  transfer the accounts to Plaintiff and continued to reap 100% of the profit therefrom, all of which is due Plaintiff during the periods of

termination from February 2014 into May 2014, as well as all CCPROFIT earned from July 2016 to the present.

229.)   Plaintiff is entitled to 100% statutory penalty on all sums owing.

230.)   K.S.A. 44-314 requires wages to be paid within 15 days of termination or not less than on 15 day intervals during employment, Violation of K.S.A. 44-314 triggers the penalty provided in K.S.A. 44-315.

231.)   CardConnect throughout Plaintiff's employments  violated K.S.A. 44-314 in that it handled payroll as follows:

a.)     Merchants who utilized CardConnect for financial transaction processing were normally paid their sales volume within a couple of days of the transactions.  CardConnect utilized First Data to handle its business as processor,

b.)     At the end of a calendar month CardConnect or  First Data would issue a statement of charges for their services to the merchant and by the second of the month the charges would be withdrawn from the merchant's account.  The charges were priced as a percentage of the merchant's sales volume plus various fees.

c.)     Within 2 weeks after the merchant charges were paid  CardConnect would receive payment of its share of the charges (CCPROFIT) from First Data not later than the middle of the month following that in which the merchant transactions occurred.

232.) By way of example:   XYZ company uses CardConnect to process its credit card transactions.  In January XYZ has $100,000 in credit card sales.   XYZ has agreed to pay CardConnect 5% of all sales for  processing, including all fees.   XYZ is paid within a day or two of each charge without deduction of CardConnect's charges.  Each of these transactions generates fees to CardConnect from which it is obligated to pay Davis his CCPROFIT%.

54

CardConnect is not paid its fees at the time of the charge, but at the first of the following month. On February 2  CardConnect (via First Data) bills the merchant the $5,000 charge for processing the $100,000 in transactions and withdraws the sum the merchant agreed to pay for the processing from the merchant's bank account.

From the sum collected from the merchant in payment of CardConnect charges, First Data deducts the sums CardConnect has agreed to pay First Data for handling the processing of the transactions, say 2% or $2,000 in this example.

By February 15 First Data remits to CardConnect the  remainder of the $5,000 after deduction of First Data's charges, in this example $3,000.00, which is the CCPROFIT from XYZ for the month.    Davis sold XYZ on using CardConnect and is entitled to 30% of the $3,000 or $900 portfolio profit percentage (commission) on XYZ's transactions from January.

Not until March 15th does CardConnect pay Davis his commission from January.

d.)     CardConnect accrued a receivable from XYZ's sales as they were processed but willfully refused to pay Davis by the 15th of the following month, instead placing Davis to 45 days delay from the close of the January transactions.

233.)   CardConnect willfully failed and refused to pay Plaintiff within 15 days of the close of the month in which the  income was generated by him, as well as it refused to pay contemporaneously with its receipt of the funds entailing Plaintiff to  daily 1% damages or penalty on all commissions in fact paid after the 15th day of the month after which the charges were processed until paid, 30% of all commission paid, in addition to all other remedies for its willful refusal to pay commission for 45 days after the close of the month in which the sales transactions were processed.

244.)   It is necessary for Plaintiff to conduct discovery or for an accounting to be ordered due to the complex manner in which CardConnect operated financially, for this reason Plaintiff cannot presently determine the exact amount owing but it is in  well in excess of $25,000.

WHEREFORE,  Plaintiff prays award of all sums constituting unpaid income he earned but has not been paid, along with the 100% statutory penalty afforded by K.S.A. 44-315, for his costs and attorneys fees, interest and such other relief as the court deem appropriate.

COUNT  FIVE  -- K.S.A.44-316

245.)   Plaintiff incorporates paragraphs 1-244 herein.

246.)     K.S.A. 44-316 provides that an employer may not condition payment of wages owing on the employee executing a settlement agreement, and that a settlement agreement for less than full consideration is void and in violation of law.

247.)   K.S.A,44-316. Payment of undisputed wages; remedies retained, provides: (a) In case of a dispute over the amount of wages due, the employer shall pay, without conditions and no later than the regular payday next following the concession, all wages, or parts thereof, conceded by him to be due, leaving to the employee all remedies he might otherwise be entitled to, including those provided under this act, as to any balance claimed.

(b) Unless payment is made by binding settlement agreement, the acceptance by an employee of a payment under this section shall not constitute a release as to the balance of his claim and any release required by an employer as a condition to payment shall be in violation of this act and shall be null and void. .

248.)   The May 2017 Letter from CardConnect advising Plaintiff his position was terminated was without prior notice and accompanied by a proposed severance, nondisclosure and no-compete agreement for $25,000 consideration.

56

249.)    Defendants were aware that they were liable to pay Plaintiff unpaid salary and CCPROFIT on an ongoing basis on his portfolio; however, and instead of offering to pay all past due as well as currently due and owing sums earned by Plaintiff Defendant CardConnect threatened Plaintiff that he would receive nothing and would be sued if he attempted to resume work. This Letter violated the mentioned statute and was extortionate and coercive in its threats coupled with its demand that Plaintiff not work and that he accept less than he was entitled to. the Letter & Agreement were also misleading and false and in an attempt to defraud Plaintiff by coercing concessions to which Defendants were not entitled.

250.)    Defendants coerced Plaintiff to sign an agreement that would be void to prevent him from other employment when they knew such a demand and agreement to be in violation of K.S.A. 44-319 and void.

251.)    On May 8, 2017  CardConnect sent Plaintiff a Letter telling him his position was eliminated and he was therefore terminated.  Accompanying the Letter was a proposed severance agreement stating that for $25,000 which CardConnect falsely represented as 5 months front pay, Plaintiff must release CardConnect and make various other concessions, including agreement to an injunction, no compete, nondisclosure, attorney fees and costs, ex parte relief and other terms and conditions all of which are unconscionable and in violation of K.S.A. 44-314, et seq. as they would preclude employment in sales elsewhere and would purportedly  grant CardConnect a right to suit and immediate ex parte injunctive relief to which it was not entitled. .

252.)    On July 17, 2017 demand was made for all past due wages and commissions and the mentioned statutes were cited and quoted.  To date CardConnect continues to refuse to pay any sum without a release, and for less than the sums owing.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

253.) K.S.A. 44-319 prohibits withholdings except as permitted by law. CardConnect each month willfully refused to pay by withholding withheld the sum of $5,000 by way of a deduction from Plaintiff's portfolio profit compensation characterizing the same as $2,500 base and $2,500 draw. These deductions from Plaintiff's portfolio profit percentage are unlawful withholding in violation of K.S.A. 44-319 and were committed each and every month by CardConnect in violation of K.S.A. 44-319.

254.) K.S.A. 44-321 prohibits waivers of employee rights:

44-321. Waivers prohibited. Except as provided in K.S.A. 44-324, no provision of, or any right created under this act may in any way be contravened, set aside or waived.

255.) . CardConnect violated K.S.A. 44-321 on May 8, 2017 in demanding that Plaintiff execute an unconscionable severance agreement obviously written by their attorney, as a condition to receive any payment whatsoever

256.) The proposed severance agreement calculated to procure a release of all of Plaintiff's employment rights, as well as a bar of Plaintiff from working for anyone in sales of financial transaction processing and would be an unlawful restraint of trade.

(a) Though Plaintiff did not sign the severance agreement the threat of legal action raised by its language has precluded Plaintiff from working in the field damaging Plaintiff while he has been unemployed by the value to be derived from his portfolio, the unjust enrichment to CardConnect in continuing to take full financial advantage of the portfolio's benefits, and has damaged Plaintiff by causing fear CardConnect would sue Plaintiff and anyone for whom he may have otherwise worked, or worked in self employment.

(b) CardConnect also mailed Plaintiff a letter containing representations calculated to prevent him from being employable in violation of the statute.

58

Wherefore Plaintiff prays the court award him all relief available in an action whatsoever prosecutable under the aforementioned statutes, including all sums due, all sums that become due in the future, interest, his costs and attorneys fees.

<div align="center">COUNT SIX = K.S.A. 44-342, et seq.</div>

257.)    :Plaintiff incorporates paragraphs 1 - 256 as though restated.

258.)    KSA  44-342  Protects commission wages with a daily 1% additional damages on commission remaining unpaid for thirty days, and  10% interest per annum thereon. CardConnect knowingly and willfully refused to pay commissions in the amounts due throughout the employment as well as knowingly failed to pay all accrued sums due within 30 days of termination, and further has knowingly failed to pay the portfolio commission since summer of 2016 entitling Plaintiff to an additional 100% damages on the unpaid commissions whether taken as a deduction or otherwise intentionally not paid.

259.)    Pursuant to K.S.A. 44-342 on the portion of the compensation due for CCPROFIT CardConnect is subject to a running 1% per day  additional damages in addition to 10% annual interest thereon.

260.)    K.S.A. 16-201. Legal rate of interest provides that  Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due..... for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter.

<div align="center">59</div>

261.) Plaintiff is entitled to 10% interest pursuant to K.S.A. 16-201 on all sums due from the dates payable for salary and CCPROFIT until paid.

262.) K.S.A. 44-324 requires that the termination or resignation of a commission sales person must be paid within 30 days following the month of the termination as to sums then due. CardConnect violated this statute from and since February 2014 with respect to that termination and from and since May 8, 2017 with respect to the final termination.

263.) K.S.A. 44-324(b) imposes 1% damages dairy on the unpaid commissions (except Saturday, Sunday and legal holidays) as additional damages and K.S.A. 324(c) affords interest on the sums unpaid in addition to the 1% daily penalty.

264.) K.S.A. 44-343 provides all undisputed commissions must be paid within 30 days unconditionally leaving to the sales person all remedies the sales person may be entitled to including those provided by the Act.

265.) K.S.A. 44-347 gives the sales person the right to recover all commissions arising from sales occurring before the termination even if they produce income thereafter.

266.) Plaintiff's sales "occurred" as a result of a prospective customer signing a contract for the provision of financial transaction processing and related services. Plaintiff's procurement of the customer's agreement constituted his sale and vested his right to ongoing payment from the CCPROFIT accrued from the customer.

267.) Plaintiff is entitled to ongoing payment of 30% of the each merchant he procured as a customer of CardConnect as CardConnect receives payment of the same for as long as the customer generates transactions for CardConnect, its successors and assigns.

60

268.)    Plaintiff also sold trade associations on the endorsement of CardConnect as an approved and recommended vendor for credit card and related services.

269.)    Sales leads generated from trade associations are valuable in that the membership is warm and receptive to calls from vendors endorsed by their association and proposals to association members were closed at over 90% by Davis.

270.)    Association endorsements gave Davis the right to  market CardConnect to the association membership.   Endorsements Davis procured were for the purpose of generating leads for Davis to sell.   Davis is entitled to his portfolio commission on all customers and profits generated from his procured endorsements regardless of the fact CardConnect converted the leads,

271.)    K.S.A. 44-347 permits commissioned sales people to sue for commissions covered by the act as well as those not covered by the act.

272.)    Plaintiff remains unpaid for the CCPROFIT % for the period of February  2014 - May 2014 and from 2016 to present, entitling him to judgment for the commissions, statutory interest, penalties, costs and attorney fees.

WHEREFORE Plaintiff prays judgment for all unpaid commission, interest, penalty of 100% on all past due commissions owing, his costs and attorneys fees and for such other and further relief as the court deem appropriate.

### COUNT SEVEN--  KS PREVENTION OF EMPLOYMENT --

273.)    Plaintiff incorporates the matters in paragraphs 1 - 272 herein.

274.)    K.S.A. 44-117. Employer not to prevent discharged employee from obtaining employment, provides:

61

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

> Any employer of labor in this state, after having discharged any person from his service, shall not prevent or attempt to prevent by word, sign or writing of any kind whatsoever any such discharged employee from obtaining employment from any other person, company or corporation, except by furnishing in writing, on request, the cause of such discharge.

275.)  CardConnect's threats uttered in the proposed Severance Agreement constitute written violation of K.S.A. 44-117.   In addition, in response to a letter requesting what would be required in a Missouri service letter request CardConnect made comments in violation of K.S.A. 44-117.

276.)  Defendants also contacted their competitor Basys to defame Plaintiff and thereby prevent his employability in questioning Basys as to whether Plaintiff had directed his business at CardConnect to Basys in violation of a purported duty that he not do so. Implicitly, if not explicitly Defendants also threatened Basys if it were to accept business from or employ Plaintiff in violation of purported, but not existent loyalty duties to CardConnect.

277.)  Defendant's disparagement of Plaintiff to its potentially sole major competitor in this market was an attempt to prevent Plaintiff from becoming employed.

278.)  K.S.A. 44-119 entitles Plaintiff to treble damages, and  statutory attorneys fees to be taxed as costs.

279.)  K.S.A. 44-118 declares violation of Chapter 44 a misdemeanor subjecting the employer to fine and incarceration.    Plaintiff contends that conduct which has been criminalized is sufficiently intolerable to warrant exemplary or punitive damages in addition to statutory enhanced damages.

280.)    Defendants conduct in refusing to pay Plaintiff was calculated to prevent him from employment in a lawful competitive manner.

281.)    Defendant's attempt to force Plaintiff to execute a contract prohibiting employment in his field was likewise an attempt to prevent employment elsewhere.

282.)    Defendants false and defamatory allegations to Basys that Plaintiff had stolen from it to Basys benefit and implicit if not explicit threat of action against Basys should they hire Plaintiff were attempts to prevent employment .

283.)    Defendants refusal to pay Plaintiff his due and release his portfolio to him were an attempt to prevent self employment.

284.)    The office of CardConnect for which Plaintiff provided services was at all relevant times located in Johnson County, Kansas where Renny Palumbo also worked..

289.)    CardConnect's conduct in violation of K.S.A. 44-117 et seq. was willful, malicious, intentional and unjustified and in violation of the act.

**Wherefore,**  Plaintiff prays the court award Plaintiff his actual damage, punitive damages, statutory trebled damages, his costs and attorneys fees and interest at 10% on all past due sums, and for such other and further relief deemed appropriate.

### COUNT EIGHT--  MISSOURI STATUTORY WAGE UNDERPAYMENT

*290.)*    Plaintiff incorporates paragraphs 1 - 289 herein**.**

**291.)**    CardConnect agreed to pay Plaintiff a monthly salary but failed to do so instead deducting $5,000 from his portfolio profit share of 30% of the profits accounts he procured generated to be serviced by CardConnect.

292.) By failing and refusing to pay his salary CardConnect violated state minimum wage law in that Plaintiff received no salary for the time spent working during a pay period or month. .

293.) Plaintiff's portfolio profit percentage was mot derived from current pay period work, but instead from work provided in prior months, and years, on an ongoing basis; thus if Plaintiff was unable to achieve a significant net increase in the portfolio's profitability in a given month he went unpaid for his time expended in CardConnect's service that month by reason of CardConnect always deducting $5,000 from his portfolio profit percentage due.

294.) R.S.Mo.    290.527 Action for underpayment of wages, employee may bring--limitation.

> 290.527. Any employer who pays any employee less wages than the wages to which the employee is entitled under or by virtue of sections 290.500 to 290.530 shall be liable to the employee affected for the full amount of the wage rate and an additional equal amount as liquidated damages, less any amount actually paid to the employee by the employer and for costs and such reasonable attorney fees as may be allowed by the court or jury. The employee may bring any legal action necessary to collect the claim. Any agreement between the employee and the employer to work for less than the wage rate shall be no defense to the action. All actions for the collection of any deficiency in wages shall be commenced within two years of the accrual of the cause of action.

295.) CardConnect paid ISO's t 90% of the CCPROFIT, in accepting the $60,000 salary Plaintiff gave up the lion's share of the value of the ongoing income by agreeing to take less than 90%. The certainty of a paycheck in the early years and convenience in not having to manage the portfolio while Davis worked for CardConnect were the tradeoff.

296.) Plaintiff was not a bona fide officer, manager or executive but merely a sales person without supervisory authority or managerial discretion. Every contract he proposed must be approved by management. Plaintiff was subjected to oppressive, offensive and age

64

discriminatory conduct by those who managed him over which he had no control. Plaintiff had no hiring or firing, HR, or other authority.

287.)    In depriving plaintiff of his $5,000 salary by deducting it from his CCPROFIT percentage CardConnect effectively paid Plaintiff zero for his time and thereby violated the statute. .

288.)    Davis is entitled under this count to $5,000 per month salary, and the $5,000 monthly additional damages provided by R.S.Mo.   290.527.

289.)    After closing a sale Davis had no further work obligation with respect to the account but instead became entitled to his percentage so long as the account generated revenue.

290.)    Davis was not paid for his time in generating accounts because his salary was deducted every month from commission checks arising from merchant activity in prior months.

291.)    The deduction of the salary from the commission or percentage of CCPROFIT can be viewed in two ways, as above the failure to pay salary by converting it from the commission, and in addition thereto the failure to pay the commission as due when due each month by a shortchange of $5,000 whatever CardConnect's irrationale may have been.

292.)    Davis is entitled pursuant to R.S.Mo. 290.527 to $10,000 monthly on account of the shortchange of his admittedly due commissions.

293.)    Davis is entitled to reasonable attorneys fees under R.S.Mo. 290.527 and his costs as well as interest from the date each payment was due to be paid.

294.)    Due to the complex and confusing manner in which CardConnect handled its payroll, the termination of February 2014 and period of non-payment, the recommencement and changes in commission rates an accounting or discovery is necessary to establish the amount of unpaid or underpaid compensation in total.

65

295.)    By reason of the foregoing CardConnect is liable in damages to Plaintiff for all of his past unpaid compensation and a 100% penalty thereon in addition to interests, his costs and attorney fees.

WHEREFORE, Plaintiff requests the court order an accounting or permit sufficient discovery by which to ascertain the exact amounts due for wages, commissions and penalties, and for an award of all past due compensation owing along with the statutory doubled damages, reasonable attorneys fees, interest, his costs, and for such other and further relief as the court deem appropriate.

<div align="center">COUNT NINE</div>

<div align="center">STATUTORY ACTION PURSUANT TO R.S. Mo. 290.110</div>

Plaintiff incorporates by reference as though fully restated his factual allegations necessary to this count plead otherwise in this Petition.

296.)    Plaintiff incorporates paragraphs 1-295.

297.)    R.S.Mo. 290.110  Payment due discharged employee--exceptions--penalty for delay, provides:

> 290.110. Whenever any person, firm or corporation doing business in this state shall discharge, with or without cause, or refuse to further employ any servant or employee thereof, the unpaid wages of the servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of the discharge or refusal to longer employ and the servant or employee may request in writing of his foreman or the keeper of his time to have the money due him, or a valid check therefor, sent to any station or office where a regular agent is kept; and if the money or a valid check therefor, does not reach the station or office within seven days from the date it is so requested, then as a penalty for such nonpayment the wages of the servant or employee shall continue from the date of the discharge or refusal to further employ, at the same rate until paid; provided, such wages shall not continue more than sixty days. This section shall not apply in the case of an employee whose remuneration for work is based primarily on commissions and whose duties include collection of accounts, care of a stock or merchandise and similar

<div align="center">66</div>

activities and where an audit is necessary or customary in order to determine the net amount due.

298.)   CardConnect admittedly wrongfully terminated Plaintiff in February 2014 and told Plaintiff it eliminated his position in May 2010. In neither case was Plaintiff terminated for cause.

299.)   CardConnect failed to pay salary and portfolio profit percentages and any accrued benefits in connection with both the 2014 admittedly wrongful termination, and the refusal to continue to employ Plaintiff in May 2017 under the explanation that his position had been eliminated.

300.)   Plaintiff made demand for payment of all sums owing and  Defendants have refused and failed to tender payment.

301.)   At the time of his 2017 termination Plaintiff CardConnect's did not intend to pay primarily commission compensation, but only to pay Plaintiff for his time and perhaps bonuses based on what others in the office generated.

302.)   CardConnect refused to pay the balance due under its $60,000 annual salary and benefits.

303.)   CardConnect  terminated Plaintiff on May 8, 2017 refusing to pay his 2nd quarter bonus and ongoing accruing CCPROFIT commission at 30% since the summer of 2016 and the installments of his annual $60,000 salary at that time.

304.)   Despite demand therefore, after each termination CardConnect failed to pay salary  compensation owing that could be calculated at those times without an accounting entitling Plaintiff to 60 days additional compensation following each termination.

305.)   Plaintiff has been damaged in an amount in excess of $25,000.00 and is entitled to his salary, and the statutory penalties, interest and his attorney fees. and costs. .

**WHEREFORE,**  Plaintiff prays the relief afforded by R.S.Mo. 290.110 including his past due and owing compensation and the statutory penalty, for his costs, interest from the date of each termination, post judgment interest and attorneys fees, and for such other and further relief as the court deem appropriate.

<center>COUNT X - TORT OF OUTRAGE.</center>

306.    Plaintiff incorporates paragraphs 1-306.

307.    Defendants conduct was of a character to cause reasonable persons to declare it outrageous and utterly intolerable in a civilized society entitling Plaintiff to an award of his actual damages in excess of $25,000, punitive or exemplary damages and such other and further relief as appropriate.

WHEREFORE,  plaintiff prays judgment for actual damages, punitive or exemplary damages, his costs, attorneys fees, interest and such other and further relief the court deem appropriate.

Respectfully Submitted,

LAW OFFICES
STEPHEN BRADLEY SMALL, LLC

*/s/   Stephen B. Small   Mo#33097*
*Box 414678*
*Kansas City, Mo  64141-4678*
*SBSESQ@aol.com*
*(816) 726-1697*
*Attorney for Plaintiff*

<center>68</center>

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TEH SHOU KAO, and T S KAO, INC., on behalf of themselves and all others similarly situated, | |
| *Plaintiffs,* | |
| v. | |
| CARDCONNECT CORP., | |
| *Defendant.* | |
| | CONSOLIDATED CIVIL ACTION NO. 16-5707 |
| TECH LOUNGE SP, LLC, and THE LAW OFFICE OF KEVIN ADAMS, PLLC, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs,* | |
| v. | |
| CARDCONNECT CORP., | |
| *Defendant.* | |

**PAPPERT, J.**                                                      **June 26, 2019**

## MEMORANDUM

      Plaintiffs are family-owned and operated small businesses: T S Kao, Inc., is a Chinese restaurant in Michigan run by Teh Shou Kao and his wife; Tech Lounge SP, LLC, is a video game lounge and coffee bar in Wisconsin owned by a husband and wife; and The Law Office of Kevin Adams, PLLC, is a firm in Michigan staffed by a husband, wife and their daughters. Plaintiffs used CardConnect, a merchant services provider, to process their debit and credit card payments. After CardConnect allegedly charged unauthorized rates and fees, Plaintiffs filed class action lawsuits.

1

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

The case was previously assigned to Judge Ditter, who determined that there was no express binding contract between the parties. Although the parties agreed that there was an implied contract, they disputed its terms. Judge Ditter directed the parties to take discovery on that issue and then submit briefs on their respective proposed terms. After reviewing the parties' extensive submissions and responses thereto, Judge Ditter agreed with the Plaintiffs that a service contract between the parties dictated the terms of the implied agreement. CardConnect seeks reconsideration of Judge Ditter's findings or, in the alternative, certification for interlocutory review. For the reasons set forth below, the Court denies CardConnect's Motion for Reconsideration as well as its request for certification for interlocutory review.

I

Judge Ditter discussed the facts of this case in a prior memorandum. *See* (Order, ECF No. 68). Kao and T S Kao filed their four-count class action Complaint against CardConnect on November 1, 2016. *See* (Compl., ECF No. 1). In Counts One and Two, they alleged that no binding contract existed between the parties and, as a result, CardConnect was unjustly enriched. *See* (*id*. at ¶¶ 79–89). In Counts Three and Four, Plaintiffs pled an alternative theory of liability: if a contract existed, then CardConnect breached it and the implied covenant of good faith and fair dealing, and certain contract terms were invalid. *See* (*id*. at ¶¶ 90–107).

The parties filed a joint status report on September 22, 2017. (Status Report, ECF No. 40.) In it, they disagreed about the discovery process with respect to class certification. Plaintiffs proposed "proceeding with class discovery, followed by a motion

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

for class certification, and then dispositive motion practice." (*Id.* at 4.)  CardConnect,

however, proposed to narrow the issues first.  (*Id.* at 2.)  Specifically:

> Defendant believes that the Court envisioned the matter proceeding in a phased approach starting with discovery related to the named Plaintiffs, the parties agreeing to Stipulated Facts to narrow the issues in dispute and identify the legal theories that the Plaintiffs seek to pursue on a class basis . . . [T]he discovery produced to date should enable the Plaintiffs to determine whether they will pursue their claims that there is no enforceable written contract between the parties (Count I) and that they are entitled to recovery under an unjust enrichment theory (Count Two), or that there is an enforceable contract between the parties, but CardConnect breached an implied covenant of good faith and fair dealing (Count Three), and that certain contractual terms are unconscionable (Count Four).

(*Id.* at 2–3.)  Also in their joint status report the parties requested consolidation with

*Tech Lounge SP, LLC, and The Law Office of Kevin Adams, PLLC, v. CardConnect*

*Corp.*, No. 17-4014 (E.D. Pa. Sept. 7, 2017), because the plaintiffs there had filed a class

action Complaint against CardConnect on September 7, 2017, alleging the same four

counts as in *Kao*.  (*Id.* at 2.); *see Tech Lounge SP, LLC, and The Law Office of Kevin*

*Adams, PLLC, v. CardConnect Corp.*, No. 17-4014 (E.D. Pa. Sept. 7, 2017), (Compl. ¶¶

90–126, ECF No. 1).  The cases were consolidated on September 26, 2017.  *See Kao and*

*T S Kao, Inc., v. CardConnect Corp.*, No. 16-5707 (E.D. Pa. Sept. 26, 2016), (Order, ECF

No. 41).

No written record exists of Judge Ditter's ruling with respect to the discovery

dispute; however, on October 10, 2017, CardConnect filed a memorandum arguing that

there was a binding express contract between the parties, and if not, there was an

implied contract.  *See* (Def.'s Mem., ECF No. 44).  In response, Plaintiffs asserted that

there was no binding express contract but conceded that there was an implied contract.

*See* (Pls.' Ans., ECF No. 45).  At some point thereafter during a telephone conference,

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

Judge Ditter determined there was no express binding contract between the parties.[1] Neither side sought reconsideration of this ruling.

From November 2017 to January 2018, the parties unsuccessfully attempted to stipulate to the terms of the implied contract. *See* (ECF Nos. 47, 51–52, 55). Consequently, Judge Ditter ordered the parties to conduct discovery on that issue. *See* (Stip. Sched. Order, ECF No. 58). On March 26, 2018, the parties filed memoranda on their respective proposed implied contract terms. S*ee* (ECF Nos. 60–61). Plaintiffs argued that "[t]he Court should hold that the implied contract terms required CardConnect to process Plaintiffs' payments in accordance with the Service Fee Schedule." (Pls.' Mem. at 1, ECF No 60.) CardConnect, however, urged Judge Ditter to consider the Service Fee Schedule among other "communications, correspondence, and the parties' own course of dealings and course of performance." (Def.'s Mem. at 2, ECF No. 61.) In addition to the parties' memoranda and numerous exhibits, they also filed responses. S*ee* (ECF Nos. 65–67).

On September 26, 2018, Judge Ditter ruled in favor of the Plaintiffs, finding that "CardConnect agreed to provide its services and rates set forth in each Plaintiff's service contract and is limited to those terms absent a mutual modification of the implied contract." (Order, ECF No. 69.) On October 10, 2018, the case was reassigned from Judge Ditter to this Court. *See* (ECF No. 70). That same day, CardConnect moved for reconsideration or, in the alternative, certification for interlocutory review of Judge Ditter's September 26 Order. (Mot. Recons., ECF No. 71.)

---

[1]     There is no record of Judge Ditter's ruling on ECF.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

II

A motion for reconsideration should be granted "sparingly" and should not be used to "rehash arguments which have already been briefed by the parties and considered and decided by the [c]ourt." *PBI Performance Prods., Inc. v. NorFab Corp.*, 514 F. Supp. 2d 732, 744 (E.D. Pa. 2007) (citation omitted). It should not give a party a "second bite at the apple." *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1231 (3d Cir. 1995). "A motion for reconsideration is not properly grounded on a request that a court reconsider repetitive arguments that have already been fully examined by the court . . . ." *Vaidya v. Xerox Corp.*, No. 97-547, 1997 WL 732464, at *4 (E.D. Pa. Nov. 25, 1997). A party seeking reconsideration must show "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . . or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Thus, a motion for reconsideration may address "only factual and legal matters that the Court may have overlooked" and may not "ask the [c]ourt to rethink what it had already thought through—rightly or wrongly." *Glendon Energy Co. v. Borough of Glendon*, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993) (citation omitted).

CardConnect timely filed its Motion pursuant to Local Rule 7.1(g), arguing that the Court erred by failing to apply the law governing implied contracts and by failing to cite to a single legal authority. (Mot. Recons. at 2.) CardConnect also asserts that the Court committed a clear error of law when it "circumvented the role of the jury and decided the central issue by weighing evidence and deciding disputed issues of fact."

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

(*Id.* at 1.)  As a result, CardConnect contends that the Court should reconsider Judge Ditter's September 26 Order to prevent manifest injustice.  Plaintiff, however, argues that "Defendant clearly does not agree with [Judge Ditter's] ruling . . . [but] Defendant cannot argue that it was not given a full and fair opportunity to make its case *before* the Court ruled."  (Resp. Opp'n at 1, ECF No. 72) (emphasis in original).

CardConnect fully briefed the issue of implied contract terms.  Its Motion recites law and facts that were previously brought to Judge Ditter's attention.  Although Judge Ditter did not cite to any authority in his September 26 Order, the Court has no basis to determine that he overlooked or failed to consider any of the arguments presented in the parties' memoranda and responses.  "The fact that an issue was not explicitly mentioned by the court does not on its own entail that the court overlooked the matter in its initial consideration."  *Morton v. Fauver,* No. 97–5127, 2011 WL 2975532, at *3 (D.N.J. July 21, 2011).  For example, Judge Ditter referenced "junk fees," inflated pass through fees and junk fees presented as pass through fees.  (Mem., ECF No. 68.)  Both parties elaborate upon these fees in their memoranda.  *See, e.g.*, (Pls.' Mem. at 3–5, ECF No. 60; Def.'s Mem. at 6–7, ECF No. 61).  Moreover, Judge Ditter cited in his Memorandum a CardPointe Fee notice provided to T S Kao, concluding that the notice is difficult to understand.  (Mem. at 3.)  CardConnect had attached to its Memorandum an exhibit with the same language, arguing that Kao had received advance notice of the fee and paid it without objection.  *See* (Def.'s Mem. at 13 & Ex. V).  Plaintiffs had included that notice in its Memorandum as well but contended that the message contained "several notable falsehoods."  *See* (Pls.' Mem. at 6 & Ex. P).

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

By arguing that Judge Ditter "improperly decided disputed issues of fact concerning the terms of the parties' implied contracts without any authority to do so," (Mot. Recons. at 6), CardConnect imposes a standard akin to summary judgment on an issue that was never reviewed under that standard—or under any standard for that matter. The purpose of the submissions was for Judge Ditter "to determine the terms agreed to when the parties entered this implied contract." (Mem. at 4, ECF No. 68.) That's precisely why each party outlined in their extensive submissions their proposed implied contract terms for Judge Ditter to adopt. *See* (Pls.' Mem., Ex. A, ECF No. 60; Def.'s Mem., ECF No. 62). When Judge Ditter didn't rule in CardConnect's favor, CardConnect contended that he made five factual findings that were not within his power to do so. (Mot. Recons. at 8–13.) But CardConnect's argument is inconsistent with the procedural history—albeit messy—of the case. In its September 22, 2017 Joint Status Report, CardConnect supported narrowing the issues before class certification. *See* (ECF No. 40). Although unsuccessful, CardConnect even tried to stipulate to the terms of the implied contract. *See* (ECF Nos. 51–52, 55). With months of discovery and the filings that followed, CardConnect knew all along that Judge Ditter's role was to determine the terms of the parties' implied contract.

In any event, if CardConnect believed that Judge Ditter did not have the authority to decide certain "disputed facts" with respect to the implied contract terms, it had multiple opportunities to raise this argument—for example, in its memorandum on implied terms or in its response to Plaintiffs' memorandum. "A motion for reconsideration may not be used to present a new legal theory for the first time or to raise new arguments that could have been made in support of the original motion."

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

*Federico v. Charterers Mut. Assur. Ass'n Ltd.*, 158 F. Supp. 2d 565, 578 (E.D. Pa. 2001)

(*McNeal v. Maritank Phila., Inc.,* No. 97–0890, 1999 WL 80268, at \*4 (E.D. Pa. Jan. 29,

1999).

<center>III</center>

Alternatively, CardConnect requests that the Court certify an order for

interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  The certification procedure is

within the discretion of the district court.  *Bachowski v. Usery*, 545 F.2d 363, 368 (3d

Cir. 1976).  "The burden remains on the party seeking certification to demonstrate that

'exceptional circumstances justify a departure from the basic policy against piecemeal

litigation and of postponing appellate review until after the entry of a final judgment.'"

*L.R. v. Manheim Tp. School Dist.*, 540 F. Supp. 2d 603, 608 (E.D. Pa. 2008) (quoting

*Douris v. Schweiker*, 229 F. Supp. 2d 391, 408 (E.D. Pa. 2002)).

A district court may certify an interlocutory order for immediate appeal if it: (1)

involves a "controlling question of law;" (2) there is "substantial ground for difference of

opinion" as to its correctness and (3) "an immediate appeal from the order may

materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *see

also Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974).  All three criteria

must be satisfied.  *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 637, 644 (E.D.

Pa. 2010).  The statutory factors, however, are merely a guide for the Court's discretion.

*See Bachowski v. Usery,* 545 F.2d 363, 368 (3d Cir. 1976) ("The certification procedure is

not mandatory; indeed, permission to appeal is wholly within the discretion of the

courts, even if the criteria are present.").

<center>8</center>

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

A

A "controlling question of law" is one in which either: (1) "if decided erroneously, would lead to reversal on appeal" or (2) is "serious to the conduct of the litigation either practically or legally." *Katz,* 496 F.2d at 755 (citations omitted).  Saving the court's time and the litigants' expenses is "a highly relevant factor." *Id.* (citation omitted).  A question that "appears to be a controlling question of law" but nevertheless presents a question "about a court's application of the facts of the case to the established legal standards are not controlling questions of law for purposes of section 1292(b)." *Glover v. Udren*, No. 08-990, 2013 WL 3072377, at *2 (W.D. Pa. June 18, 2013) (citation omitted).  Here, Judge Ditter received extensive submissions from the parties, who each argued what should comprise the implied contract terms, and favored the Plaintiffs' arguments.  His decision does not present the "pure" question of law that interlocutory appeals were designed to address.  *See Ahrenholz v. Board of Trustees of Univ. of Ill.*, 219 F.3d 674, 676–77 (7th Cir. 2000).

B

There is a "substantial ground for difference of opinion" when the matter involves "one or more difficult and pivotal questions of law not settled by controlling authority." *McGillicuddy v. Clements,* 746 F.2d 76, 76 n.1 (1st Cir. 1984).  In other words, "[s]ubstantial grounds for difference of opinion exist where there is genuine doubt or conflicting precedent as to the correct legal standard." *Bradburn Parent Teacher Store, Inc. v. 3M,* Civ. A. No. 02–7676, 2005 WL 1819969, at *4 (E.D. Pa. Aug. 2, 2005).  A moving party's citation to numerous conflicting decisions on the same issue might constitute a sufficient basis for the finding that substantial differences of opinion

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

exist.  *See White v. Nix,* 43 F.3d 374, 378 (8th Cir. 1994) (finding that conflicting and

contradictory opinions provide substantial ground for a difference of opinion).

Additionally, the absence of controlling law on a particular issue can constitute

substantial grounds.  *Chase Manhattan Bank v. Iridium Africa Corp.,* 324 F. Supp. 2d

540, 545 (D. Del. 2004).  However, a court "should not certify questions of relatively

clear law merely because the losing party disagrees with [its] analysis."  *In re Chocolate

Confectionary Antitrust Litig.*, 607 F. Supp. 2d 701, 706 (M.D. Pa. 2009) (citing *Elec.

Mobility Corp. v. Bourns Sensors/Controls,* 87 F. Supp. 2d 394, 398 (D.N.J. 2000)).  A

CardConnect argues that "[t]here is no precisely controlling law on the Court's

determination to have the parties brief the issue of implied contract terms and then

decide disputed issues of fact outside the restraints imposed in a motion for summary

judgment." (Mot. Recons. at 19.)  CardConnect misconstrues its submission to Judge

Ditter; it was not a motion for summary judgment and was never contemplated or

argued as such.  Further, courts have "broad discretion to tailor discovery narrowly and

to dictate the sequence of discovery" to meet the needs of each case.  *Crawford–El v.

Britton,* 523 U.S. 574, 598 (1998).  "It is well established that the scope and conduct of

discovery are within the sound discretion of the trial court."  *Marroquin-Manriquez v.

I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983).  After Judge Ditter ruled that there was no

binding express contract, he ordered the parties to exchange documents "relevant to the

issue of the terms of the implied contract." (Order, ECF No. 47.)  That Order stated

that "Plaintiffs will designate what they propose are the terms of the implied contract

with the intention that the parties will be able to stipulate to the terms" and

"Defendant will have 30 days to respond to Plaintiffs' proposed terms." (*Id.*)  After

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

several telephone conferences and the parties' unsuccessful attempt to stipulate to the terms of the implied contract, Judge Ditter ordered the parties to take discovery and submit memoranda on the issue, which he would take "under advisement and issue a ruling." *See* (ECF Nos. 55 & 58).  He then did just that. *See* (Mem., ECF No. 68). CardConnect fails to offer any conflicting precedent on Judge Ditter's discretionary course of action with respect to his tailoring of discovery and the resolution of an issue the parties agreed to submit to him.

## C

Finally, the moving party must establish that certification of the appeal materially advances the ultimate termination of the litigation by considering "whether an immediate appeal would (1) obviate the need for trial; (2) eliminate complex issues, thereby greatly simplifying the trial; or (3) eliminate issues thus making discovery much easier and less costly." *Wheeler v. Beard*, No. 03-4826, 2005 WL 2108702, at *3 (E.D. Pa. Aug. 31, 2005) (citation omitted).  Here, the action is over two years old and discovery has been taken on an important issue.  A ruling in favor of CardConnect would not materially advance the ultimate termination of the litigation because the case would be remain in the same procedural posture with next steps including class certification. *See Augustin v. City of Phila.*, No. 14-CV-4238, 2016 WL 7042215, at *1 (E.D. Pa. Apr. 8, 2016) (concluding that an immediate interlocutory appeal would not materially advance the ultimate termination of the case where "this action is nearly two years old, extensive discovery has been taken and summary judgment entered as to the admittedly threshold legal issue [and] [t]he necessary next steps here involve the filing of a class certification motion and the fashioning of an appropriate remedy").

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

An appropriate Order follows.

BY THE COURT:

_/s/ Gerald J. Pappert_
GERALD J. PAPPERT, J.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TECH LOUNGE SP, LLC and THE LAW OFFICE OF KEVIN ADAMS, PLLC, on behalf of themselves and all others similarly situated,** | |
| **Plaintiffs,** | Civil Action No. _____ |
| **v.** | **COMPLAINT ☒CLASS ACTION** |
| **CARDCONNECT CORP.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## <u>COMPLAINT ☒CLASS ACTION</u>

Plaintiffs Tech Lounge SP, LLC and The Law Office of Kevin Adams, PLLC, on behalf of themselves and the class of persons and entities preliminarily defined below, file this Class Action Complaint against Defendant CardConnect Corp. ("CardConnect" or "Defendant"). This case is directly related to another class action pending in this Court – *Kao, et al. v. CardConnect Corp.*, Civil Action No. 2:16-cv-05707-WD (E.D. Pa.) – and will be designated a related case on the civil cover sheet. In the *Kao* case, CardConnect has staked its position that it could only ever be liable for categories of improper fees actually paid by a named class representative – as opposed to liability for all unauthorized fees generally – thus necessitating this suit. If Defendant's position in *Kao* is eventually deemed correct, then customers would arguably have lost their right to pursue reimbursement for millions of dollars of improper fees. Although a new suit for the additional fee categories could be filed at that time, claims for fees assessed prior to the statute of limitations cut-off might be foreclosed. As such, this action needed to be promptly filed.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

## NATURE OF THE CASE

1.      This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant arising from its improper business practices in connection with the provision of merchant services relating to payments via credit and debit cards ("merchant services" or "payment processing services").

2.      In today's business world, the vast majority of merchants must accept payment for goods and services via credit and debit cards to stay competitive in the marketplace.  In order to accept this method of payment, the merchant must utilize merchant services.

3.      Merchants rely on the companies that provide merchant services to do so at a fair price and in accordance with fair and appropriate terms.  Fees for merchant services are likely the third highest expense most merchants incur, following labor and product costs.

4.      Merchant services are provided through a system involving many parties.  For instance, in addition to the merchant that receives payment and the customer who provides such payment, the processing of a card transaction is likely to involve (a) the bank that issued the credit or debit card to the customer (e.g., Chase or Bank of America); (b) the card association through which the transaction is processed (e.g., Visa, MasterCard, Discover, or American Express); (c) the card association member bank (e.g., Wells Fargo, Synovus); (d) the company that actually processes the payment (e.g., First Data); (e) the company that sells or leases the payment processing equipment to the merchant (although the merchant is certainly allowed to own this equipment); (f) the merchant acquirer that provides merchant services (e.g., ensures payments are processed, handles monthly billing, and maintains the relationship with the merchant); and (g) the Independent Sales Organization ("ISO") that enrolls merchants in the merchant acquirer's

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

services.  CardConnect is a merchant acquirer and is also an ISO.  Additionally, CardConnect deals with over 1,100 third party sales agents to enroll merchants in its services.

5.      The number of involved parties and moving pieces make it very difficult for small merchants to understand the process and/or how much it will cost.

6.      Front-end explanation and clarity by ISOs is critical because merchants typically sign long-term deals for merchant services that are either non-cancellable or cancellable only with hefty early termination penalties.  For example, CardConnect has implemented contracts with terms of up to five years and with early termination fees of $750 or more.

7.      Unfortunately, some ISOs and payment processors take advantage of their position.  They induce "mom and pop" merchants to purchase merchant services without disclosing fees they know the merchant will be charged.  They also set up contractual relationships that bind the merchant but not themselves and bury unconscionable and self-serving provisions in the middle of their fine print form contracts that allow them to charge whatever they want, whenever they want for merchant services.

8.      ISOs engage in such tactics because they receive profits every month as long as they can keep merchant customers from leaving to competitors.

9.      As an ISO, CardConnect is on the front line as the direct contact with merchants and the intermediary between merchants and the payment processor and member bank.  CardConnect deals with First Data as its payment processor and Wells Fargo Bank, N.A. as its primary member bank.

10.     This case challenges CardConnect's business practices.  Specifically, CardConnect induces merchants to enter business relationships with it and its member bank by promising it will charge merchants low, agreed-upon rates and fees for payment processing services.  CardConnect

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

then has merchants and a principal guarantor sign long-term written contracts with boilerplate, non-negotiable terms and conditions.

11.     The fine print terms that CardConnect intends to largely govern the contractual relationship are set forth in a separate document.  In this way merchants see and execute one document that prominently displays the agreed-upon rates and fees (the "Merchant Processing Application"), but are purportedly also bound by another document (the "Program Guide"). Through the separate, fine print Program Guide, CardConnect seeks to backtrack from the agreed-upon fees and rates that have actually been reviewed and approved by the merchants and immunize itself from liability if the merchant learns of CardConnect's overcharges.  Such provisions are illusory, lack mutuality, violate public policy, and are unconscionable.

12.     More fundamentally, however, neither CardConnect nor the member bank ever actually "accept" the contracts by signing them – an express condition precedent to their formation. What results is a state of contractual limbo that gives CardConnect the discretion to disregard agreed-upon rates and charges that it never formally "accepted," while at the same time purporting to hold merchants to fine print terms that are unfavorable to them.

13.     After merchants and their principal guarantors sign the contracts and the parties begin to do business, CardConnect raises rates and imposes new, unanticipated payment processing fees.  CardConnect is able to do so because it never "accepted" the contracts and is thus not limited to the fees and charges denoted therein.  These practices, of course, constitute unjust enrichment and it would be improper for CardConnect to retain such excessive, uncontemplated fees and charges.

14.     Alternatively, if CardConnect and the member bank could be deemed to have "accepted" the contract (such that it had been formed), the excessive fees and charges imposed

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

violate such contracts.  Such fees are also violative of the covenant of good faith and fair dealing, which applies to such contracts under Pennsylvania law (which is made applicable by a term of CardConnect's form contract).

15.    Any argument by CardConnect that the excessive fees and charges are authorized by self-serving, adhesive contractual provisions referenced in paragraph 11, *supra*, are without merit because such terms are unenforceable.

## PARTIES

16.    Plaintiff Tech Lounge SP, LLC ("Tech Lounge") is a Wisconsin limited liability company with its principal place of business at 1036 Main Street in Stevens Point, Wisconsin. Tech Lounge operates a video gaming lounge.

17.    Plaintiff The Law Office of Kevin Adams, PLLC ("Adams") is a Michigan professional service limited liability company with its principal place of business at 31324 Schoolcraft Road in Livonia, Michigan.  Adams operates a law office.

18.    Defendant CardConnect Corp. is the new name of FinTech Acquisition, Corp. ("FinTech").  FinTech was formed in 2013 and went public in 2015, raising $100 million to make acquisitions.  It was required to close on such an acquisition by August of 2016, or the company was to be dissolved.  On March 7, 2016, FinTech announced that it would acquire FTS Holding Corporation, the parent corporation for CardConnect LLC.  The price was about $350,000,000 in cash and stock.  The deal closed on August 1, 2016.  The combined companies are now included in CardConnect Corp., which is publicly traded on the NASDAQ Stock Market with ticker symbol "CCN."

19.    In May of 2017, it was announced that First Data Corporation would acquire all outstanding CardConnect shares at a price of $15.00/share.  The aggregate transaction amount is

5

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

approximately $750,000,000, including repayment of CardConnect's outstanding debt and the redemption of CardConnect's preferred stock.  At the time of the First Data deal, CardConnect was processing approximately $26 billion of volume annually from about 67,000 merchant customers.  If this transaction is consummated, and depending on the corporate structure utilized by First Data after closing, it may become appropriate to add or substitute First Data or another of its affiliates as a real party in interest.

## JURISDICTION AND VENUE

20.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest, fees, and costs, and some class members, including Plaintiffs, are citizens of states other than Pennsylvania.

21.    This Court has personal jurisdiction over Defendant because it conducts substantial business within the district.  Indeed, CardConnect's headquarters are located in King of Prussia, Pennsylvania.  As such, it has significant, continuous, and pervasive contacts in this district.

22.    Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendant has its headquarters here and conducts substantial business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district.

23.    If CardConnect's form contract is deemed to be enforceable, venue and jurisdiction would also be proper pursuant to the contract's forum selection clause, which states:

> **Venue.** We have substantial facilities in the State of Pennsylvania and many of the services provided under this Agreement are provided from these facilities. The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the appropriate state or federal court located in Pennsylvania.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

## COMMON FACTUAL ALLEGATIONS

A.   <u>CardConnect Induces Merchants to Do Business with Promises of Low Cost Pricing.</u>

24.    CardConnect works with over 1,100 independent sales agents who sell CardConnect's services.  These agents are not CardConnect employees.  CardConnect also uses in-house sales people which are its employees.

25.    Even sales people that are not CardConnect employees, however, are allowed to use a CardConnect email address, switchboard for phone calls, fax number, etc.  These authorized agents are even encouraged to give themselves a title, such as "Sales Manager, CardConnect," even though they are not employed by the company.  They are allowed to pick their own titles, without regard for their actual position – sales agent – for CardConnect.  Once again, they also use CardConnect paperwork and contracts.  In all respects, customers are given the false impression that the sales agents are the officers or employees of a large publicly-traded corporation.

26.    CardConnect pays these sales agents substantial commissions on the revenue CardConnect receives from merchant customers the agents enroll.

27.    CardConnect agents contact prospective merchant customers and promise they can save them money on merchant services if they switch to CardConnect.

28.    The agents and merchants then negotiate the fees the merchant would pay for merchant services.   These fees are prominently described in a "Service Fee Schedule" in CardConnect's form "Merchant Processing Application" (hereinafter, "Application").

B.   <u>A Contractual Relationship Is Contingent Upon CardConnect and Wells Fargo First Signing the Agreement.</u>

29.    If a merchant is satisfied with the agreed-upon fees, the CardConnect agent has the merchant sign the Application, which includes contractual language which purports to bind the

7

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

merchant.   For example, it states "Client agrees to all the terms of this Merchant Processing Application and Agreement."

30.    The Application also purports to integrate a much larger document, the CardConnect Program Guide.   Since it includes dozens of pages of small print legalese, it is understood that no merchant could ever read or understand the Program Guide.

31.    The Application also requires that an individual person sign and "unconditionally and irrevocably guarantee the full payment and performance of" the merchant.

32.    The Application states in bolded print immediately above the merchant's signature line that "**[t]his Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by CardConnect and Bank**."   Bank is later defined to mean Wells Fargo Bank, N.A.   CardConnect may substitute Synovus Bank (USA) as "Bank" in some versions of the contract, since the CardConnect website states that the company is also an ISO for Synovus.

33.    The Application then includes a section to be completed by CardConnect and Wells Fargo (or other Bank if applicable).   For CardConnect it states: "Accepted By Financial Transaction Services, LLC dba CardConnect" and includes a signature line, blank to fill in the signer's title with the company, and a blank for the date.   For "Bank" it states: "Accepted By Wells Fargo Bank, N.A., 1200 Montego Way, Walnut Creek, CA 94598" and includes a signature line, blank to fill in the signer's title with Wells Fargo, and a blank for the date.

34.    In multiple additional sections of CardConnect's form contract documents, which were drafted and approved by CardConnect and Wells Fargo (and likely by Synovus Bank), it is made clear that both of these entities must accept and sign as a condition precedent to a legally binding contract.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

35.   For example, the Program Guide's "Confirmation Page" has a section denoting "Important Member Bank Responsibilities," which includes a requirement that:  "The Bank ***must be*** a principal (***signer***) to the Agreement." (emphasis added).

36.   The Program Guide also incorporates the applicable rules of the card associations. *E.g.,* Program Guide, Preface (providing that all parties are bound by the "Card Organization Rules").  These rules require member banks to sign the Agreement.  *E.g.*, MasterCard Rules, § 7.6.1 (stating that all merchant agreements ***must*** be "signed by the Customer," with "Customer" defined to include the member bank).  Further, MasterCard requires the contract to state: "The Merchant Agreement ***is not effective*** and may not be modified in any respect ***without the express written agreement of the Customer*.**"   *Id.* at § 7.6.1(1)(b) (emphasis added).   MasterCard specifically ***prohibits*** that the contract "take effect or imply that it takes effect prior to being ***signed by the Customer*.**"   *Id.* at § 7.6.1(3) (emphasis added).   Pursuant to MasterCard Rule 5.1, CardConnect and Wells Fargo could be subject to an "assessment up to USD 2,500 per day" for ***each day*** they are not in compliance as to ***each merchant***.

37.   This signature requirement is mutually beneficial.   It provides assurances to merchants that they can enforce the proposed contract.  After all, merchant discussions about the terms are with low-level representatives who are independent contractors and certainly are not authorized to sign for CardConnect or Wells Fargo.   Thus, having a signed agreement was necessary to allow merchants to protect themselves if CardConnect or Wells Fargo breached it. The signature requirement also allowed CardConnect and Wells Fargo final say over whether they were bound by the decision of CardConnect agents to contract with merchants.  Obviously, if the agent agreed to terms that either CardConnect or Wells Fargo believed were not acceptable, either company could withhold signature.  Moreover, without the signature requirement, CardConnect

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

and Wells Fargo would be subject to enormous assessments by the card associations for violating their clear rules.

38.     Despite these clear requirements in their own form contract documents, however, neither CardConnect nor Wells Fargo actually sign the Application.  As such, they have adopted a contracting system whereby they can always argue that merchants are bound by the terms of their contract, but they are never bound, because no authorized officer of CardConnect or Wells Fargo has ever signed the contract.  Indeed, pursuant to the plain terms, the contract "shall not take effect until . . . accepted by CardConnect and Bank."

39.     Of course, merchants are not aware of this trick.  They believe they have a binding deal with CardConnect at the agreed-upon rates and fees prominently displayed in the Application. Indeed, merchants are attracted to CardConnect because the contract includes rates and fees that will allow them to save money by reducing the costs they will pay for payment processing services if they switch providers.  This approach is very appealing to merchants because payment processing is a substantial business expense for them.

C.      CardConnect Buries Absurd Provisions in the Fine Print of the Program Guide that Purport to Allow It to Charge Whatever It Wants Without Fear of Legal Action.

40.     The Application itself does not indicate that (a) the agreed-upon fees and rates will increase (nor would increases be expected since technology and competition has actually driven down costs for payment processing) or (b) new, un-disclosed fees and rates will be charged.  Such terms unquestionably are important to merchants and would impact their decision to do business with CardConnect.

41.     Instead of conspicuously setting forth such critical provisions in the Application, CardConnect buries them in the fine print, non-negotiable Program Guide.  Multiple versions of

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

the Program Guide have been in effect during the relevant period, but the material terms have been the same throughout.

42.     The Application states that the merchant and personal guarantor obligate themselves to the terms set out in the Program Guide.  Given the dense legalese of the Program Guide, which is spread over 44 pages of tiny text (depending on the version and format), there is zero chance of a merchant (or the personal guarantor) actually having read or understood it.

43.     The Program Guide is a boilerplate document that is not negotiable.  *See*, *e.g.*, Program Guide, Confirmation Page ("**NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM TERMS AND CONDITIONS WILL BE ACCEPTED**") (emphasis in original).

44.     Several terms set forth in the Program Guide represent a unilateral effort by CardConnect to (a) covertly backtrack from the rates and fees prominently set forth in the Application and (b) immunize itself from liability for improper practices.

45.     For example, the Program Guide purports to allow CardConnect "to increase our fees or add new fees for Services for any reason at any time, by notifying you thirty (30) days' [sic] prior to the effective date of any such change or addition." *Id.* at § 19.5.  Boiled down to its core, this provision purports to give CardConnect unlimited discretion to charge whatever it wants for merchant services even if such fees and rates are vastly different and higher than those that are clearly set forth in the Application.

46.     By way of additional examples, the Program Guide purports to (a) limit the statute of limitations for obtaining reimbursement for overcharges to 60 days (*id.* at § 19.10), (b) limit the total amount of CardConnect's liability to twelve months of fees (*id.* at § 21.4), and (c) waive the merchants' right to a trial by jury (*id.* at § 34.3).

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

47.     CardConnect uses these provisions, as well as its hefty early termination fees, as tools to discourage aggrieved merchants from terminating their relationships with CardConnect or pursuing legal action for overcharges.

48.     If the CardConnect contract is binding – despite Defendant's and Wells Fargo's failure to complete a condition precedent, by signing the contract – then several of the provisions highlighted above and others violate public policy, lack mutuality, are unconscionable, and are otherwise void and unenforceable.  *E.g.*, Program Guide, §§ 19.4, 19.10, 21.4, 21.5, 22.3, 24.2, 34.3, 35.7.

49.     More likely, since a binding agreement was never consummated given CardConnect and Wells Fargo's willful scheme to never sign the contract, the Court should apply principles of quasi-contract, determine that CardConnect's imposition of unfair, uncontemplated fees has resulted in unjust enrichment, and order Defendant to reimburse its victims.

D.      <u>CardConnect Raises Fees and Rates and Imposes New Categories of Fees Not Reflected in the Contract.</u>

50.     After CardConnect starts providing merchant services, almost immediately it begins cramming merchants with fees and rates that are inconsistent with the agreed-upon charges that are prominently set forth in the Application.

51.     Indeed, it increases agreed-upon rates and fees and also adds new categories of fees that were not referenced in the Application so that a few months into the relationship the fees and charges being imposed bear virtually no resemblance to those which merchants actually accepted.

52.     CardConnect knows that if it disclosed these substantial fees in the Applications, merchants would be much less likely to leave their then-current processor to do business with CardConnect.  Instead, CardConnect crams merchants with these unanticipated fees after the

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

relationship has commenced and merchants are "locked in" to long term deals that are only terminable upon payment of hefty penalties.

53.     CardConnect also waits until after the merchant is enrolled to add new fees because it need not pay any percentage of the new fees to the sales agent that originally enrolled the merchant in CardConnect's services.  Thus, for example, rather than disclose an annual "EMV P2PE Fee" of $95.00 on the Application and pay as much as 80% of the amounts received from such fee to the sales agent (depending on the terms agreed upon with the sales agent), CardConnect waits until the merchant is already enrolled and then imposes the fee and keeps 100% of the fee for itself.

54.     CardConnect seizes these additional amounts from merchant bank accounts before merchants even know they are gone.  Indeed, by the time merchants receive statements notifying them of the prior month's payment processing charges, CardConnect has already taken such amounts from their bank accounts.

**INDIVIDUAL FACTUAL ALLEGATIONS**

A.     <u>Plaintiffs and CardConnect Negotiate Fees for Merchant Services.</u>

55.     Plaintiffs are former payment processing customers of CardConnect.  Their relationships with Defendant began in similar ways.

56.     Plaintiffs dealt with authorized agents of CardConnect who informed them that they could save substantial payment processing costs if they switched to CardConnect.  Plaintiffs and the agents then proceeded to negotiate the fees Plaintiffs would pay for such services.

57.     The agents presented Plaintiffs with the form Applications which specifically identified the fees and rates they would be charged.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

58.     The Applications explained that Plaintiffs would both be charged "pass-through interchange" pricing.  Under this method of pricing, the interchange rates and the assessments set by the card associations are passed through to the merchant *at cost* and the merchant is separately charged an additional amount representing the payment processing fee.

59.     The Applications reflect that Plaintiffs will pay the standard card association interchange rates and assessments plus additional fees equal to 0.5% of the transaction amount and $0.10 per transaction.

60.     The Applications also disclosed that Plaintiffs would be charged specified recurring fees, such as monthly statement fees, batch fees, and regulatory product fees.

61.     Plaintiffs were satisfied with the terms, rates, and fees explicitly and prominently denoted on the Application and decided to do business with CardConnect.

62.     Plaintiffs thereafter signed the Applications.  Contracts were never consummated, however, because neither CardConnect nor Wells Fargo (the member bank) ever accepted the contracts by signing them.  *See ¶¶ 29-39, supra.*

B.     <u>CardConnect Imposes Excessive Fees on Plaintiffs.</u>

63.     Even without binding written contracts, the parties began to do business.

64.     After the parties' relationship commenced, it soon became clear that the agreed upon pricing was not being followed.

65.     CardConnect inflated card association fees that were supposed to be passed through to Plaintiffs at cost.  By way of example, Tech Lounge was charged $1.99 in Visa credit card interchange fees and $5.52 in Visa debit card interchange fees in July of 2015, even though its true pass through interchange fees were only $1.97 and $5.49, respectively.  By way of further example,

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

Adams was charged $7.50 in December of 2016 for a MasterCard "LOCATION FEE," even though the true amount of this pass through charge is much less.

66.    CardConnect also charged Plaintiffs junk fees that are mentioned *nowhere* on the Applications.  By way of example only, Adams was charged a "DATA BREACH" fee of $8.95 in June of 2017.  By way of further example, Adams was charged an "EMV P2PE" fee of $95.00 in December of 2016.

67.    CardConnect also charged Plaintiffs fees for services that Plaintiffs did not request and indeed provided no discernable benefit.  By way of example only, Tech Lounge was charged a monthly fee of $11.95 for "MERCHANT CLUB."  Tech Lounge did not request this service and has never benefitted therefrom.  It is a wholly worthless service that has been added by CardConnect to Tech Lounge's bill for no other reason than to line its own pockets.

68.    These fees are merely illustrative of the many unauthorized fees assessed by CardConnect.  Although Plaintiffs never agreed to pay these fees, CardConnect direct-debited these fees from Plaintiffs' bank account.  As is Defendant's practice, such fees were taken before Plaintiffs received statements itemizing such charges.

69.    CardConnect will likely attempt to defend its imposition of these unauthorized fees by arguing that the Program Guide provided it with the discretion to impose new fee categories. However, even assuming the Program Guide is a binding, enforceable contract (which Plaintiffs dispute), CardConnect's ability to impose new fee categories is contingent upon CardConnect providing 30 days notice "prior to the effective date of any such change or addition."  *See* Program Guide, § 19.5.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

70.     However, CardConnect failed to provide timely or substantively sufficient notices. CardConnect's implementation of new fees without providing timely, proper notice is a direct breach of the Program Guide.

71.     CardConnect's actions are also not authorized by Section 19.4 of the Program Guide, which purports to allow new fees to be modified in response to pricing increases made by the "Card Organizations."  Here, the new fees that CardConnect imposed did not originate from the Card Organizations, but rather by CardConnect directly.

72.     Even if CardConnect had provided timely advance notice of the new fees, they would still be improper.  Indeed, good faith and fair dealing constrains CardConnect's ability to use its discretion to add fees which were not contemplated by the parties.  For example, although a contract may leave discretion to create a new fee, and thereby profit one party to the other party's detriment, good faith and fair dealing precludes such improper conduct.  Thus, even if its self-granted ability to mark up rates and create new fees is enforceable, Defendant is bound to exercise its contractual discretion in good faith.  CardConnect's manipulation of Plaintiffs' fees and charges was done for no other reason than to increase profits.  This does not comport with good faith and fair dealing.

73.     The improper fees referenced above are not the only unauthorized fees and charges which CardConnect has taken from Plaintiffs.  Plaintiffs are not in possession of all of their monthly statements and CardConnect – likely in violation of federal law – refused to provide these documents to Plaintiffs or their counsel.  Tech Lounge was even told that a subpoena would be required for it to obtain copies of its own monthly statements.  There is no doubt that the records (and CardConnect's internal data) will show that numerous other improper fees were assessed,

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

including unauthorized junk fees and misleading mark-ups of interchange charges and assessments, which should have been passed through at cost.

74.     CardConnect has also seized or kept additional funds from Plaintiffs' accounts based upon improper fees, charges, assessments, and practices.  Despite many written and verbal complaints from Plaintiffs and their representatives, Defendant has failed to provide a proper accounting of all funds which it has refused to properly credit to Plaintiffs' accounts.  The total extent of such amounts improperly retained by Defendant will not be known until discovery is undertaken.

75.     Plaintiffs' experiences with CardConnect are not isolated, but rather are illustrative of Defendant's improper business practices towards its customers.

### CLASS ACTION ALLEGATIONS

76.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3), Plaintiffs bring this class action on behalf of themselves and all those meeting the following class definition:

> All United States persons or entities charged unauthorized amounts
> for payment processing services by CardConnect.

Plaintiffs reserve the right to modify or amend the definition of the proposed Class, or add other proposed classes or subclasses, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

77.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

78.     The time period for the Class is the number of years immediately preceding the date on which this Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

79.     The proposed Class meets all requirements for class certification.  The members of the Class are so numerous that joinder is impractical.  The Class consists of, at the very least, thousands of members and the identity of those persons and entities is within the knowledge of Defendant and can be ascertained by resort to CardConnect's records.

80.     The claims of the representative Plaintiffs are typical of the claims of the Class. Plaintiffs, like all other members, were victimized by CardConnect's improper practices. Moreover, Plaintiffs, like all members, have incurred monetary damages as a result of CardConnect's misconduct.  Furthermore, the factual basis of Defendant's misconduct is common to members of the Class, and represents a common thread of conduct resulting in injury to all members of the Class.

81.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

82.     Among the questions of law and fact common to the Class are:

   a.     Did CardConnect require merchants to enter the same or materially similar contracts during the Class Period;

   b.     Whether CardConnect and Wells Fargo (or other bank as applicable) signed any customer contracts, thus accepting the terms as a condition precedent to the formation of a valid      contract;

   c.     When did CardConnect begin assessing or increasing each improper charge;

   d.     Which of these charges are improper or unauthorized;

   e.     Did merchants receive any tangible benefit from the improperly assessed charges;

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

     f.      Was CardConnect unjustly enriched by its conduct;

     g.      If a contract exists, did such contract include unconscionable or otherwise unenforceable provisions, including but not limited to those purporting to limit Defendant's liability, require early termination fees, require payment of Defendant's attorney's fees, and allow Defendant to disregard the agreed upon fees and charges;

     h.      Did CardConnect breach contractual provisions in assessing improper charges; and

     i.      Did CardConnect breach the covenant of good faith and fair dealing.

83.     Other questions of law and fact common to the Class include:

     a.      The proper method or methods by which to measure damages; and

     b.      The declaratory or other equitable relief to which the Class may be entitled.

84.     Plaintiffs' claims are typical of the claims of other members of the Class in that they arise out of the same wrongful policies and practices and the same or substantially similar unenforceable provisions of the unexecuted contracts and related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other member of the Class.

85.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

86.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of CardConnect, most Class members could not afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will be unable to obtain redress for their losses and Defendant's misconduct will have occurred without remedy.

19

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

87.     Even if Class members themselves could afford such individual litigation, the court system could not.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

88.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendant.

89.     Defendant has refused to correct its conduct and such inaction is generally applicable to the Class, thereby making appropriate declaratory relief with respect to the Class as a whole.  Specifically, CardConnect continues to knowingly overbill the Class and to enforce unconscionable or otherwise unenforceable contractual provisions.  Class-wide declaratory relief is appropriate to put an end to these illicit practices.

<u>**REQUESTS FOR RELIEF**</u>

<u>**COUNT ONE**</u>
<u>**DECLARATORY RELIEF**</u>
<u>**NO BINDING CONTRACT EXISTS**</u>

90.     Plaintiffs repeat paragraphs 1 through 89 above.

91.     Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

92.     Defendant has established a system through which it obtains merchant signatures on its form Applications but it does not itself sign (or have Wells Fargo or other bank as applicable

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

sign) the contract. However, because the Application, Program Guide, and incorporated rules of the card associations require CardConnect and its member bank to both sign the Application before a contract can "take effect," no contractual relationship is ever actually formed between the parties. *E.g.*, *Franklin Interiors v. Wall of Fame Management Co.*, 511 A.2d 761, 762 (Pa. 1986) (if effectiveness of contract is "expressly conditioned upon the written approval" of a party and that party never signs, no enforceable contract exists).

93.   The Court should declare that there is no binding, enforceable contract between CardConnect, on the one hand, and Plaintiffs and the Class members, on the other hand.

94.   The Court should also declare that Plaintiffs and the Class members have not waived any rights to rely on the signature requirement. Further, for Class members who still process transactions through CardConnect, the Court should declare that CardConnect and Wells Fargo (or other bank as applicable) cannot now sign such contracts in an effort to make them effective.

95.   Judicial declarations in this regard are necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to one another.

**COUNT TWO**
**UNJUST ENRICHMENT**

96.   Plaintiffs repeat paragraphs 1 through 89 above.

97.   Plaintiffs assert a common law claim for unjust enrichment. Given the parties do not have an enforceable contractual relationship, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees for merchant services.

98.   As alleged herein, Plaintiffs and the Class members have conferred benefits on Defendant in the form of monies, and Defendant has appreciated such benefits.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

99.     However, acceptance and retention of such benefits would be unjust under these circumstances.   Specifically, CardConnect and Plaintiffs and the Class members expressly negotiated the amount of fees CardConnect would charge for merchant services, yet CardConnect rountinely charged and seized more than such amounts.  CardConnect did so, not because its costs increased, but merely to enrich itself at the expense of Plaintiffs and the Class members.

100.    CardConnect seized such excessive amounts from the bank accounts of Plaintiffs and the Class members before it even provided them with billing statements itemizing the overcharges.

101.    CardConnect also refuses to allow Plaintiffs and the members of the Class to avoid such overcharges unless they pay large early termination fees, which typically exceed the amounts of the overcharges.

102.    It would be unjust, inequitable, and unconscionable under these circumstances for CardConnect to retain all amounts it has received from Plaintiffs and the Class that exceed the agreed-upon charges.

103.    Plaintiffs and the other Class members are entitled to seek and do seek restitution from Defendant as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendant by virtue of its wrongful conduct.

## COUNT THREE
## BREACH OF CONTRACT INCLUDING BREACH OF THE COVENANT
## OF GOOD FAITH AND FAIR DEALING

104.    Plaintiffs repeat paragraphs 1 through 89 above.

105.    This claim is brought in the alternative to Counts One and Two, *supra*.  In the event the contract is found to be binding, the actions taken by CardConnect have materially violated the specific terms of such contracts.  Further, Defendant has breached the contract by violating the

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

covenant of good faith and fair dealing.  CardConnect is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

106.    CardConnect violated the contract by assessing improper charges not provided for in the contract, to include improperly inflated charges, additional fees not even mentioned in the contract, charges for worthless services and charges which should have been waived, and by unilaterally marking up agreed-upon fees and charges without legal basis and without proper notice.  Thus, CardConnect has materially breached the express terms of its own form contract.

107.    Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts, or those obligations have been waived by CardConnect.

108.    Plaintiffs and members of the Class sustained damages as a result of CardConnect's breaches of contract.

109.    Given the contract's stipulation that Pennsylvania law applies, the elements of breach of contract are identical for all members of the Class.

110.    Pennsylvania law also imposes upon each party to a contract the duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

111.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

112.    By charging fees that are inconsistent with those laid out in the contract, including but not limited to, increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, CardConnect has violated the spirit of the contract and breached the covenant of good faith and fair dealing.  Even if CardConnect believed that it had given itself contractual discretion to increase markups and fees, or add new fees, such discretion is constrained by good faith and fair dealing under Pennsylvania law and Defendant's actions do not comport with this duty.

113.    Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract.  There is no excuse or defense for CardConnect's conduct under Pennsylvania law.

114.    Plaintiffs and members of the Class sustained damages as a result of CardConnect's direct breaches of the contract and Defendant's breaches of the covenant of good faith and fair dealing.  As such, all elements for a successful claim under Pennsylvania law have been satisfied.

<u>**COUNT FOUR**</u>
<u>**DECLARATORY RELIEF**</u>
<u>**INVALIDITY OF CERTAIN CONTRACT TERMS**</u>

115.    Plaintiffs repeat paragraphs 1 through 89 above.

116.    This Count is brought in the alternative to Counts One and Two, *supra*.  If the Court determines that no effective contract was formed pursuant to Count One, it will not need to address this Count.

117.    Class-wide declaratory relief is appropriate where a Defendant has "acted or refused to act on grounds that apply generally to the class."

118.    Defendant has increased agreed-upon fees and rates and attempted to immunize itself from liability for its practices by burying provisions in the adhesive contract that purport to

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

make it virtually impossible for merchants to obtain relief from Defendant's overbilling practices. These provisions include but are not limited to the following sections of the Program Guide:  19.4, 19.5, 19.10, 21.4, 21.5, 22.3, 24.2, 34.3, and 35.7.

119.    Such provisions should be deemed unenforceable on multiple grounds.

120.    For example, those provisions which give CardConnect unlimited discretion to make changes or amendments to the contract for any reason or no reason at all (*e.g.*, Program Guide, §§ 19.4, 19.5, 35.7) render the contract illusory and lacking in mutuality.

121.    Moreover, these provisions and all others which Defendant has imposed to exculpate itself from liability are procedurally and substantively unconscionable.

122.    Such provisions are procedurally unconscionable because Defendant is a publicly-traded company worth hundreds of millions of dollars and Plaintiffs and the Class members are small businesses and individual guarantors.  Plaintiffs and the Class members must accept debit and credit cards to make their businesses competitive in the marketplace and thus require merchant services.  They are thus at the mercy of companies such as Defendant that provide such services.  Indeed, as Defendant has acknowledged in its motion to dismiss the *Kao* case, such one-sided exculpatory clauses are "common" and "standard" in the industry (*see Kao*, Dkt. No. 11, p. 22), thus proving that Plaintiffs and the Class members lack any meaningful way to avoid them.

123.    Moreover, these take-it-or-leave-it provisions are buried in the Program Guide which consists of small, non-descript font occupying ***44 single-spaced pages***.  The subject provisions are set forth in thick, densely-worded paragraphs and are not prominently distinguished in any manner from other contractual terms.  *Id.*  To say, the provisions at issue are inconspicuous and difficult to comprehend is an understatement.  Indeed, the manner in which the clauses were

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

formatted and presented to Plaintiffs and the Class members has the effect of garnering no attention.

124. Moreover, the provisions are also substantively unconscionable because they are unreasonably favorable to CardConnect. Indeed, because the provisions are included within the adhesive Program Guide, which by its own terms was not negotiable, substantive unconscionability is clear.

125. Thus, a judicial declaration is necessary and appropriate so the parties may ascertain their rights, duties, and obligations with respect to these provisions.

126. The Court should use its equitable powers to declare these provisions to be unenforceable and enjoin their enforcement.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, demand a jury trial on all claims so triable and judgment:

1. Certifying this case as a class action pursuant to Federal Rule 23;

2. Awarding declaratory relief as requested herein;

3. Awarding restitution of all improper fees and charges paid to Defendant by Plaintiffs and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

4. Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

5. Awarding actual damages in an amount according to proof;

6. Awarding compensatory, general, nominal, and punitive and exemplary damages, as allowed by law;

7. Awarding pre-judgment interest at the maximum rate permitted by applicable law;

Electronically Filed - Jackson - Kansas City - July 30, 2019 - 10:15 AM

8.     Reimbursing all costs and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

9.     Awarding such other relief as this Court deems just and proper.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury to the fullest extent permitted by law.

**Respectfully submitted,**

Dated: <u>September 7, 2017</u>

/s/ KJG2445
Richard M. Golomb, Esquire
Kenneth J. Grunfeld, Esquire
~~GOLOMB & HONIK, P.C.~~
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
Fax:     (215) 985-4169
Email: rgolomb@golombhonik.com
          kgrunfeld@golombhonik.com

E. Adam Webb, Esquire
Matthew C. Klase, Esquire
(*Pro Hac Vice* to be filed)
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, SE, Suite 480
Atlanta, Georgia 30339
Phone: (770) 444-0773
Fax:     (770) 217-9950
Email: Adam@WebbLLC.com
          Matt@WebbLLC.com

*Attorneys for Plaintiffs*

27